UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – –X
                                     :

HUMAN SERVICES COUNCIL OF NEW YORK  :
                                     :

               Plaintiff,        :

                                     :

     versus                  :       **COMPLAINT**

The CITY OF NEW YORK,         :

              Defendant.     :

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

       Plaintiff Human Services Council of New York ("HSC"), by its undersigned attorneys, for its Complaint, alleges as follows:

       1.        This lawsuit challenges New York City Local Law 87 of 2021 ("Local Law 87" or the "Statute"), which Mayor Bill de Blasio ("de Blasio") signed into law in late 2021, after City Council Speaker Corey Johnson ("Johnson"), obtained its passage in the New York City Council.  While Johnson and de Blasio tout the new law as an instrument to promote union neutrality and "labor peace" for the not-for-profit organizations that provide social services to New Yorkers, it has nothing to do with neutrality or peace.  Local Law 87 cedes control over the City of New York's social services to union leaders, period.  The new law is a ticking time bomb that Johnson and de Blasio have left for Mayor-elect Eric Adams, which will only harm communities still reeling from the pandemic and slow down the contract registration process.

       2.        Through this Complaint, Plaintiff Human Services Council ("HSC") – the umbrella organization that represents the bulk of the City's human services providers – seeks to strike down Local Law 87, which, among other things, is clearly preempted by federal law, the National Labor Relations Act ("NLRA").   HSC is requesting injunctive and declaratory relief.

3.     Local Law 87 places New York's communities at great risk.  It allows union leaders to decide which social service organizations will receive the government funds they need to help those in crisis, and it places the power to cut off critical services into the hands of union officials, beyond the control of the City officials elected to make those decisions.

4.     HSC is pro-worker; it is not anti-union.  HSC has a long history of advocating for fair pay for the human services workers who serve at the front lines around the City.  Most recently, HSC launched its "Just Pay" campaign which seeks to persuade the City to implement a $21 floor for human services workers, with fully-funded and enforced cost of living increases.  For years, HSC has pressed for fully-funded, living wages for the workers employed by its members; it is the City that has failed to provide the funds to ensure that those workers can be compensated.  HSC's opposition to Local Law 87 is in furtherance of its advocacy for human services workers:  Local Law 87 places human service workers, and their clients, at risk, and it does nothing to promote their working conditions.

5.     Local Law 87 became effective on November 16, 2021, and only applies to City contracts involving human services.  It regulates organizations such as HSC's members, *i.e.*, not-for-profit organizations that provide residents of New York City ("New Yorkers") with access to childcare, elder care, housing and shelter assistance, food pantries, mental health counseling, and disaster relief.

6.     While the Defendant, the City of New York, may claim that the Statute was designed to ensure the uninterrupted flow of human services by human services contractors with the City, the language of Local Law 87 belies that.  The words of Local Law 87, and its history, make clear that service continuity is not its goal, and will not be its end.  Local Law 87 gives unions unwonted and almost complete power over whether City contracts for human services

2

have been breached.

7.        It is clear that Local Law 87 was designed to shift power to union leaders. Indeed, the labor union, District Council, 37 has said that it was "deeply involved" in "drafting" the Statute.  *See* District Council 37 Press Release, dated August 18, 2021, at <https://www.dc37.net/news/newsreleases/2021/nr8_18>.

8.        City officials at the center of the enactment of Local Law 87 confirmed this. De Blasio said that he signed Local Law to make New York City "a union town."  *Id.*

9.        Most importantly, the words of Local Law 87 itself demonstrate that it was designed to shift powers to union leaders relative to the City (and employers). The Statute grants de facto veto power to union leaders over City contracts, by requiring human services contractors with City agencies (sometimes "the City" or "government") to obtain signatures from unions on attestations that the Statute now requires as  a condition of doing business with the City.  Local Law 87 also has spillover effects on labor that may arise out of a contractors' *non-City* contracts. It is unlawful and should be enjoined.

