**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HUMAN SERVICES COUNCIL OF NEW YORK, BRONXWORKS, INC., CATHOLIC CHARITIES, DIOCESE OF BROOKLYN, THE CHILDREN'S AID SOCIETY, THE CHILDREN'S VILLAGE, THE FEDCAP GROUP INC., FORESTDALE INC., GREENWICH HOUSE, INC., MOSHOLU MONTEFIORE COMMUNITY CENTER, INC., PUBLIC HEALTH SOLUTIONS, and RISEBORO COMMUNITY PARTNERSHIP INC.,<br><br>        Plaintiffs,<br><br>v.<br><br>THE CITY OF NEW YORK, ERIC ADAMS in his official capacity as the Mayor of the City of New York, and BRAD LANDER in his official capacity as the Comptroller of the City of New York,<br><br>        Defendants,<br><br>and<br><br>DISTRICT COUNCIL 37, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO,<br><br>        Intervenor-Defendant. | Case No. 1:21-cv-11149-PGG<br><br>Judge Paul G. Gardephe<br><br>**DEFENDANT-INTERVENOR'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

ARGUMENT ..................................................................................................................... 2

   I.       Federal labor law does not preempt Local Law 87................................................. 2

        A.   The continuity-of-services agreements required by Local Law 87
              do not violate the LMRA. ....................................................................... 2

        B.   The NLRA does not prevent the City from exercising its proprietary
              interest in minimizing the risk that labor strife will interrupt the
              services it purchases on the private market............................................. 4

             1.     As the Supreme Court held in *Boston Harbor*, a government
                     entity acting as purchaser—not regulator—may require its
                     contractors to execute labor agreements to avoid service
                     disruptions.................................................................................... 4

             2.     Local Law 87 is narrowly tailored to the City's proprietary
                     interest in continuous service. ....................................................... 8

              3.     Local Law 87 does not endow unions with the authority to
                     control City contracting. .............................................................. 11

              4.     Local Law 87's certification requirements are not
                     preempted..................................................................................... 15

              5.     Local Law 87 does not strip labor rights from either workers
                     or their employers. ...................................................................... 16

               6.     The subjective motivations of City officials do not bear on
                     the City's proprietary intent when it enacted Local
                     Law 87. ....................................................................................... 18

   II.      Each of Plaintiffs' constitutional and state-law challenges fail. ......................... 19

CONCLUSION................................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adcock v. Freightliner LLC*,
    550 F.3d 379 (4th Cir. 2008) .................................................................3

*Airline Serv. Providers Ass'n v. Los Angeles World Airports*,
    873 F.3d 1074 (9th Cir. 2017), *cert denied*, 139 S. Ct. 2740 (2019) ............................8, 10, 11

*Bd. of Cnty. Comm'rs v. Umbehr*,
    518 U.S. 668 (1996)...............................................................19

*Bias Yaakov of Spring Valley v. Alloy, Inc.*,
    936 F. Supp. 2d 272 (S.D.N.Y. 2013).......................................................6

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors*,
    507 U.S. 218 (1993)...............................................................4, 5, 7, 8

*Bldg. Indus. Elec. Contractors Ass'n v. City of New York* ("*BIECA*"),
    678 F.3d 184 (2d Cir. 2012)......................................................7, 8, 18

*Cal. Coastal Comm'n v. Granite Rock Co.*,
    480 U.S. 572 (1987).............................................................12

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)............................................................17

*Dana Corp.*,
    356 NLRB 256 (2010) .........................................................6, 17

*Dist. Lodge 26, IAM v. United Techs. Corp.*,
    610 F.3d 44 (2d Cir. 2010)......................................................14

*Filo Foods, LLC v. City of SeaTac*,
    357 P.3d 1040 (Wash. 2015)....................................................16

*Golden State Transit Corp. v. Los Angeles*,
    475 U.S. 608 (1986).............................................................7

*Healthcare Ass'n v. Pataki*,
    471 F.3d 87 (2d Cir. 2006)........................................................8

*HERE Local 217 v. J.P. Morgan Hotel*,
    996 F.2d 561 (2d. Cir. 1993).....................................................17

*HERE Local 57 v. Sage Hosp. Res., LLC*,
    390 F.3d 206 (3d Cir. 2004)....................................................3, 8

*Home Care Ass'n of Am. v. Newsom*,
   525 F. Supp. 3d 1128 (E.D. Cal. 2021), *vacated on other grounds sub nom.*
   *Home Care Ass'n of Am. v. Bonta*, 2022 WL 445522 (9th Cir. Feb. 14, 2022) ......................16

*Hughes Commc'ns Galaxy, Inc. v. United States*,
   271 F.3d 1060 (Fed. Cir. 2001)............................................................................................20

*Knick v. Township of Scott*,
   139 S. Ct. 2162 (2019)..........................................................................................................19

*Local 342 v. Town of Huntington*,
   31 F.3d 1191 (2d Cir. 1994)..................................................................................................20

*Lujan v. G&G Fire Sprinklers, Inc.*,
   532 U.S. 189 (2001)..............................................................................................................21

*Machinists v. Wis. Emp. Rels. Comm'n*,
   427 U.S. 132 (1976)................................................................................................................4

*Macke Co. v. United States*,
   467 F.2d 1323 (Ct. Cl. 1972)................................................................................................14

*Martz v. Inc. Vill. of Valley Stream*,
   22 F.3d 26 (2d Cir. 1994)......................................................................................................20

*Massó-Torrellas v. Municipality of Toa Alta*,
   845 F.3d 461 (1st Cir. 2017)................................................................................................20

*Metcalf Constr. Co., Inc. v. United States*,
   742 F.3d 984 (Fed. Cir. 2014)..............................................................................................14

*Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.*,
   431 F.3d 277 (7th Cir. 2005) .........................................................................................8, 9, 10

*Mulhall v. Unite HERE Local 355*,
   667 F.3d 1211 (11th Cir. 2012), *cert. dismissed*, 571 U.S. 83 (2013)..............................2, 3, 4

*N. Ill. Chapter of Assoc. Builders & Contractors v. Lavin*,
   431 F.3d 1004 (7th Cir. 2006) ..............................................................................................11

*Pacemaker Yacht Co. v. NLRB*,
   663 F.2d 455 (3d Cir. 1981)..................................................................................................17

*Perry & Wallis, Inc. v. United States*,
   427 F.2d 722 (Ct. Cl. 1970) ..................................................................................................15

*Pickering v. Bd. of Educ.*,
   391 U.S. 563 (1968)..............................................................................................................19

*S&D Maint. Co. v. Goldin*,
844 F.2d 962 (2d Cir. 1988)................................................................................20

*Sabri v. United States*,
541 U.S. 600 (2004)............................................................................................12

*San Diego Bldg. Trades Council v. Garmon*,
359 U.S. 236 (1959)..............................................................................................4

*Teague v. Lane*,
489 U.S. 288 (1989)..............................................................................................3

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008)............................................................................................12

*Wis. Dep't of Indus., Lab. & Hum. Rels v. Gould*,
475 U.S. 282 (1986)..................................................................................5, 15, 16

**Statutes**

29 U.S.C. § 186(a) .................................................................................................2

NLRA § 8................................................................................................................7

**Other Authorities**

N.Y.C. Admin. Code § 1-105 ..............................................................................16

N.Y.C. Admin. Code § 6-145 ....................................................................... *passim*

Defendant-Intervenor District Council 37, American Federation of State, County and

Municipal Employees, AFL-CIO ("DC 37"), respectfully submits this memorandum of law in

support of its motion to dismiss Plaintiffs' First Amended Complaint ("Complaint"). Am.

Compl. (ECF No. 76) (Aug. 16, 2022). That lengthy Complaint mounts a series of ambitious—

and ultimately meritless—facial assaults on Local Law 87 of 2021 ("Local Law 87") of the City

of New York ("City").

By enacting Local Law 87, the City sought to ensure that, when it contracts with private

entities to obtain human services—day care, foster care, home care, health services, housing and

shelter assistance, youth services, senior center operations, employment training, and legal

services, to name only a few examples—on behalf of its constituents, those essential services are

delivered without interruption. To that end, Local Law 87 conditions the award of a City human

services contract on executing—or negotiating toward—an agreement between the City's

contractors and certain unions, committing to the uninterrupted delivery of those specific

services that the City has purchased. Plaintiffs allege that the City's pursuit of that proprietary

interest in the uninterrupted delivery of important human services purchased from private

contractors actually "cedes to union leaders control over contracts between the City of New York

and social service providers," claiming that it is preempted by federal labor law, precluded by

various constitutional restrictions, and contrary to unspecified provisions of New York and City

law. Am. Compl. ¶ 1.

The City defeats each of those scattershot attacks in its thorough memorandum of law in

support of its motion to dismiss ("City Memo."). Out of respect for the limited time and

resources of this Court and the parties, DC 37 does not repeat here each of the City's arguments

or its detailed recitation of the background and standard of review. Instead, DC 37 endorses and

adopts those materials in the City's memorandum and adds complementary points to those that the City has already advanced. We focus, in particular, on Plaintiffs' claims that federal labor law preempts Local Law 87, noting that this Court granted DC 37's motion to intervene in this action for the purpose of facilitating the fair adjudication of Plaintiffs' preemption claims. *See* Order 9 (ECF No. 87) (Sept. 29, 2022).

## ARGUMENT

## I.      Federal labor law does not preempt Local Law 87.

HSC claims that Local Law 87 is preempted by both Section 302 of the federal Labor-Management Relations Act ("LMRA") and the National Labor Relations Act ("NLRA"). Both contentions fail as a matter of law.

### A.      The continuity-of-services agreements required by Local Law 87 do not violate the LMRA.

Plaintiffs allege that compliance with Local Law 87 "expose[s] employers to potential federal criminal liability" under Section 302 of the LMRA. Am. Compl. ¶ 162. That provision imposes criminal penalties on employers that provide any "thing of value" to a union that represents or seeks to represent the employer's employees. 29 U.S.C. § 186(a). According to Plaintiffs, an agreement not to interrupt services *to the City* constitutes an impermissible thing of value *to the unions* that represent or seek to represent a human service contractor's employees.

Plaintiffs premise that counterintuitive claim solely on *Mulhall v. Unite HERE Local 355*, 667 F.3d 1211 (11th Cir. 2012), *cert. dismissed*, 571 U.S. 83 (2013)—which they cite in their Complaint, Am. Compl. ¶ 162—but that case provides no support. There, the Eleventh Circuit considered the allegation that an employer—in apparent exchange for a union's financial support for a ballot initiative favorable to the employer's business—agreed to provide the union with certain access to the employer's employees and to remain neutral with respect to the union's

efforts to organize those employees. *See* 667 F.3d at 1213. Even on those facts, the Eleventh

Circuit did *not* suggest that the neutrality agreement was facially invalid—a conclusion that

would have brought it into conflict with the decisions of at least two other courts of appeals.[1]

Instead, the Eleventh Circuit held that whether such an agreement violated Section 302 turned on

the intentions of the parties, remanding to the district court to evaluate "the reason why" the

specific agreement was executed in that case. *Id.* at 1216. "Employers and unions may set ground

rules for an organizing campaign, even if the employer and union benefit from the agreement.