10.       Most egregiously, Local Law 87 also interferes with workers' rights, guaranteed in Article 7 of the NLRA, to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection," which includes the right to strike.  Local Law 87 punishes contractors and subcontractors that do not secure labor agreements that require workers "to refrain from actions intended to or having the effect of interrupting" services.  Local Law 87/NYC Administrative Code 6-145(a) (subpart 1. of definition of  "Labor Peace Agreement").  Local Law 87's directive thus implicates, and interferes with, the workers' NLRA-protected right to engage in "concerted activities."  Under the Statute, workers do not need to be consulted before a union leader can negotiate away their rights in a labor peace

agreement.

## THE PARTIES

11.     Plaintiff HSC is a non-profit business association organized and existing under the laws of the State of New York and having its principal place of business at 130 East 59th Street, New York, New York.  HSC includes 170 employer members who employ hundreds of thousands of employees in the New York City area. HSC exists to assist its member employers in their labor relations (along with other issues) through informational meetings, community and public relations, political action, and advocacy.  HSC also exists to protect its member employers and the New York City-area business community against legislative and administrative actions that violate their rights under federal labor laws and the United States Constitution.  This assistance and protection is directly germane to the purpose of HSC.

12.     HSC's member employers include contractors who provide care or treatment services under contracts with New York City.  HSC members constitute a diverse network of human services organizations. HSC members' workforce includes more than 200,000 employees in areas like providing access to housing, childcare, elder care, homeless shelters, food pantries, mental health counseling, and disaster response.  These providers deliver services to an estimated 2.5 million New Yorkers annually.  They train their employees and help keep workers in good jobs.  They provide early childhood education and after-school programs, run food pantries, respond to emergencies and natural disasters, provide mental health counseling, shelter homeless people, and care for the elderly, among many other community services.  HSC members contract for a significant part of the approximately $6 billion in City human services contracts, and range in size from small community-based organizations to large Citywide organizations that employ hundreds and serve tens of thousands of New Yorkers each day.

13.     HSC has a long history of advocating for increased pay for human services

workers.  In October 2021, HSC launched its "Just Pay" campaign, which seeks to persuade the City and State to implement the following three reforms to improve pay among human services workers:  (i) "[e]stablish, fund, and enforce an automatic annual cost-of-living adjustment (COLA) on all human services contracts," (ii) "[s]et a living wage floor of no less than $21 an hour for all City and State funded human services workers," and (iii) "[c]reate, fund, and incorporate a comprehensive wage and benefit schedule for government contracted human services workers comparable to the salaries made by City and State employees in the same field."  *See* < https://www.justpayny.org>.  In mid-2021, HSC issued a report regarding the effect of the Coronavirus pandemic on human services workers, and concluded "[g]overnment must commit to paying equitable wages to contracted human services workers," by "enact[ing] a comprehensive plan to raise the wages of the sector to be commensurate with wages of government employees."  *See* HSC website, at <https://humanservicescouncil.ftlbcdn.net/wp-content/uploads/2021/06/HSC-Taskforce-Report-Essential-or-Expendable-How-Human-Services-Support-Communities-Through-COVID-19.pdf>.  In March 2017, HSC issued a report which noted that "[m]ost State human services contracts have not been adjusted for rising costs in many years," and that the human services "workforce has borne the brunt of the State's funding failure."  The report concluded that "[l]abor compensation in human services contracts should begin to reflect the education, experience, skills and commitment of this predominantly female workforce." *See* HSC website, at <https://humanservicescouncil.ftlbcdn.net/wp-content/uploads/Initiatives/RestoreOpportunityNow/RONreport.pdf >.  In December 2015, HSC issued a report which advocated for a "government funded $15 per hour minimum wage for human services workers throughout New York State."  *See* HSC website, at <https://humanservicescouncil.ftlbcdn.net/wp-content/uploads/Reports/15andFunding-

Report.pdf>.

14.     Defendant City of New York is a municipality with offices in New York,

New York 10007.  The City is a citizen of New York within the meaning of 28 U.S.C. § 1332.