But innocuous ground rules can become illegal payments if used as valuable consideration in a

scheme to corrupt a union or to extort a benefit from an employer," the Eleventh Circuit

reasoned. *Id.* at 1215.

The *Mulhall* decision thus turned on the question of whether the employer may have

offered a thing of value to corrupt the union. As the City correctly explains in its memorandum,

the agreements required by Local Law 87 are quite unlike the agreement considered in *Mulhall*.

City Memo. 36. We add only that, even if *Mulhall* were authoritative,[2] it would have no

application here, where the government, through Local Law 87, *requires* its contractors to

negotiate toward agreements to ensure continuity of the services for which the City contracts.

---

[1] *See Adcock v. Freightliner LLC*, 550 F.3d 379, 374 (4th Cir. 2008); *HERE Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 219 (3d Cir. 2004).

[2] We trust that Plaintiffs will not repeat the argument, previously asserted in support of their motion for a preliminary injunction, that the Supreme Court supposedly concluded that "*Mulhall* should remain governing law" when it dismissed as improvidently granted its previous grant of certiorari to review that case. Plfs.' Memo. Supp. Mot. Prelim. Injunction 15 (ECF No. 40) (Apr. 8, 2022) (hereafter, "P.I. Mot."). That dismissal was seemingly premised on belated recognition that serious jurisdiction issues would likely prevent the Court from reaching the merits. *Mulhall*, 571 U.S. at 85-86 (Breyer, J., dissenting). In any event, it is axiomatic that the Court's decision not to rule on a case has no precedential value. *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 296 (1989) ("[T]he denial of a writ of certiorari imports no expression of opinion upon the merits of the case." (internal quotation marks omitted)).

There is no question of bribery where these "ground rules for an organizing campaign," *Mulhall*, 667 F.3d at 1215, to the extent they even benefit the union, are demanded by the government.

      **B.**      **The NLRA does not prevent the City from exercising its proprietary interest in minimizing the risk that labor strife will interrupt the services it purchases on the private market.**

As the City correct explains in its memorandum, Local Law 87 merely protects its proprietary interest in ensuring the uninterrupted delivery of human services and thus does not constitute regulation preempted by the NLRA. City Memo. 25-27. That argument derives from the Supreme Court's decision in *Building & Construction Trades Council v. Associated Builders & Contractors* ("*Boston Harbor*"), 507 U.S. 218 (1993), in which the unanimous Supreme Court distinguished between what a state or local government may *not* do as a "regulator" of commerce and what it may instead do as a "proprietor" or "purchaser" of services. We begin by reiterating that basic point, before addressing certain of the arguments that Plaintiffs have previously advanced in this litigation and appear to reiterate in their Complaint.

      **1.**      **As the Supreme Court held in *Boston Harbor*, a government entity acting as purchaser—not regulator—may require its contractors to execute labor agreements to avoid service disruptions.**

In *Boston Harbor*, the Supreme Court considered whether the NLRA preempted a Project Labor Agreement ("PLA") negotiated at the behest of a governmental entity to ensure that a public construction project proceed without interruption due to labor disputes. The First Circuit had held that this PLA requirement was preempted by the NLRA under both *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), and *Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976). *Boston Harbor*, 935 F.2d 345, 360 (1st Cir. 1991) (en banc). The Supreme Court, however, unanimously reversed.

The Court distinguished its earlier holding in *Wisconsin Department of Industry, Labor*

*and Human Relations v. Gould*, which had held preempted a statute debarring from state

contracts any company with three NLRA violations in a five-year period. 475 U.S. 282, 283-84

(1986). The *Boston Harbor* Court explained that *Gould* came to that conclusion because "*in that*

*case*, 'debarment . . . serves plainly as a means of enforcing the NLRA,'" and that "[n]o other

purpose could credibly be ascribed" to the statute other than "deter[ring] labor law violations."

*Boston Harbor*, 507 U.S. at 228 (quoting *Gould*, 475 U.S. at 287). The critical distinction was

whether government was acting as "regulator" or as "purchaser." *Id.* at 229. Although in *Gould*

the state had claimed to be exercising its "spending power rather than its regulatory power," 475

U.S. at 287, *Boston Harbor* explained why *Gould* had rejected that contention—and why *Gould*

did not dictate the outcome of the case before it:

> The conduct at issue in *Gould* was a state agency's attempt to compel conformity
> with the NLRA. Because the statute at issue in *Gould* addressed employer conduct
> unrelated to the employer's performance of contractual obligations to the State, and
> because the State's reason for such conduct was to deter NLRA violations, we
> concluded: "Wisconsin 'simply is not functioning as a private purchaser of
> services,' . . . [and therefore,] for all practical purposes, Wisconsin's debarment
> scheme is tantamount to regulation."

507 U.S. at 228-29 (quoting *Gould*, 475 U.S. at 289) (alterations in original). Noting that a

private purchaser of services could require a project labor agreement similar to the one before it,

the Court concluded that, "[t]o the extent that a private purchaser may choose a contractor based

upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser*

should be permitted to do the same." *Id.* at 231 (emphasis in original).