## JURISDICTION AND VENUE

15.     This action for declaratory and injunctive relief arises under the Declaratory

Judgment Act, 28 U.S.C. Sections 2201 et seq., the National Labor Relations Act ("NLRA"), 29

U.S.C. § 151 et seq., and the First and Fourteenth Amendments of the United States Constitution.

This Court has original jurisdiction pursuant to 28 U.S.C.§§ 1331 and 1343 because HSC's First

and Second Claims for Relief allege violations of 42 U.S.C. § 1983.  More specifically, HSC 's

First Claim for Relief alleges that Local Law 87 violates the First and Fourteenth Amendments

of the United States Constitution.  HSC's Second Claim for Relief alleges that Local Law 87

violates Article VI, Paragraph 2 of the United States Constitution (the "Supremacy Clause")

because the Statute is preempted by the NLRA.

16.     This Court also has supplemental jurisdiction over state law claims under 28

U.S.C. § 1346.

17.     This Court is a proper venue for this action because, among other things, the

Defendant resides in the State in which this district is located, and thus venue is proper under 28

U.S.C. § 1391(a)(2).

## BACKGROUND

### A.  The City Contracts with Not-for-Profit Organizations for Human Services

18.     Nonprofit human services providers (sometimes "nonprofits") have long

been a backbone of both the economic and social fabric of New York City, combining

government resources with private giving and philanthropy to deliver services to over 2.5 million

New Yorkers each year.  These providers are both essential partners to City government—

contracted to provide mandated services like homeless shelter, in addition to key programs like childcare, afterschool programs, food pantries, and mental health services—and also independent organizations that can and do react quickly to changing needs in their communities and engage in rapid response to ensure children and families have their needs met.

19.     New York City contracts with human services organizations for approximately $6 billion in services each year, and many of the organizations they contract with have operating budgets that are funded predominately through government contracts.  Because of this, the City plays a comprehensive role in setting the wages and benefits for City-contracted human services workers.  Salaries or rates of service are often set in Requests For Proposals ("RFPs") issued by the City, and those salary levels limit the independence of organizations that are heavily City-funded to set salaries at different rates.  In fact, in the past, HSC members have had budgets rejected by the City if they set *higher* salaries, even if this is within the limits of the provider's budget or funded with private dollars.

20.     The City's contracts rarely cover the full costs of human services programs, and certainly do not do so upfront because of constant delays in contracting and payment.  In addition, with increased expenses in providing additional services during the Coronavirus pandemic, human services nonprofits face cash flow problems as well as chronic underfunding. This has been a significant, nagging issue because most human services contract reimbursement rates have not been adjusted to reflect rising costs in New York, leaving budget holes that private philanthropy cannot fill.  Even after the City asks not-for-profit organizations to begin serving clients, delays in contracting and payments force providers to take out loans or lines of credit to make payroll and rent payments, and continue to deliver services. These loans or lines of credit often amass interest that is not reimbursed by government contracts.  A survey of HSC's

members showed that nearly 46 percent were forced to take out loans or draw on lines of credit due to withheld or delayed government payments, at an average annual cost of $223,000 per organization. This puts providers at risk of insolvency as they struggle to borrow to make rent and pay salaries, and it saps the resources they need for programming, strategic planning, and workforce compensation.

21.     The City's contracting practices have undermined the human service providers' efforts to pay competitive wages to their workers.  The City either directly sets reimbursable salary rates for human services workers working on City contracts or sets those salary rates indirectly by limiting the reimbursement rate for a unit of service while simultaneously dictating, in City contracts, the required staffing.  The City's contracting practices have led to extreme pay disparities where human services workers make on average 71% of what City employees make, and 82% of what private sector workers receive.