Here, there can be no question that the City is acting as purchaser rather than regulator in

requiring that its human services contractors agree—or at least negotiate—with labor

organizations that represent or seek to represent their employees to ensure the continuity of the

vital governmental services for which the City is paying, much as private employers will execute

such labor peace agreements to avoid potential disruptions. *See, e.g.*, *Dana Corp.*, 356 NLRB 256, 257 (2010) (describing pre-recognition agreement between union and employer that included a no-strike/no-lockout provision). Indeed, the perceived threat of potential disruption is particularly great here, in light of both Plaintiffs' recognition that the City's human-services industry suffers from substandard employment conditions, Am. Compl. ¶ 115, and the circulation of news articles discussing the possibility of work stoppages within that industry.[3]

The requirements of Local Law 87 are far more modest than the PLA that the Supreme Court approved in *Boston Harbor* and far more directly connected to safeguarding the City's proprietary interest. Much like Local Law 87, the PLA in *Boston Harbor* advanced labor peace by prohibiting conduct—strikes—that would disrupt the project's construction. *Id.* at 221. But it also went much further than that, requiring private contractors to commit to "recognition of [the union] as the exclusive bargaining agent for all craft employees," to ensure that "all employees be subject to union-security provisions compelling them to become union members within seven days of their employment," and to rely on "the primary use of [the union's] hiring halls to supply the project's craft labor force," among other obligations. *Id.* at 221-22. The Court approved each of those requirements—and more—on the grounds that they sought "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id.* at 232.

Likewise, in *Building Industry Electrical Contractors Association v. City of New York*

---

[3] The declaration of Rose Lovaglio-Miller—filed in support of DC 37's proposed opposition to Plaintiffs' motion for a preliminary injunction—collects news coverage of a selection of recent strikes or potential strikes in the regional human services industry. R. Lovaglio-Miller Decl. (ECF No. 47-3) (Apr. 13, 2022). This Court may take judicial notice of the fact that those stories were published. *See, e.g.*, *Bias Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 278 (S.D.N.Y. 2013).

("*BIECA*"), the Second Circuit applied *Boston Harbor* to approve a host of requirements in the City's PLAs that went far beyond mere "no-strike clauses" ensuring labor peace for the duration of the projects. 678 F.3d 184, 186 (2d Cir. 2012). Those PLAs not only required that "the covered projects will be serviced by contractors recognizing . . . [a specific union] as the sole bargaining representatives for all construction workers on PLA-covered projects," but also that those projects would be subject to labor agreements "incorporat[ing] favorable terms for" union members, including use of union hiring halls, contributions to "affiliated union fringe benefit funds," and "standard work rules and hours." *Id.*

In prior briefing, Plaintiffs suggested that *Boston Harbor* and *BIECA* were inapplicable outside the context of PLAs governing construction projects. Plfs.' Reply Supp. Mot. Prelim. Injunction 8 (ECF No. 45) (Apr. 8, 2022). To be sure, in *Boston Harbor*, the Supreme Court buttressed its analysis by recognizing the policy concerns underlying the provisions of NLRA §§ 8(e) and 8(f), which authorize private-sector employers to enter into prehire agreements with union-only subcontracting clauses in the construction industry. *See* 507 U.S. at 230-32. But Plaintiffs were wrong to assert that the distinction between government actions as regulator and as purchaser applied only in that context. That is clear from *Boston Harbor*'s discussion of the prior holding of a non-construction case, *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608 (1986). In *Golden State*, the Court held that a city's attempt to condition renewal of a taxicab franchise upon the settlement of a labor dispute was preempted. As the Court explained in *Boston Harbor*, however, "a very different case would have been presented had the city of Los Angeles purchased taxi services from Golden State in order to transport city employees"—rather than "exercis[ing] . . . its regulatory power of license nonrenewal to restrict Golden State's right to use lawful economic weapons in its dispute with its union." 507 U.S. at 227. "In that situation,

if the strike had produced serious interruptions in the services the city had purchased, the city would not necessarily have been pre-empted from advising Golden State that it would hire another company if the labor dispute were not resolved." *Id.* at 227-28.

It should thus come as no surprise that, consistent with *Boston Harbor*, the Second Circuit and every other court of appeals that has addressed the issue have applied the regulator/purchaser distinction in cases outside the construction industry involving LPAs.[4]

### 2. Local Law 87 is narrowly tailored to the City's proprietary interest in continuous service.

The Second Circuit has recognized the possibility that "a state law . . . with *profound* effects outside of the state's market interest in the transaction would be preempted" by federal labor law. *BIECA*, 678 F.3d at 189 (emphasis added). Such "[e]xtracontractual effect," the Court explained, "is an indicator of regulatory rather than proprietary intent, so a provision that is not 'narrow' may be preempted because of such regulatory intent." *Id.* at 189 n.2. Under this scheme, "'narrow' refers to the range and type of covered conduct," rather than arbitrary criteria, such as "the number of covered projects." *Id.*

Here, Local Law 87 focuses single-mindedly on the City's interest in continuity of

---

[4] *See Healthcare Ass'n v. Pataki*, 471 F.3d 87, 108 (2d Cir. 2006) ("A major limitation on the labor law preemption doctrines is the principle that state conduct will not be preempted if the state's actions are proprietary, rather than regulatory."); *Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1077 (9th Cir. 2017) (holding that the city "in its capacity as proprietor of LAX" could "require businesses at the airport to accept certain contractual conditions aimed at preventing service disruptions"), *cert denied*, 139 S. Ct. 2740 (2019); *Sage Hosp.*, 390 F.3d at 218 (upholding agreement governing operations of hotel because of city's proprietary interest in the success of the hotel project it had financed); *Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.*, 431 F.3d 277, 278 (7th Cir. 2005) ("But if the state is intervening in the labor relations just of firms from which it buys services, and it is doing so in order to reduce the cost or increase the quality of those services rather than to displace the authority of the National Labor Relations Act and the National Labor Relations Board, there is no preemption.").

service, not unrelated conduct. It applies only to "covered employer[s]," who are defined as certain contractors providing services under a "city service contract" that includes as its principal purpose the provision of human services. N.Y.C. Admin. Code § 6-145(a)-(b). It requires only the execution of an agreement—or negotiations towards an agreement—where a labor union either represents or seeks to represent certain "covered employees," *id.* at § 6-145(b)(1)-(2), defined as employees "who directly render[] human services in performance of a city service contract," *id.* at § 6-145(a). And the required agreement need only provide for "the uninterrupted delivery of services to be rendered pursuant to the city service contract and to refrain from actions intended to or having the effect of interrupting such services." *Id.* The City's guidance reinforces the plain language of the statute, explaining that the ordinance is entirely agnostic as to whether covered employers and labor organizations include additional provisions in their agreements. Kane Decl. Ex. 3 (FAQ No. B(3)) ("LPAs *may* also include other terms agreed upon by the parties." (emphasis added)).