22.     HSC estimates that about half of its members have some unionized workers. Nonprofits' workers are unionized through a variety of organizations, including District Council 37 and 1199SEIU.  HSC is not anti-union, and its members routinely partner with unions on common issues and advocacy campaigns.  However, since the City's budgetary position has a larger impact on the salaries of human service employees engaged on City contracts, unionization does not improve their working conditions.  Unionized employees working on City human services contracts generally do not have higher salaries than their non-unionized counterparts, and when union dues are accounted for, their net incomes may be lower.

**B.  Union Leaders Drafted Local Law 87 to Control the Human Services Contracts**

23.     On or about March 9, 2021, New York City Council Speaker Corey Johnson announced his candidacy for Comptroller of the City of New York.  Johnson sought the

endorsement of District Council 37, New York City's largest public employee union, in connection with his candidacy, and he obtained that endorsement on or about March 25, 2021.

24.      On April 22, 2021, Johnson introduced bill "Int 2252-2021," which ultimately became Local Law 87.  District Council 37 was "deeply involved in drafting" the legislation.  *See* District Council 37 Press Release, dated August 18, 2021, at < https://www.dc37.net/news/newsreleases/2021/nr8_18> ("District Council 37 Press Release").

25.      Bill Int 2252-2021 was passed into law on August 18, 2021, and was designated as New York City Local Law 2021/087.  Local Law 87 amends the administrative code of New York City by adding a new section 6-145, which is captioned "Labor peace agreements for human services contracts."  The Statute became effective on November 16, 2021.

26.      Johnson, the main sponsor of Local Law 87, did not identify any historic work stoppages that needed to be avoided in the future, and did not suggest that the law would somehow promote a continuity of services for New York's communities.  Instead, he said that the law would "give over 200,000 of our City's essential human service workers the right to organize for the pay and benefits they deserve."  Similarly, de Blasio, who signed Local Law 87, said that it would ensure that New York City is "a union town."  *Id.*

C.  **Local Law 87's Union Leader Signature Requirements**

27.      Local Law 87 inserts union leaders into the City government contracting procurement process by requiring New York City human services contractors and subcontractors to submit attestations—signed by a union leader—to the City in connection with every City contract and subcontract.

28.      The Statute contains a set of definitions of some of the terms used in its operative provisions.  As relevant here, Local 87 defines a "City service contract" as an

9

agreement between a City agency and any person when "the principal purpose of such agreement is to provide human services." A "[c]overed employer" is "a city service contractor or city service subcontractor." A "[c]overed employee" is "an employee of a covered employer who renders human services in the performance of a city service contract[.]" It defines "Human Services" as "social services contracted for by a [City] agency on behalf of third party clients including but not limited to day care, foster care, homes care, health or medical services, housing and shelter assistance, preventive services, youth services, the operation of senior centers, employment training and assistance, vocational and educational programs, legal services and recreation programs." Local Law 87/NYC Administrative Code 6-145(a).

29.     Under Local 87, if a labor organization has "sought to represent" its "covered employees," the City contractor or subcontractor must file an "attestation" with the City "signed by one or more labor organizations, as applicable." The requirement for providing "attestations" signed by labor leaders applies throughout the contract term.

30.     First, the labor leader signature must be obtained within three months of the contract award or renewal, or subcontract approval:

> No later than 90 days after the award or renewal of a city service contract or approval of a city service subcontractor, such covered employer, shall either: (a) *submit an attestation* to the applicable contracting agency, *signed by one or more labor organizations*, as applicable, *stating that the covered employer has entered into one or more labor peace agreements with such labor organizations*, and identify: (i) the classes of covered employees covered by the labor peace agreements, (ii) the classes of covered employees not currently represented by a labor organization and that no labor organization has sought to represent, and (iii) the classes of covered employees for which labor peace agreement negotiations have not yet concluded; *or (b) submit an attestation* to the applicable contracting agency stating that the covered employer's covered employees are not currently represented by a labor organization and *that no labor organization has sought to represent such covered employees*.

> Local Law 87/NYC Administrative Code 6-145(b)(1) (emphases added).