Nevertheless, Plaintiffs allege that Local Law 87 has such widespread extracontractual effect that it is preempted by the NLRA. That is so, they assert, because human services contractors sometimes "employ workers who work on both City projects and non-City projects," such as workers who "provide human services that are only partially funded by the City" and also, "in part, by the federal government, the state government, and/or private donors." Am. Compl. ¶ 147. Under those circumstances, Plaintiffs invoked as "directly on point" the Seventh Circuit's decision in *Metropolitan Milwaukee Association of Commerce v. Milwaukee County*, 431 F.3d 277 (7th Cir. 2005), in a prior submission. P.I. Mot. 18. But that case invalidated a county ordinance that, unlike this one, swept far beyond mere continuity of services that the government had purchased on the private market. That decision held preempted a county

ordinance that required certain contractors to execute labor peace agreements containing far more expansive provisions regulating labor relations than the continuity-of-service agreements at issue here, such as anti-coercion and arbitration provisions, and a requirement that employers disclose employee contact information. *See id.* at 278. That holding was based in large part on the "language of the ordinance," under which "most of the agreement itself applies to the employer's other employees—employees who may never work on a County contract—as well as to the work that is not County-related of the employees who do work part of the time on the County contracts." *Id.* at 279 (noting that "all but one of the terms that the agreement must contain apply to 'employees,' . . . rather than just to 'employees of the employer [who are] working within the appropriate bargaining unit,'" even though the ordinance distinguished between those two groups of employees).

Local Law 87 is different. As noted, it applies only to the work of "covered employees," defined as those individuals who "directly render[] human services in performance of a city service contract." N.Y.C. Admin. Code § 6-145(a). And it requires only agreements safeguarding "the uninterrupted delivery of services *to be rendered pursuant to the city service contract*," *id.*, § 6-145(a) (emphasis added), not any other work that those employees may perform, let alone other terms and conditions of such employees' work. Local Law 87 is thus narrowly aimed at ensuring uninterrupted performance of the human services for which the City has contracted; it is not, as in *Metropolitan Milwaukee*, "a pretext to regulate the labor relations of companies that happen, perhaps quite incidentally, to do some County work." 431 F.3d at 282.

In this regard, Local Law 87 is on all-fours with the requirement governing employers at a government-operated airport that the Ninth Circuit upheld in *Airline Service Providers Association v. Los Angeles World Airports*, 873 F.3d 1074 (9th Cir. 2017). There, the Ninth

Circuit considered the government's decision to condition the provision of a license to operate at the airport on an employer's commitment to execute agreements with unions prohibiting certain interruptions to services at the airport. *Id.* at 1077. Distinguishing *Metropolitan Milwaukee*, the court emphasized that the requirement for a labor peace agreement in that case "repeatedly refers to operations at LAX, employees at LAX, and the LAX licensing program specifically." *Id.* at 1083 n.10.[5] The Ninth Circuit thus concluded that the requirement was not preempted. The same is true here, given Local Law 87's exclusive focus on the uninterrupted delivery of the services that the City has purchased.

### 3. Local Law 87 does not endow unions with the authority to control City contracting.

Much of Plaintiffs' Complaint is premised on the extraordinary claim that "Local Law 87 cedes to union leaders control over contracts between the City of New York and social service providers." Am. Compl. ¶ 1. That charge is not grounded in the language of the statute, but instead in speculation about the operation of its attestation requirement. Because Plaintiffs insist that "a union leader can unilaterally decide to withhold the union's signature on an attestation without having to give any reason," they hypothesize that unions can "misuse this power in any number of ways to control, or even stop, work on a City contract." *Id.* at ¶ 141. According to Plaintiffs, a union might exercise that presumed power for any number of nefarious reasons, including that "the union leader simply does not like the contractor"; "to induce the City to shift work to another contractor that the union leader favors"; to give the union leverage "to begin

---

[5] *See also N. Ill. Chapter of Assoc. Builders & Contractors v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2006) (distinguishing *Metropolitan Milwaukee* as "prescribing how employers must handle labor relations in *all aspects* of their business," whereas in the case before it "Illinois is concerned exclusively with how subsidized renewable-fuels projects contract for labor; its condition is *project-specific*" (emphases added)).

unionizing those parts of the employer's workforce that do not work on City contracts"; or to prevent outsourcing of work that "the union leader maintains . . . should instead be handled by City employees." *Id.* Or a contractor may, on Plaintiffs' reading of the statute, be prevented from negotiating an agreement or otherwise find itself in violation of the ordinance because the union "may never respond" to the contractor's request for negotiations; the union's employees may vote against unionization; a union may contact employees about unionization without the contractor's knowledge; or covered employees already "represented by a union . . . may be approached by another, competing union." *Id.* at ¶ 143.

That speculation—that some unions might, on Plaintiffs' reading of Local Law 87, sometimes abuse the ordinance—is reason enough to reject Plaintiffs' facial challenge. To prevail on such a facial challenge, Plaintiffs must establish that there is "no possible set of conditions [that] . . . would not conflict with federal law," not the mere possibility that the statute might, occasionally, be applied in ways that allegedly create such conflict. *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987). That rigorous standard restrains courts from "go[ing] beyond the statute's facial requirements and speculat[ing] about 'hypothetical' or 'imaginary' cases," thereby preventing the "'premature interpretation of statutes on the basis of factually barebones records.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). That caution is particularly appropriate here. After all, Plaintiffs do not allege any facts suggesting that even a single instance of misuse of Local Law 87 has occurred, even though nine months elapsed between the effective date of the ordinance and the filing of their most-recent Complaint.