31.      The labor leader signature must also be obtained, after the first three months, if the labor organization seeks to represent the covered employees thereafter:

> *Where a labor organization seeks to represent the covered employees of a covered employer* after the expiration of the 90-day period following the award date of the city service contract or the approval of a city service subcontractor, and the labor organization has provided notice to the contracting agency and the covered employer regarding such interest, *the covered employer shall then submit an attestation signed by the labor organization to the applicable contracting agency* no later than 90 days after the date of notice *stating that it has entered into a labor peace agreement with such labor organization or that labor peace agreement negotiations have not yet concluded*.

> Local Law 87/NYC Administrative Code 6-145(b)(2) (emphases added).

32.      Under Local Law 87, if a not-for-profit organization providing human services under a contract or subcontract with the City fails to submit an attestation signed by a union leader, it is in "material breach" of the contract, and the not-for-profit can lose its City funding and contract.  Local Law 87/NYC Administrative Code 6-145(e)(2)(a).

33.      The Statute provides that the Mayor or his designee "shall promulgate implementing rules and regulations, as appropriate and consistent with the section[.]" Local Law 87/NYC Administrative Code 6-145(d)(2).  No rules or regulations have been promulgated.

### D.  Local Law 87 Cedes City Power Over its Social Services to Union Leaders

34.      While Johnson and de Blasio characterized Local Law 87 as promoting neutrality and labor peace, it actually puts New Yorkers at risk, subjecting them to disruption in the social services that they depend upon.  In part, this is due to the Statute's requirement that not-for-profit human service providers secure union leaders' signatures on attestations in order to maintain their contracts with the City.

35.      Under Section (b)(1) of the Statute, within 90 days after the award or renewal

of a contract with the City relating to human services, the contractor or subcontractor must submit to the City an attestation *signed by a labor union*, stating that the contractor or subcontractor has entered into a so-called "labor peace agreement" with that union or that negotiations have not concluded.  The Statute says that, if the contractor does not submit the attestation with the union leader's signature, the contractor is in material breach of the employer's contract with the City, which can lead to termination of the contract.  Local Law 87/NYC Administrative Code 6-145(e)(2)(a).  The only circumstance under which a contractor or subcontractor can proceed without a union leader's signature is if the contractor can attest that no union has sought to represent its employees.

36.     Under Section (b)(2) of the Statute, after a City contract has been in force for at least 90 days, at any point thereafter during the life of the contract, any union can approach a contractor or subcontractor and state that it wishes to represent covered employees of that contractor or subcontractor.  The contractor or subcontractor must then submit to the City agency an attestation *signed by the labor union* regarding that it has entered into an agreement with that union or that negotiations have not yet concluded, i.e. that negotiations are underway.  If the contractor or subcontractor fails to submit the attestation within 90 days of being approached by a union, then the contractor is in material breach of their contract with the City.  Local Law 87/NYC Administrative Code 6-145(e)(2)(a).

37.     The Statute's requirement that contractors obtain signatures from union leaders on attestations that are now a condition of doing business with the City gives union leaders effective veto power over City contracts.  Under the Statute, a union leader can unilaterally decide to withhold its signature on an attestation without having to give any reason and without any consequence to the union.  A union leader can misuse this power in any number

of ways to control, or even stop, work on a City contract.  For example:

- A union leader could withhold its signature on an attestation if the union leader simply does not like the contractor that was given the City contract;

- Relatedly, a union leader could withhold its signature on an attestation sought by one contractor in order to induce the City to shift work to another contractor that the union leader favors;

- A union leader could also threaten to withhold its signature on an attestation regarding covered employees as a way to force an employer to allow the union to begin unionizing those parts of the employer's workforce that do not work on City contracts; and

-  A union leader could deploy its signature power to block providers from performing a type of human services work that the union leader maintains should not be privatized, but should instead be handled by City employees.

38.        In addition to misusing the Statute's "union signature" requirement, the union leader could instigate, or threaten to trigger a City investigation of a contractor or subcontractor, by invoking the Statute's enforcement provisions.