There is good reason that none of Plaintiffs' fears about the operation of Local Law 87 have come to pass: All of the fanciful scenarios listed in their Complaint are prevented by the

City's implementation of Local Law 87 via its contractual Rider and its published interpretation of those contractual terms, all of which assure contractors that they may rely on their good-faith efforts to comply with the attestation requirement, as the City points out in its memorandum in support of the motion to dismiss. City Memo. 31-32.

> The Rider, in the first place, explicitly spells out the good-faith assumption:

> In evaluating any violation of this section or any other provision of this rider or Admin. Code § 6-145, the city shall consider any relevant conduct of a labor organization, . . . [and] the contractor's good faith efforts to comply with the terms of this rider and Admin. Code § 6-145 . . . . In considering whether the contractor has exercised good faith efforts in attempting to comply with obligations related to the submission of attestations in compliance with this section, the city shall consider the contractor's documented efforts to negotiate with labor organizations.

Kane Decl. Ex. 1 (Rider, § 4(D)). Similarly, the City's guidance explains that it "will consider a City Service Contractor's or City Service Subcontractor's good faith efforts in evaluating whether a Contractor or Subcontractor has complied with the requirements of Local Law 87," and that the contracting agency "will not find the Contractor or Subcontractor to be in breach of contract" if it demonstrates that it "exercised good faith efforts" to negotiate an LPA and secure the appropriate attestation but was nonetheless unsuccessful—for example because of the union's refusal to sign an attestation or its failure to respond to the contractor's attempts to initiate negotiations toward an LPA. Kane Decl. Ex. 3 (FAQ No. C(13)).

The remaining scenarios that Plaintiffs fear are equally implausible and addressed by the City's Rider and guidance. Thus, with respect to Plaintiff's concern that the employees of a contractor would make it impossible to execute an LPA if they voted against union representation, the guidance make clear that "Local Law 87 does not affect whether or not a covered employer is legally obligated to bargain collectively with a labor organization." Kane Decl. Ex. 3 (FAQ No. C(10)). The contention that a union might attempt to organize a

contractor's employees without informing the contractor is equally irrelevant: The Rider and accompanying guidance require a union to notify a contractor in writing when the union seeks to represent the contractor's covered employees. Kane Decl. Exs. 1, 3 (Rider § 4(C)(1); FAQ No. C(8)). And both documents clarify that where the contractor's employees are already covered by a collective bargaining agreement with one labor organization, an attempt by a competing union to organize those employees will not trigger the ordinance's attestation requirements. Kane Decl. Exs. 1, 3 (Rider § 4(E); FAQs No. C(12)).

The contractual rider and published guidance both safeguard Plaintiffs from the speculative mischief that they envision. Nonetheless, Plaintiffs cast doubt on the authority of those legal instruments, worrying that they are so unenforceable that the City might seek to weasel out of them. Am. Compl. ¶ 33. But that inchoate objection appears to misunderstand that Local Law 87 is implemented via contractual provisions in the City's agreements with its human services contractors, such as the standardized Rider that the City has published and interpreted via its guidance. *See, e.g.*, N.Y.C. Admin. Code § 6-145(e). The government must act fairly in enforcing those agreements. *See, e.g.*, *Dist. Lodge 26, IAM v. United Techs. Corp.*, 610 F.3d 44, 54 (2d Cir. 2010) ("There is an implied covenant of good faith and fair dealing in every contract."). And when the government publishes its interpretation of the provisions of an agreement before executing the contract, it should come as no surprise that it will be bound by that interpretation.[6]

---

[6] *See, e.g.*, *Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 996 (Fed. Cir. 2014) (holding that a party was entitled to rely on written "pre-bid questions-and-answers for bidders' use," notwithstanding arguably inconsistent language in the formal provisions of the party's contract with the government); *Macke Co. v. United States*, 467 F.2d 1323, 1326 (Ct. Cl. 1972) (even in the context of oral representations interpreting proposed government contracts, "official statements can and should be taken into account in ascertaining the parties' joint understanding"); *Perry & Wallis, Inc. v. United States*, 427 F.2d 722, 725 (Ct. Cl. 1970) ("A

In short, HSC's parade of horribles about union veto power, and its argument that the ordinance is preempted for that reason, are meritless.

### 4.    Local Law 87's certification requirements are not preempted.

Plaintiffs' Complaint also includes occasional allegations worrying over Local Law 87's certification requirement. *See* Am. Compl. ¶¶ 12, 131. That peripheral provision requires contract bidders to submit certifications disclosing any instances during the preceding five years in which the bidder "has been found by a court or government agency to have violated federal, state or local laws regulating labor relations," N.Y.C. Admin. Code § 6-145(c)(1)(c)—including, but certainly not limited to, violations of the NLRA. *See* Kane Decl. Ex. 3 (FAQ No. C(6)). Although Plaintiffs' Complaint does not specify why that modest requirement might bear on Local Law 87's validity, they have argued in prior briefing that the certification provision improperly "seeks to enforce the NLRA," relying on *Gould*, 475 U.S. 282. P.I. Mot. 16.

That decision, however, is readily distinguishable, as we have already noted. In holding Wisconsin's disbarment statute preempted, *see supra* 4-5, the Court applied its longstanding rule that that the NLRA prevents states from "providing their own regulatory or judicial remedies for conduct prohibited . . . by the Act," concluding that the state statute was preempted because it had no purpose other than to "enforce[e] the NLRA" via "a supplemental sanction for violations" of federal labor law. *Id.* at 286-88.