39.        The Statute's requirement that an employer obtain a union-signed attestation can also place a not-for-profit organization in impossible situations.  For example:

- A union leader may never respond to a contractor's request for the union to enter into a so-called "labor peace agreement," making it impossible for the contractor to comply with the attestation requirement.

- A contractor's covered employees may vote against joining the union, again making it impossible for the contractor to comply with the attestation

requirement, and with the result that the contractor may lose its City funding, and be forced to lay-off the employees that the Statute purportedly protects.

- A union leader may approach covered employees directly about unionization, without the contractor's knowledge, and the employees may not inform their employer about a contact from the union, causing a contractor to unwittingly be in violation of the attestation requirement.

- A contractor's covered employees, while represented by one union, may be approached by another, competing union. Unless the employees vote to join the new union, it would be impossible for the contractor to attest that negotiations "have not yet concluded," since negotiations will never begin with that second competing union.

Under the Statute, the employer's failure to obtain a union-signed attestation in each of these circumstances is considered a material breach of their contract with the City. Local Law 87/NYC Administrative Code 6-145(e)(2)(a).

40.     As the above examples illustrate, Labor Law 87's union-signature requirement gives union leaders the power to unilaterally place contractors in breach of their contracts with the City. No business or governmental entity, interested in continuity of services being purchased in the market, would provide union leaders with that kind of power, *i.e.,* the power to disrupt City-contracted services.

### E.  Local Law 87 Undermines Workers' Rights to Strike

41.     Local Law 87 also interferes with workers' rights, guaranteed in Article 7 of the NLRA, to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection," which includes the right to strike. Local Law 87 punishes contractors

and subcontractors that do not secure labor agreements that require workers "to refrain from actions intended to or having the effect of interrupting" services.  Local Law 87/NYC Administrative Code 6-145(a) (subpart 1. of definition of  "Labor Peace Agreement").  Local Law 87's directive thus implicates, and interferes with, the workers' NLRA-protected right to engage in "concerted activities."

### F.  Local Law 87's Regulatory Impact Spills Over Into Non-City Work

42.        Local Law 87 will have spill-over effects on non-City contracts.  HSC members include employers that provide human services through City contracts, as well as services funded by the federal government, the state government, and/or private organizations. These not-for-profit organizations employ workers who work on both City projects and on non-City projects.  In some cases, these workers provide human services that are only partially funded by the City, i.e., services that are funded, in part, by the federal government, the state government, and/or private donors.  Thus, through Local Law 87, the City is leveraging its partial funding of human services projects to force unionization of *all* these employees.

43.        Many HSC members include employers who, in addition to providing human services under City contracts, provide privately-funded services to the public.  Since the definition of "covered employee" reaches such employees, its regulatory impacts spill over into the non-City work performed by such employees.  Indeed, even if such an employer were to segregate the part of its workforce that works on City contracts from that part of its workforce performing services outside of a City contract, Local Law 87 would still have spill-over effects, since it gives a union leader the power to withhold its signature on an attestation as leverage to force an employer to allow the union to begin organizing those parts of the employer's workforce that are not working on City projects.

### G.  **Local Law 87 Impairs Existing Contract Rights**

44.     While it would be bad enough if Local Law 87 were purely prospective, it also has retroactive effects.  First, since the City rarely processes its human services contracts on time, virtually all of those contracts, when finalized by the City, are retroactive, meaning that they are registered by the City Comptroller after the contract start date.  City contracts are sometimes registered months, or even years, after their start dates.  As a result, a purportedly-prospective Local Law 87 will be retroactive, in effect.  Second, since Local Law 87, by its terms, reaches "renewals" of pre-existing contracts, it is retroactive.  Generally, the renewal of a City contract is one-sided; the City can renew a contract, and a provider must accept the renewal.  Local Law 87 unlawfully inserts new terms into contracts through their renewal.  Finally, the City has claimed that Local Law 87 will affect contractors identified in the City budget as a recipient of "discretionary funding."  The City has said that, if, due to the City's delays in registering such a contract, it is not registered until after Local Law 87's effective date, then the discretionary funding, earmarked for a contractor before Local Law 87 was even introduced, would be subject to Local Law 87.