Here, however, Local Law 87 does not prescribe any penalties that would enforce federal labor law with supplemental sanctions. Indeed, City contractors are *already* required to submit information concerning their prior legal violations to the City—as the City's memorandum and

---

party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretation and cannot later claim that it thought something else was meant.").

its recent guidance explains—and compliance with Local Law 87 merely requires a contractor to indicate that it has submitted that information pursuant to its separate obligation. City Memo. 32-33; Kane Decl. Ex. 3 (FAQ No. C(7)). Unlike the Wisconsin statute in *Gould*, Local Law 87 does not exclude repeat violators of federal labor law from City contracts—or, indeed, impose *any* penalty whatsoever upon a contractor that discloses prior violations of federal law. Rather, Local Law 87 requires nothing more than the compilation and submission of information about violations of the law—not limited to NLRA violations—that is already a matter of public record. The ordinance does not impose any consequences for disclosed violations, let alone the *per se* debarment penalty that compelled the outcome in *Gould*. Where, as here, a local statute does not sanction violations of federal labor law, *Gould* has no application.[7]

Of course, if a contractor believes that the City has used the contractor's disclosure of prior NLRA violations to disqualify it from competing for a contract, the contractor could bring an as-applied challenge to that implementation of the law. But there is no ground for Plaintiff's attempt to invalidate Local Law 87's disclosure requirement on its face.[8]

### 5.    Local Law 87 does not strip labor rights from either workers or their employers.

Plaintiffs allege that Local Law 87 deprives workers of their right to strike under the

---

[7] *See Filo Foods, LLC v. City of SeaTac*, 357 P.3d 1040, 1056 (Wash. 2015) (holding *Gould* inapplicable even to local minimum-wage ordinance imposing penalties for violating prohibition on retaliation for exercising rights under that ordinance because those penalties were "not a supplemental sanction appended to the NLRA"). And it should go without saying that the mere disclosure of public information is not preempted. *See Home Care Ass'n of Am. v. Newsom*, 525 F. Supp. 3d 1128, 1137-39 (E.D. Cal. 2021) (refusing to preempt even disclosure of employee lists that would affect the bargaining process), *vacated on other grounds sub nom. Home Care Ass'n of Am. v. Bonta*, 2022 WL 445522 (9th Cir. Feb. 14, 2022).

[8] The arguments in text ought to be dispositive. But in the event the Court should disagree and believe that the disclosure requirement is potentially preempted, the provision codifying that requirement, N.Y.C. Admin. Code § 6-145(c)(1)(c), is readily severable from the remainder of the ordinance, as the City Council has instructed. *See* N.Y.C. Admin. Code § 1-105.

NLRA and "strips employers" of unspecified rights under that same statute. Am. Compl. ¶¶ 146, 161. As we have already noted, however, both the Supreme Court and the Second Circuit have permitted state and local governments to advance their proprietary interests by insisting that contractors execute agreements with their unions precluding work stoppages. *See supra* 6-7. Such voluntary agreements are hardly forbidden by the NLRA; to the contrary, federal labor policy *encourages* unions to execute such agreements in the name of industrial peace.[9] And Local Law 87 merely requires agreements—or negotiations toward an agreement—between "the covered employer and the labor organization and its *members*," N.Y.C. Admin Code § 6-145(a) (emphasis added). It does not encourage agreements that purport to bind "employees" who have not joined the pertinent union. Indeed, unions that have not been granted the authority to serve as exclusive bargaining representatives lack the authority to bind non-members. *See, e.g.*, *HERE Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 566 (2d. Cir. 1993) (although "a union must represent a majority of employees in order to enter a valid collective bargaining agreement," pre-recognition labor-peace agreements remain enforceable).

Plaintiffs also claim that Local Law 87 strips employers of their rights under federal labor law, although they do not elaborate on that conclusory allegation. To the extent they mean to suggest that Local Law 87 deprives employers of their right under the NLRA "to advocate to its workers against unionization"—as they claimed in prior briefing, P.I. Mot. 21—then the plain language of the ordinance rebuts that argument. By its terms, Local Law 87 requires only that the

---

[9] *See, e.g.*, *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 237 (1938) (agreement between employer and union that represented only its members, not all employees in the bargaining unit, advanced statutory policy of preventing labor strife); *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 460 (3d Cir. 1981) ("The waiver of the right to strike over the dispute at issue here violates no principle of labor law and indeed may encourage industrial peace."); *Dana Corp.*, 356 NLRB 256, 259 (2010).

employer accept—or negotiate toward—an agreement that bars it from locking out employees delivering services purchased by the City or other "actions intended to or having the effect of interrupting such services." N.Y.C. Admin. Code § 6-145(a). Nothing in the ordinance prohibits employers from advocating against unions. And nothing in the ordinance requires employers to execute any agreements that would otherwise govern their speech.

**6.    The subjective motivations of City officials do not bear on the City's proprietary intent when it enacted Local Law 87.**

Plaintiffs pepper their Complaint with allegations about the subjective motivations of officials, and even DC 37, when the City enacted Local Law 87, alleging that they "*designed*" the law "to shift power to union leaders." Am. Compl. ¶¶ 6, 124-28, 132. In a hearing held before Plaintiffs filed that revised Complaint, however, this Court explained that, under binding law, "'the subjective motivation of a state actor is irrelevant to preemption analysis, which instead is guided by the objective effects of state action in relation to the federal scheme.'" Hrg. Tr. 17:10-13 (quoting *Legal Aid Soc'y v. City of New York*, 114 F. Supp. 2d 204, 237 (S.D.N.Y. 2000)) (ECF No. 73); *see also id.* at 34:25-35:11. Indeed, in *BIECA*, the Second Circuit affirmed dismissal of a complaint despite the plaintiff's arguments for reversal on the ground that the challenged government conduct "was motivated . . . not by efficiency, but by political cronyism" of a favored union, which raised "an issue of material fact" over the City's motivation that supposedly "rendered dismissal inappropriate." 678 F.3d at 188, 191. Just as the Second Circuit rejected that argument in *BIECA*, this Court was right to reject a parallel argument here. Plaintiffs' repetition of their allegations about subjective motivation in their most recent Complaint should be ignored.