### H.  **Recent Implementation of Local Law 87**

45.     The requirements of Local Law 87 became effective on November 16, 2021.  While the statute provides for the Mayor to promulgate rules through the City Administrative Procedure Act, or CAPA, the Mayor has not issued such rules.  Instead, the Mayor has demanded that covered contractors enter into covered contracts without knowing if or when any rules may be promulgated, including rules that may apply to any union agreement for covered employees.  Local Law 87/NYC Administrative Code 6-145(a) (defining "labor peace agreement").

46.     Local Law 87's requirements have been incorporated by reference into the

City's most recent contract offers.  Many of HSC's members and other covered contractors have refused to sign the City's contract offers requiring their compliance with the Statute on the grounds that the Statute is unconstitutional and preempted by federal law.  Contractors continue to insist that any union organizing take place in accordance with the NLRA, under the exclusive jurisdiction of the National Labor Relations Board ("NLRB").

## CLAIMS FOR RELIEF

## FIRST CLAIM

47.        Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 46.

48.        Local Law 87 violates the freedom of speech and freedom of association guarantees bestowed by the First Amendment to the United States Constitution, as applied to the states (and their subdivisions) through the Fourteenth Amendment, in ways that include, but are not limited to: (1) imposing a prior restraint and content-based restrictions on speech; (2) chilling and restricting otherwise protected speech regarding unions and unionization; (3) compelling speech, association with speech, or promotion of speech; (4) requiring City contractors to relinquish their free speech and association rights as a condition of entering into City service contracts; (5) exacting a penalty for the exercise of constitutional rights; and (6) placing economic and administrative burdens on those who exercise constitutional rights.

49.        Local Law 87 violates the Due Process Clause guarantees of the Fourteenth Amendment to the United States Constitution by depriving certain City contractors of their private property rights without due process.  Among other things, the Statute is void for vagueness, was enacted without a lawful public hearing process, and is being implemented without the promulgation of rules contemplated in the Statue.

50.        Local Law 87 violates the Equal Protection Clause guarantees of the

17

Fourteenth Amendment to the United States Constitution in ways that include, but are not limited to: (1) imposing content-based restrictions on speech; (2) creating two different standards of speech, in order to promote speech favoring unions, and in order to limit speech in opposition to unions or unionization; (3) favoring contractors who are willing to give up their rights under the NLRA over those who are not; and (4) requiring City contractors that provide human services to give up statutory and constitutional rights as a condition of entering into City service contracts, while allowing other City contractors to retain and exercise those rights.

51.     By virtue of the foregoing, HSC is entitled to the relief requested herein.

## SECOND CLAIM

52.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 51.

53.     The Supremacy Clause of Article VI of the United States Constitution gives Congress the authority to enact federal legislation preempting state and local laws. In passing the NLRA, Congress has struck a delicate balance between the rights of private employers, employees, and unions involved in efforts to organize employees. Congress also established a comprehensive regulatory scheme to ensure that this balance is maintained and enforced under the exclusive jurisdiction of an expert agency— the NLRB.

54.     Local Law 87 impermissibly conflicts with, regulates, and readjusts the delicate balance of rights Congress struck in the NLRA. It strips employers of rights they have under the NLRA, and deprives the NLRB of its exclusive jurisdiction to determine whether, when, and how union organizing will take place.  Local Law 87 also gives certain powers to unions that they do not possess under the NLRA.  Local Law 87 also conflicts with the NLRA because it requires contracting employers to agree to with unions and union members that they *all* will not engage in "concerted activities for the purpose of collective bargaining or other

mutual aid or protection" that are protected under the NLRA, thereby essentially requiring

employers to interfere with labor actions and thereby violate the NLRA.  Local Law 87 is,

therefore, preempted by the NLRA by virtue of the Supremacy Clause of the United States

Constitution.