II.     **Each of Plaintiffs' constitutional and state-law challenges fail.**

As noted, the City persuasively dispatches both Plaintiffs' constitutional claims and their claims under unspecified State and City law. We adopt the City's arguments wholeheartedly. Here, we add only a few words on several of those claims for the benefit of the Court.

**A.** As the City explains, Plaintiffs' claims under the First Amendment fail for the simple reason that Local Law 87 neither regulates speech nor mandates the sort of association that the First Amendment forbids. City Memo. 9-13. In the alternative, the City notes that, even if Local Law 87 implicated protected speech in some isolated application, then "Plaintiffs' contractor statuses would mean that their rights are equivalent to those of public employees and can be outweighed by public interests in achieving efficient performance." *Id.* at 10 n.5. We add that this latter argument is supported not merely by commonsense, but also by binding precedent. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673-74 (1996) (holding that government contractors' speech rights are subject to the balancing test for public employees' speech first articulated in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)).

**B.** Plaintiffs' claim under the Takings Clause is premised on the allegation that, if they fail to comply with Local Law 87, the City might, someday, fail to pay them "for services . . . already provided." Am. Compl. ¶ 171. The City demonstrates not only that this claim is wildly speculative, but also that Plaintiffs fail to establish that Local Law 87, by its mere enactment, deprives them of all economically beneficial use of their property, as the Takings Clause requires for regulatory takings. City Memo. 22. We add that Plaintiffs' speculative claim will not ripen until the government actually fails to pay them what they are due on account of Local Law 87. *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2167 (2019) ("A property owner has an actionable Fifth Amendment takings claim when the government takes his property without

19

paying for it."). And if the government ultimately fails to pay what it owes, as Plaintiffs fear, then that conduct "would constitute a simple breach of contract," and would "not become a constitutional violation simply because the contracting party is a municipality." *Massó-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 468 (1st Cir. 2017). If the rule were otherwise, "then nearly all Government contract breaches would give rise to compensation under the Fifth Amendment," making constitutional controversies out of simple commercial disputes. *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

 **C.** As to Plaintiffs' procedural due process claims, the City persuasively establishes that Plaintiffs have failed to identify any protectible property interest because Local Law 87 applies only to human services contracts that contractors elect to execute after the ordinance's effective date. City Memo. 14-17. Even if the law were retroactively applicable, however, Plaintiffs would still fail to identify a constitutionally protected property interest here. To the extent they mean to invoke the specter—summoned in support of their Takings Clause claim, Am. Compl. ¶ 171— that failure to comply with Local Law 87 might result in the City's refusal to pay them for services rendered, that speculation has no place in a facial challenge to Local Law 87's validity. In any case, when it comes to "an ordinary contract," the Second Circuit has cautioned that "[t]he right to payment . . . does not rise to the level of a constitutionally protected property interest." *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 31 (2d Cir. 1994); *accord, e.g.*, *Local 342 v. Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994). That rule recognizes that, "whenever a person contracts with a state, breach by the state can be considered a denial of his entitlement to performance of the contract. If the concept of 'entitlement' were this expansive, federal courts could be asked to examine the procedural fairness of every action by a state alleged to be in breach of its contracts." *S&D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988). In any

event, any constitutionally cognizable interest in payment would "be fully protected by an ordinary breach-of-contract suit." *Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001).

## CONCLUSION

For the reasons stated above and in the City's memorandum, Plaintiffs' Complaint should be dismissed in its entirety.

Dated: October 14, 2022

/s/ Richard F. Griffin, Jr.
Caitlin Kekacs (Bar No. 4999926)
Richard F. Griffin, Jr.*
Leon Dayan*
Joshua A. Segal*
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW, Suite 1000
Washington, DC 20005
Phone: 202-842-2600
Fax: 202-842-1888
ckekacs@bredhoff.com
rgriffin@bredhoff.com
ldayan@bredhoff.com
jsegal@bredhoff.com

Robin I. Roach (RR 1809)
General Counsel
District Council 37, AFSCME, AFL-CIO
125 Barclay Street
New York, New York 10007
(212) 815-1450
rroach@dc37.net

*Counsel for District Council 37*

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I certify that on October 14, 2022, I served via electronic mail a copy of Defendant-

Intervenor's Memorandum of Law in Support of Its Motion to Dismiss the First Amended

Complaint on the following counsel of record:

> Claude M. Millman
> Caroline Rule
> Usman Mohammad
> Michelle E. Lee
> Seven World Trade Center, 34th Floor
> New York, NY 10007
> cmillman@kflaw.com
> umohammad@kflaw.com
> crule@kflaw.com
> mlee@kflaw.com
> *Attorneys for Plaintiff Human Services*
> *Council of New York*
>
> Rachel B. Kane
> Michael S. Adler
> 100 Church Street
> New York, NY 10007
> rakane@law.nyc.gov
> madler@law.nyc.gov
> *Attorneys for Defendants the City of New York,*
> *Mayor Eric Adams, and Comptroller Brad Lander*

Dated: October 14, 2022                                    /s/ Joshua A. Segal
                                                           Joshua A. Segal