55.        By virtue of the foregoing, HSC is entitled to the relief requested herein.

## THIRD CLAIM

56.        Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 55.

57.        The Contracts Clause of Article I, § 10 of the United States Constitution

prohibits any State, city or municipality from passing any law impairing the obligation of

contracts.  The Contracts Clause applies to Defendant City and prohibits it from enacting laws

that substantially impair Plaintiff's members' existing, lawful contracts.  Contracts Clause

violations are actionable under 42 U.S.C. § 1983.

58.        Local Law 87 substantially impairs the contracts of HSC members to provide

human services to the City.  The law permits a non-party to the contract, a union, to render a

contractor in material breach of the contract if the union withholds a signed attestation that is

now required under this law.  The attestation requirement can render a contractor in material

breach of the contract, and jeopardize its ability to obtain payment for services it has provided,

notwithstanding the contractor's actual performance under the contract.  The City cannot show

that Local Law 87 is both reasonable and necessary to the City's purported goal of ensuring the

uninterrupted flow of services by contractors providing human services to the City.

59.        In applying Local law 87 to Plaintiff's members, the City has acted under

color of statute, ordinance, regulation and policy of the municipality.  The City's conduct has

deprived Plaintiff's members of the rights, privileges, and immunities secured by the United

States Constitution and laws of the United States to which Plaintiff's members are legitimately entitled.

60.       By virtue of the foregoing, HSC is entitled to the relief requested herein.

### FOURTH CLAIM

61.       Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 60.

62.       The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the taking of private property for public use, without just compensation. The Takings Clause is applicable to States, cities and municipalities through the Fourteenth Amendment to the United States Constitution. The Takings Clause applies to services rendered for compensation. Takings Clause violations are actionable under 42 U.S.C. § 1983.

63.       Local Law 87 violates the Takings Clause by creating a mechanism for the City to retain services provided by HSC members to the City without paying for those services. Local Law 87 permits a non-party to the contract, a union, to render a contractor in material breach of the contract if the union withholds a signed attestation that is now required under this law. The attestation requirement can render a contractor in material breach of the contract notwithstanding the contractor's actual performance under the contract, and can be used by the City as justification for not paying the contractor for services it has provided.

64.       In applying Local law 87 to Plaintiff's members, the City has acted under color of statute, ordinance, regulation and policy of the municipality. The City's conduct has deprived Plaintiff's members of the rights, privileges, and immunities secured by the United States Constitution and laws of the United States to which Plaintiff's members are legitimately entitled.

65.       By virtue of the foregoing, HSC is entitled to the relief requested herein.

## FIFTH CLAIM

66.        Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 65.

67.        While the Statute is void under federal law, Plaintiff also invokes New York

State and City law with respect to the infirmities, described above, which also render Local Law

87 unlawful.

**WHEREFORE**, HSC requests that the Court: (1) declare that Local Law 87 is

preempted by the NLRA, unconstitutional under the Contracts Clause of Article I, § 10 of the

United States Constitution and the First, Fifth and Fourteenth Amendments thereof, and unlawful

under New York State and City law; (2) preliminarily enjoin Defendant, all of its subdivisions,

and all other persons and entities from enforcing Local Law 87; (3) permanently enjoin

Defendant, all of its subdivisions, and all other persons and entities from enforcing Local Law

87; (4) award HSC its attorney fees pursuant to 42 U.S.C. § 1988; and (5) grant such further

relief as may be just and proper under the circumstances.

Dated:  New York, New York
          December 29, 2021

                                        KOSTELANETZ & FINK, LLP

                                        By:  _____
                                           Claude M. Millman
                                           Caroline Rule
                                           Usman Mohammad
                                           Michelle E. Lee (admission pending)

                                           Seven World Trade Center, 34 Floor
                                           New York, NY  10007
                                           212-808-8100
                                           cmillman@kflaw.com
                                           *Attorneys for Plaintiff*

21