UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – –X

HUMAN SERVICES COUNCIL OF NEW YORK, :
BRONXWORKS, INC., CATHOLIC CHARITIES,
DIOCESE OF BROOKLYN, THE CHILDREN'S :
AID SOCIETY, THE CHILDREN'S VILLAGE,
THE FEDCAP GROUP INC., FORESTDALE :
INC., GREENWICH HOUSE, INC., MOSHOLU
MONTEFIORE COMMUNITY CENTER, INC., :
PUBLIC HEALTH SOLUTIONS, RISEBORO
COMMUNITY PARTNERSHIP INC., :

          Plaintiffs, :

v. :

The CITY OF NEW YORK, ERIC ADAMS in his :
official capacity as the Mayor of the City of New
York, and BRAD LANDER in his official capacity :
as the Comptroller of the City of New York,

          :

          Defendants, :

and :

DISTRICT COUNCIL 37, AMERICAN
FEDERATION OF STATE, COUNTY AND :
MUNICIPAL EMPLOYEES, AFL-CIO,

          :

         Intervenor-Defendant. :

          :

– – – – – – – – – – – – – – – – – – – – – – – – – – X

21-cv-11149 (PGG)

**PLAINTIFFS' MEMORANDUM
OF LAW IN OPPOSITION TO
THE CITY DEFENDANTS'
AND THE INTEVENOR-
DEFENDANT'S MOTIONS TO
DISMISS THE AMENDED
COMPLAINT**

Claude M. Millman
Caroline Rule
Usman Mohammad
KOSTELANETZ LLP
Seven World Trade Center, 34th Floor
New York, NY  10007
212-808-8100
*Attorneys for Plaintiffs*

TABLE OF AUTHORITIES ................................................................................................ iv

BACKGROUND ............................................................................................................... 4

    A.   The City's Human Services "Contracts" are *Sui Generis* ................................... 4

    B.   DC37 Drafted Local Law 87 to Control the "Contracts" ................................... 7

    C.   Local Law 87's Union Leader Signature Requirements ..................................... 8

    D.   Local Law 87 Cedes City Power Over its Social Services to Union Leaders ................. 9

    E.   Local Law 87's Regulatory Impact Spills Over Into Non-City Work ........................... 12

    F.   Local Law 87 Impairs Existing Contract Rights ........................................... 13

    G.   Recent Implementation of Local Law 87 ..................................................... 14

ARGUMENT ................................................................................................................... 14

    A.   The Complaint States a Claim for National Labor Relations Act Preemption ............. 14

        1.   The City's Claimed "Market Participation" Is Irrelevant Due to Local Law 87's Spillover Effects ..................................................................................... 15

        2.   In Any Event, the City Is Not Acting as a "Market Participant" .......................... 21

            a.   The City's Conduct Is Not Typical of Similarly-Situated Private Parties ......... 22

            b.   Local Law 87 is Not Narrowly Tailored to Address a Proprietary Problem ...... 24

                i.   The Statutory Language is Regulatory, Not Proprietary ............................. 24

                ii.   The Legislative History Defeats the "Market Participation" Defense ........... 28

        3.   The Cases Relied on by the City in Support of Its "Market Participant" Defense Are Distinguishable ..................................................................................... 30

        4.   Defendants' Other Assertions About Local Law 87 are Meritless .......................... 34

            a.   Local Law 87 Strips Plaintiffs of Rights Protected by the NLRA .................... 34

            b.   Local Law 87 Affords Unions Additional Powers ..................................... 35

            c.   Local Law 87 Interferes with the NLRB's Jurisdiction ............................... 36

    B.   The Complaint States a Claim for Labor Management Relations Act Preemption ....... 37

C.   The Complaint States a Claim for a Violation of Plaintiffs' First Amendment Rights. 39

    1.   The City's Freedom of Speech Cases Are Inapposite ................................................. 43

    2.   The City's Freedom of Association Cases Are Inapposite ........................................ 45

D.   The Complaint States a Claim Under the Contracts Clause of the U.S. Constitution ... 47

    1.   Local Law 87 Creates a Substantial Impairment of Contract .................................... 48

    2.   Local Law 87 *Does Not* Serve a Significant and Legitimate Public Purpose But *Does* Provide a Benefit to Special Interests ....................................................................... 53

CONCLUSION ...................................................................................................................... 55

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*2 Tudor City Place Assocs. v.2 Tudor City Tenants Corp.*, 924 F.2d 1247 (2d Cir. 1991) .......... 55

*Adcock v. Freightliner LLC*, 550 F.3d 369 (4th Cir. 2008) ........................................................... 42

*Airline Services Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074
   (9th Cir. 2017)................................................................................................... 20, 21, 34

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ...................................................... 59

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of
   Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993)............................................ 26, 33, 34

*Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184
   (2d Cir. 2012)............................................................................................... 22, 33, 34

*Brooks v. Raemisch*, 717 Fed. Appx. 766 (10th Cir. 2017) .......................................................... 50

*California v. ARC America Corp.*, 490 U.S. 93 (1989) ................................................................. 15

*Camps Newfound v. Town of Harrison*, 520 U.S. 564 (1997).................................................... 3, 24

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686
   (5th Cir. 1999)........................................................................................... 23, 29, 35

*Carey v. Wolnitzek*, 2012 WL 4597236 (E.D. Ky. Sep. 29, 2012) .............................................. 49

*CF & I Steel v. Bay Area Rapid Transit District*, 2000 WL 1375277 (N.D. Cal. 2000).............. 29

*Chamber of Com. of U.S. v. Brown*, 554 U.S. 60 (2008)................................................... 32, 38, 39

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).............................................. 28

*Community Housing Improvement Prog. v. City of New York*, 492 F. Supp. 3d 33
   (E.D.N.Y. 2020)................................................................................................ 54

*Connecticut State Police Union v. Rovella*, 36 F.4th 54 (2d Cir. 2022)....................................... 54

*Donohue v. Mangano*, 886 F. Supp. 2d 126 (E.D.N.Y. 2012)...................................................... 60

*Donohue v. Paterson*, 715 F. Supp. 2d 306 (N.D.N.Y. 2010) ...................................................... 59

*Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 411 (1983) .............................. 60, 61

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393 (2d Cir. 2013)....................... 33

*George v. Richter*, 2014 WL 1666448 (S.D.N.Y. April 25, 2014)................................................ 37

*Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 (1986) .................................... 40

*Harmon v. Markus*, 412 Fed. App'x 420 (2d Cir. 2011) ............................................................ 55

*Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87 (2d Cir. 2006)............. 17, 34, 35

*Hosp. Emps. Div. of Local 79 v. Mercy-Memorial Hosp. Corp.*, 862 F.2d 606 (6th Cir. 1988) .. 43

*Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC*,
390 F.3d 206 (3d Cir. 2004).................................................................................................. 42

*Hull Corp. v. Hartnett*, 77 N.Y.2d 475, 571 N.E.2d 54, 568 N.Y.S.2d 884 (Ct. App. 1991) ...... 29

*IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 434 (D. Vt. 2009), *rev'd* 630 F.3d 263
(2d Cir. 2010)...................................................................................................................... 48

*In re New York State Corr. Officers & Police Benev. Ass'n, Inc.*, 70 A.D.3d 240, 892 N.Y.S.2d
614 (3d Dept. 2009) ......................................................................................................... 3, 62

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)............................................................. 52

*Legal Aid Society v. City of New York*, 114 F. Supp. 2d. 204 (S.D.N.Y. 2000) ..................... 36, 37

*Linden Lumber Div., Summer & Co. v. N.L.R.B.*, 419 U.S. 301 (1974) ...................................... 40

*Lyng v. Int'l Union*, 485 U.S. 360 (1988) ................................................................................. 52

*Medford v. Eon Labs, Inc.*, 2021 WL 5204035 (D.N.J. Nov. 9, 2021)........................................ 44

*Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021)................................................. 53, 61

*Metro. Milwaukee Ass'n of Com. v. Milwaukee County*, 431 F.3d 277 (7th Cir. 2005) ........ passim

*Metro. Taxicab Bd. of Trade v. City of New York*, 2008 WL 4866021
(S.D.N.Y. Oct. 31, 2008) ..................................................................................................... 25

*Mulhall v. Unite Here Loc. 355*, 667 F.3d 1211 (11th Cir. 2012) ................................... 41, 42, 44

*New Energy Co. of Indiana v. Limbach*, 486 U.S. 269 (1988) .................................................... 24

*New York Bankers Ass'n, Inc. v. City of New York*, 119 F. Supp. 3d 158 (S.D.N.Y. 2015)......... 33

*Roberts v. New York*, 911 F. Supp. 2d 149 (N.D.N.Y. 2012) ..................................................... 54

*Scahill v. District of Columbia*, 909 F.3d 1177 (D.C. Cir. 2018) ................................... 51

*Startzell v. City of Philadelphia*, 553 F.3d 183 (3d Cir. 2008) ..................................... 53

*Sullivan v. Nassau Cty. Interim Finance Authority*, 959 F.3d 54 (2d Cir. 2020) .................. 57, 58

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................ 51

*Unite Here Loc. 355 v. Mulhall*, 571 U.S. 83 (2013) ................................. 42

*United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977) ............................ 61

*Van–Go Transp. Co., Inc. v. New York City Bd. of Educ.*, 53 F. Supp. 2d 278 (E.D.N.Y.1999) ...................................... 32

*White v. Massachusetts Council of Const. Emps., Inc.*, 460 U.S. 204 (1983) .............. 18

*Williams v. Marinelli*, 987 F.3d 188 (2d Cir. 2021) ................................ 43

*Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282 (1986) ............................ 16, 26, 29, 32

*Ziglar v. Abassi*, 137 S. Ct. 1843 (2017) ................................ 43

**Statutes**

LMRA Section 302, codified at 29 U.S.C. § 186 ........................................ 37

Local Law 87 of 2021/NYC Administrative Code § 6-145 ................................... passim

NLRA Section 8, codified at 29 U.S.C. § 158 ........................................ 15

**Constitutional Provisions**

U.S. Const, art VI, cl. 2 (Supremacy Clause) ............................... 1, 3, 15, 55

U.S. Const. amend 1 (First Amendment) ..................................... passim

U.S. Const. art. 1, § 10, cl.1 (Contracts Clause) ...................... 47, 48, 50, 52

**Other Authorities**

Item 15. July 29, 2021 Hearing Transcript of the City Council of the City of New York .......... 31

Item 16. Minutes of the Proceedings for the Stated Meeting of Thursday, July 29, 2021 of the
   City Council of the City of New York ........................................................ 31, 39, 46

NYC DHS Fiscal Manual for 2019 .............................................................................. 18

Plaintiffs[1] respectfully submit this memorandum in opposition to the motions of the City-affiliated defendants[2] (the "City") and intervenor-defendant, District Council 37 ("DC37") (the "City" and "DC37," collectively "Defendants") to dismiss the Amended Complaint (the "Complaint" or "Compl."). The Court should deny the motions.

Plaintiffs include the Human Services Council of New York ("HSC") and ten nonprofits that receive City funding to partially fund social services like homeless services, childcare, and elder care. Compl. ¶ 16. All of the individual nonprofit Plaintiffs,[3] with one exception, belong to HSC, an umbrella organization of approximately 170 nonprofits. *Id.* HSC members employ over 200,000 people and receive a significant part of the City's annual $6 billion in City human services contracts. Compl. ¶¶16-17.

Plaintiffs filed their Complaint seeking to strike down New York City's Local Law 87 of 2021, codified at NYC Administrative Code § 6-145 ("Local Law 87," "LL87" the "Statute," or the "Law"), which, among other deficiencies, is preempted by the Constitution's Supremacy Clause and federal labor relations laws, including the National Labor Relations Act ("NLRA") and the Labor Management Relations Act (the "LMRA" or "Taft Hartley Act").

Local Law 87 places New York's needy communities at risk. By allowing union leaders to decide which social service providers will receive the City funds that provide partial support

---

[1] Human Services Council of New York ("HSC"), BronxWorks, Inc. ("BronxWorks"), Catholic Charities, Diocese of Brooklyn (operating as "Catholic Charities Brooklyn & Queens" or "CCBQ"), the Children's Aid Society ("Children's Aid"), the Children's Village ("Children's Village" or "CV"), the Fedcap Group Inc. ("Fedcap"), Forestdale Inc. ("Forestdale"), Greenwich House, Inc. ("Greenwich House"), Mosholu Montefiore Community Center, Inc. ("MMCC"), Public Health Solutions ("PHS"), and RiseBoro Community Partnership Inc. ("RiseBoro").

[2] The City of New York and the Mayor and Comptroller, in their official capacities.

[3] Referred to herein variously as nonprofits, human services providers, providers, City service contractors, and the like.

1

for those providers' work with City residents in need, the Law places the power to cut off critical services into the hands of union officials, who are beyond the control of the City officials elected to make decisions about which human services providers should receive City contracts.

While Defendants now claim that the Statute was designed to ensure the uninterrupted flow of human services, the language of Local Law 87 belies that goal. The Law's text reveals that its design was to shift power to union leaders.

The Statute grants *de facto* veto power to union leaders over City human services. It does so in part by requiring nonprofit human services providers to obtain signatures from union leaders on "attestations" that the Statute now requires as a condition for City funding, regardless of any union leader's intransigence. LL87 § 6-145(e)(2). In addition, under Local Law 87, it is **mandatory** that the City Comptroller conduct an investigation whenever the Comptroller receives "a verified complaint in writing from an interested party" alleging noncompliance with the Statute's requirements, providing an avenue for any disgruntled union leader or employee to interfere with a nonprofit's City funding. LL87 § 6-145(f)(1). The City separately requires that contractors and prospective contractors disclose "investigations" when seeking City funds and includes records of "investigations" in its City contracting "Caution database." A "Caution" regarding an "investigation" can block a contractor's funding. Compl. ¶ 9. In all these ways, unions may use Local Law 87 to force concessions from Plaintiffs.

It is an approach similar to the one deemed a violation of New York State's government contracting laws. *In re New York State Corr. Officers & Police Benev. Ass'n, Inc.*, 70 A.D.3d 240, 243-44, 892 N.Y.S.2d 614, 617 (3d Dept. 2009) (State may not lawfully agree to "be prevented from entering a contract for health services with [a] bidder unless it obtain[s] [a joint union and government committee's] consent," as it "would constitute an impermissible

delegation of the state's obligations in letting contracts" through a "veto power," "add[ing] another layer to the decision-making process, one not contemplated or provided by the legislatively crafted procurement scheme," such that "the state would be hog-tied, unable to enter any contract" without the committee's approval).  It is also a violation of the Supremacy Clause.

In an attempt to invoke a so-called "market participation" exception to the federal preemption of local law, Defendants awkwardly try to portray the City's partial financial support of social services, such as foster care, homeless services, day care, and senior care, as a form of commercial "market participation" by the City.  It is a comparison so inapt that Chief Justice Rehnquist and Justices Thomas, Ginsburg, and Scalia rejected it years ago, noting that "orphanages, homeless shelters, and refuges for battered women" involve services "far removed from commercial activity and utterly unconnected to any genuine private market." *Camps Newfound v. Town of Harrison*, 520 U.S. 564, 605 (1997) (Scalia, J., dissenting).

Even if Local Law 87 concerned some type of "market participation" by the City, this would not avail Defendants on their motions to dismiss.  At this early stage of this litigation, this Court must accept the Complaint's allegation that the Law has unlawful spillover effects on labor relations that do not arise from City contracts.  *See Metro. Milwaukee Ass'n of Com. v. Milwaukee County*, 431 F.3d 277, 279 (7th Cir. 2005) (overturning summary judgment dismissing challenge to "labor peace" statute given plaintiff's allegation that the "labor peace" agreements required by that statute would "have a spillover effect on labor disputes arising out of the contractors' non-County contracts").  Plaintiffs allege in the Complaint that they employ workers who are **only partially funded by the City**, and that Local Law 87's burdens necessarily spill over on to Plaintiffs' labor relations with respect to those employees' non-City-funded work.  Since these spillover effects cannot be disputed on Defendants' motions to dismiss, the

motions can be denied on that ground alone.

**BACKGROUND**

**A. The City's Human Services "Contracts" are *Sui Generis***

The issues presented by the City's motion to dismiss require an understanding of the human service provider nonprofits' unusual relationship with the City, which is anything but "commercial," and nothing like any private market. "Contracts" between the City and nonprofits that provide human services are completely different from ordinary commercial contracts or even other types of government contracts. Compl. ¶ 117. These differences flow from the fact that the nonprofits literally exist to support the needy and are passionate about the uninterrupted delivery of human services. *Id.* The nonprofits do not care for the needy **because** the City contracts for social services or pays for the delivery of some aspects of their services. *Id.* They serve the needy to fulfill charitable missions – in many cases faith-based charitable missions. *Id.*

The nonprofits' uncapitalistic approach is quite understandable when one considers that many organizations, including faith-based and community-based non-profits, were caring for the needy long before governments, such as the City, began funding safety-nets. Compl. ¶ 117. Indeed, in the eighteenth century, religious and social organizations such as the nonprofits cared for the needy without government contracts and without government funding. *Id.* The settlement house movement of the nineteenth century furthered some of these charitable traditions. *Id.* As governments expanded their social services, they looked to the pre-existing charitable network and offered partial funding to support the charitable work. *Id.*

Eventually, many governments, such as the City, used "contracts" to document their funding grants to human services providers. Compl. ¶ 117. The documents referred to as City human services "contracts," however, are not market-based contracts. *Id.*; *see* Compl. ¶ 116.

For example, the "contracts" are usually "retroactive." Compl. ¶ 117. Most human

4

services contractors start "working" for the City (serving City social services clients) long before a contract is in place (*i.e.*, before a contract is "registered" by the City Comptroller, a prerequisite for any payment or contract implementation), and long before the City is prepared to fund a nonprofit's activities. *Id.* Ordinary businesses would balk at such an arrangement. If the City asks a construction contractor to build a bridge, the contractor will typically wait to begin construction until the government contract is "registered." *Id.* By contrast, the human services providers referenced in Local Law 87 routinely start "working" without legal assurance that the City will pay, and without any contract funds in hand. *Id.*

As a result, the nonprofits that are regulated by Local Law 87 are usually serving the City's needy while still at risk of receiving no City funding. According to the City, if a nonprofit begins "working," after receiving a promise of a "contract" from the City, and no contract is ever "registered," the nonprofit has no legal right to City funds. *Id.*; Compl. ¶ 118.

The City has acknowledged that, when it deals with a nonprofit human services contractor, it is not engaging in a market transaction because, among other things, these nonprofits are mission-driven, not revenue-driven. Compl. ¶ 116. The City admitted at a 2022 press conference that it had "taken advantage of nonprofits" because the City knows that a nonprofit is "going to do the work, that they're going to provide the services for children and their families, ***whether they get paid or not***. And it's a different system for for-profit companies. They're not going to do the work until they get the check." *Id.* (emphasis added).

Even when they are "registered" by the City Comptroller, as required by the City Charter for contract "implementation," the City's "contracts" do not cover the full costs of human services programs. Compl. ¶ 114. As a result, the nonprofits must find other financial sources to make payroll and rent payments, and continue to deliver services for which the City purportedly

"contracts." *Id.*

The City's view of the written "contracts" that the Comptroller "registers" renders them quite different from ordinary commercial arrangements in additional respects. Compl. ¶ 118. The City says that it can terminate these "contracts" "at will" without regard for the nonprofit's lost opportunities, and that it can suspend these "contracts" "indefinitely" without any sort of compensation. *Id.* The City also claims that disputes under them are to be decided by a panel of the City's choosing, individuals paid by the City, that this process is neither judicial nor arbitration, and that the City can seek review of its own subordinates' decisions. *Id.*

Given the history of the nonprofits and their charitable missions, the City has never been concerned that human services delivery will be disrupted by labor unrest. Compl. ¶ 119. The City has long known that the nonprofits have at least two reasons to continue providing services, even in the face of a union organizing drive. *Id.* First, the nonprofits care more about providing their services than about protecting finances (as evidenced by their willingness to deliver services even before the City "registers" contracts). *Id.* Second, once contracts are "registered," the nonprofits are legally obligated to provide services (as the City's "contract" termination rights are one-sided). *Id.*

The City's approach to the nonprofits' worker salaries also departs from "market" practices. While the City does not fully fund (*i.e.*, does not pay for) the services referenced in the City contracts with nonprofits, Compl. ¶ 121, it effectively limits what nonprofits pay many human services workers, Compl. ¶ 113. Human services workers' salaries or rates of service are often set in requests for proposals issued by the City; the City rejects nonprofits' budgets that set salaries higher than deemed appropriate by the City, even if this expense is within the provider's budget or is funded with private dollars. *Id.* These City practices have led to extreme pay

disparities, where human services workers at nonprofits make on average 71% of what City employees make, and 82% of what private sector workers receive.  Compl. ¶ 115.

In this noncapitalistic arrangement, it is the nonprofit ***employers*** that are passionate about the working conditions of their human services employees.  Compl. ¶ 120.  HSC's "Just Pay" campaign is a central feature of its advocacy.  "Just Pay" is a "campaign to fight for pay equity for the essential human services workforce."  *Id.*  Nonprofits human services workers were not paid more because the Mayoral Administration of Bill de Blasio insisted on budgets that undermined the nonprofits' ability to offer higher salaries.  Compl. ¶ 115.

In this odd environment, unions have found it difficult to organize the employees of nonprofits because the unions have little to offer those workers.  Compl. ¶ 115.  Unlike a construction company, which may have greater control over staffing patterns and access to capital, a human services charity cannot increase wages at will.  *Id.*; Compl. ¶ 13.  Unionized employees whose salaries are partially-funded through City human services "contracts" generally do not have higher salaries than their non-unionized counterparts, and when union dues are accounted for, their net incomes may be lower.  Compl. ¶ 123.  As a result, some human services workforces have rejected union organizing efforts as contrary to their own financial interests.  Compl. ¶ 122.

## B.  DC37 Drafted Local Law 87 to Control the "Contracts"

On or about March 9, 2021, New York City Council Speaker Corey Johnson announced his candidacy for Comptroller of the City of New York.  Compl. ¶ 124.  Johnson sought the endorsement of DC37, the City's largest public employee union, and he obtained that endorsement on or about March 25, 2021. *Id.*  On April 22, 2021, Johnson introduced bill "Int 2252-2021," which ultimately became Local Law 87.  Compl. ¶ 125.  DC37 announced that it

was "deeply involved in drafting" the Law.  Compl. ¶ 126.

Local Law 87 was not enacted to prevent any identified or identifiable historic work stoppages (there are none), and so does nothing to promote continuity of human services for New York's needy communities.  Compl. ¶ 128.  Johnson, the Law's main sponsor, did not identify any historic work stoppages that the Law would have prevented, and did not suggest that the Law would somehow promote continuity of services for the City's communities.  *Id.*  Instead, he said that the law would "give over 200,000 of our City's essential human service workers the right to organize for the pay and benefits they deserve"; and former Mayor de Blasio, who signed the Law, said that it would ensure that New York City is "a union town."  *Id.*

Local Law 87 imposes a blanket labor relations policy preventing a broad category of human service providers from exercising their rights under the NLRA.  Compl. ¶ 130.  The Law is not limited to any particular location, is not limited to any specific project, is not limited temporally, and is not predicated on any need to redress a history of service disruptions.  *Id.*

## C.  Local Law 87's Union Leader Signature Requirements

Local Law 87 inserts union leaders into the City government contracting procurement process by requiring New York City human services contractors and subcontractors to submit attestations – signed by a union leader – to the City in connection with every City contract and subcontract.  Compl. ¶ 133.

Local Law 87 defines a "City service contract" as an agreement between a City agency and any person when "the principal purpose of such agreement is to provide human services."  Compl. ¶ 134.  A "[c]overed employer" is defined as "a city service contractor or city service subcontractor."  *Id.*  A "[c]overed employee" is defined as "an employee of a covered employer who renders human services in the performance of a city service contract[.]"  *Id.*  Under these

definitions, if a nonprofit employer has a "contract" or subcontract, through which the City partially funds social services provided by the nonprofit, *any* employee of the nonprofit who spends *any* amount of time rendering a human service covered by the City "contract" is a "covered employee" – even if the City only provides funds for a tiny fraction of that employee's salary, and even if most of that employee's labor is unrelated to the City "contract."

Under Local 87, if a labor organization has "sought to represent" any "covered employee" of one of the nonprofit City contractors or subcontractors, that nonprofit must file an "attestation" with the City "signed by one or more labor organizations, as applicable." Compl. ¶ 135. The requirement for providing "attestations" signed by labor leaders applies throughout the term of the City "contract." *Id.* If a union has approached the nonprofit contractor, the nonprofit must somehow persuade the union leader to sign the attestation confirming that "the covered employer has entered into one or more labor peace agreements with such labor organizations" or that "labor peace agreement negotiations have not yet concluded." Compl. ¶¶ 136-37.

If a nonprofit fails to submit a required attestation signed by a union leader, it is, under Local Law 87, in "material breach" of the contract, and the nonprofit can lose its existing City funding and be deemed "ineligible" for any future contracts. LL87 § 6-145(e)(2)(a); *see* Compl. ¶ 138. Since City human services contracts are retroactive, *see* Background, Point F., below, this usually means that the nonprofit will lose any chance of obtaining funding for the services already rendered. *See* Compl. ¶ 149. The only way that a nonprofit can continue its relationship with the City, without obtaining a union leader's signature, is if the nonprofit can attest that no union has sought to represent any of its employees. Compl. ¶ 138.

**D. Local Law 87 Cedes City Power Over its Social Services to Union Leaders**

Local Law 87 is titled as a Local Law "To amend the administrative code of the city of

New York, in relation to requiring city human services contractors to enter into labor peace agreements." It does not, however, promote labor peace. Compl. ¶ 140. Local Law 87 puts needy New Yorkers at risk, subjecting them to disruption in the social services that they depend upon. *Id.* In part, this is due to Local Law 87's requirement that every nonprofit human services provider secure a union leader's signature on the statutorily-required attestation as a condition to preserving the nonprofit's relationship with the City. *Id.*

The Statute's requirement that nonprofits obtain signatures from union leaders on attestations that are now a condition of receiving City funds, gives union leaders effective veto power over City contracts. Compl. ¶ 141. Under the Statute, a union leader can unilaterally decide to withhold the union's signature on an attestation without having to give any reason and without any consequence to the union. *Id.* A union leader can misuse this power in any number of ways to control, or even stop, work on a City "contract." *Id.* For example:

- A union leader can withhold the union's signature on an attestation if the union leader simply does not like the nonprofit that was awarded the City "contract," *id.*;
- Relatedly, a union leader can withhold signature on an attestation sought by one nonprofit in order to induce the City to shift work to another contractor that the union leader favors, *id.*;
- A union leader may also threaten to withhold its signature on an attestation regarding covered employees as a way to force an employer to allow the union to begin unionizing those parts of the employer's workforce that do not work on City "contracts," *id.*; and
- A union leader may deploy the union's signature power to block providers from performing a type of human services work that the union leader maintains should not be privatized, but should instead be handled by City employees that the union represents, *id.*

In addition to misusing the Statute's "union signature" requirement, a union leader could instigate, or threaten to trigger, a mandatory City Comptroller investigation of a nonprofit contractor or subcontractor, by invoking the Statute's provision that ***requires*** an investigation whenever the Comptroller receives "a verified complaint in writing from an interested party"

10

(which may indeed be a dissatisfied union).  LL87 § 6-145(f)(1); Compl. ¶ 142.  The mere

existence of a pending City investigation may make it difficult or impossible for the nonprofit to

receive City funds.  Compl. ¶ 9.

The Statute's requirement that an employer obtain a union-signed attestation can also

place a nonprofit in various impossible situations. Compl. ¶ 143. For example:

- A union leader may never respond to a nonprofit's request for the union to enter into a so-called "labor peace agreement," making it impossible for the nonprofit to comply with the attestation requirement, *id*.
- A nonprofit's covered employees may vote against joining the union, again making it impossible for the nonprofit to comply with the attestation requirement, and with the result that the nonprofit may lose its City funding, and be forced to lay-off the employees that the Statute purportedly protects, *id*.
- A union leader may approach covered employees directly about unionization, without the contractor's knowledge, and the employees may not inform their employer about a contact from the union, causing a nonprofit to unwittingly be in violation of the attestation requirement, *id*. (The City's recent FAQs[4] purporting to define a union "contact" for purposes of the Law do not resolve this problem, as the FAQs do not have the force or effect of law and are not binding on the City.)
- A nonprofit's covered employees, while represented by one union, may be approached by another, competing union.  Unless the employees vote to join the new union, it will be impossible for the nonprofit to attest that negotiations "have not yet concluded" with the new union, since negotiations will never even begin with that second competing union, *id*.

Yet, under the Statute, a nonprofit employer's failure to obtain a union-signed attestation in each

of these circumstances is considered a material breach of its "contract" with the City.  LL87 § 6-

145(e)(2)(a).

As the above examples illustrate, Local Law 87's union-signature requirement gives

union leaders the power to unilaterally place nonprofits in breach of their "contracts" with the

---

[4] The City's Feb 4, 2022 FAQs ("Feb. 4 FAQs") and March 25, 2022 FAQs ("Mar. 25 FAQs") are attached, respectively, as Exhibits 2 & 3 to the Declaration of Rachel B. Kane in Support of Defendant's [sic] Motion to Dismiss the Amended Complaint. ("Kane Dec.")

City. Compl. ¶ 144. No business or other entity that is truly interested in continuity of services that it purchases in the open market would willingly provide union leaders with that kind of power, *i.e.,* the power to disrupt services. *Id.* The Statute alters and interferes with Plaintiffs' bargaining positions vis-à-vis unions. *Id.*

Significantly, since DC37, which primarily bargains with the City for labor agreements covering City employees, can also function as a "union" under Local Law 87, the Statute also alters the bargaining power between the City and its own unions. Compl. ¶ 145. In effect, through the Statute, the City has given its own unions a gift; a new power, a thing of significant value. *Id.* DC37's leaders can use powers and leverage under Local Law 87 to interfere with the City's decision to "contract out" the provision of human services, rather than rely on City employees, and can position DC37 to disrupt the services of nonprofit human services providers by withholding an attestation or initiating a Comptroller's investigation. *Id.* In this respect, Local Law 87 undermines, alters, and influences the normal bargaining relationship between the City and its own union. *Id.*

**E. Local Law 87's Regulatory Impact Spills Over Into Non-City Work**

Local Law 87 will have spillover effects on non-City contracts and other work by "covered employees" that is not funded by the City. Compl. ¶ 147. Local Law 87's impacts are not limited to activities that are fully-funded by the City. *Id*

Plaintiffs not only provide human services that are the subject of City "contracts," but also provide services funded by the federal government, the state government, and/or private organizations. *Id.* They employ workers who work both on City projects and on non-City projects. *Id.* In some cases, individual workers provide human services that are only partially funded by the City, *i.e.,* services that are funded, in part, by the federal government, the state

government, and/or private donors. *Id.* Local Law 87, however, regulates the work of any employee providing a human service requested by the City, regardless of whether the bulk of that employee's salary comes from a non-City source. *Id.* Accordingly, Local Law 87 leverages the City's partial funding of human services projects to force unionization of ***all*** these employees. *Id.*

Most significantly, the spillover effects reach the non-City work of Plaintiffs' employees who, in addition to providing human services under City "contracts," separately provide privately-funded services to members of the public. Compl. ¶ 148. Indeed, even if an employer were to (or be able to) segregate the part of its workforce that works on City "contracts" from the part of its workforce that performs services outside of a City "contract," Local Law 87 would still have spillover effects, since it gives a union leader the power to withhold the union's signature on an attestation as leverage to force an employer to allow the union to begin organizing those parts of the employer's workforce that are not working on City projects. *Id.*

### F. Local Law 87 Impairs Existing Contract Rights

While it would be bad enough if Local Law 87 were purely prospective, as noted it also has retroactive effects. Compl. ¶ 149. First, since the City rarely processes its human services "contracts" on time, virtually all of those "contracts," when finalized by the City, are retroactive, meaning that they are registered by the City Comptroller after the contract start date. *Id.* City human services "contracts" are sometimes registered months, or even years, after their start dates. *Id.* As a result, a purportedly-prospective Local Law 87 will, in effect, be retroactive. *Id.* Second, since Local Law 87, by its terms, reaches "renewals" of pre-existing "contracts," it is explicitly retroactive. *Id.* Local Law 87 unlawfully inserts new terms into "contracts" due for renewal. *Id.* Finally, the City has claimed that Local Law 87 will affect a nonprofit identified in the City budget as a recipient of "discretionary funding." *Id.* The City has said that, if, due to the

City's delays in registering that nonprofit's "contract," it is not registered until after Local Law 87's effective date, then the discretionary funding, earmarked for that nonprofit before Local Law 87 was even introduced, will be subject to Local Law 87. *Id.*

## G. Recent Implementation of Local Law 87

The requirements of Local Law 87 became effective on November 16, 2021. Compl. ¶ 150. While the Statute provides for the Mayor to promulgate rules through the City Administrative Procedure Act ("CAPA"), the Mayor has not issued such rules. *Id.* Instead, the City has demanded that nonprofits sign "contracts" without knowing if or when any such rules may be promulgated, including rules that may apply to any union agreement for "covered employees," let alone what these rules may provide. *Id.*

Although the City promulgated answers to purported "Frequently Asked Questions" on March 25, 2022 (Mar. 25 FAQs), purportedly to attempt to clarify certain aspects of Local Law 87, those FAQs have only created more confusion among Plaintiffs. Compl. ¶ 151. Many of the FAQs make matters worse, as they further the City's effort to promote unionization of private organizations. *Id.* For example, while Local Law 87 does not say that nonprofit human service providers have to provide union leaders with "access" to the employer's workplace and to confidential "employee contact information," nor to support union leaders' "alternate procedures related to recognizing the labor organization for bargaining purposes," the FAQs suggest that any nonprofit that fails to accede to a union leader's demands for these benefits will be found in breach of its contracts and subjected to investigation or termination of its "contract." *Id.*

## ARGUMENT

## A. The Complaint States a Claim for National Labor Relations Act Preemption

Local Law 87's regulation of Plaintiffs' labor relations is preempted by federal labor law

under the NLRA in violation of the Supremacy Clause and the NLRA. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Therefore, when Congress intends explicitly or implicitly—as in the NLRA— that federal law shall "occupy the field" at issue, local law is preempted. *California v. ARC America Corp.*, 490 U.S. 93, 100 (1989). Federal labor law preemption issues have arisen so frequently that specific preemption doctrines have developed under the NLRA. *Garmon* preemption (*San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959)) preempts local laws that interfere with employers' rights, under NLRA Section 8(a), to meet and confer with employees during their working time about the pros and cons of unionization, 29 U.S.C. § 158(a)(2), and campaign for non-unionization of employees under NLRA Section 8(c), 29 U.S.C. § 158(c). *See* 359 U.S. at 245. *Machinists* preemption (*Lodge 76, Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140 (1976)) precludes local government efforts to regulate or interfere with labor relations matters that Congress intended to leave unregulated by the NLRA and related statutes, and intended instead to be "controlled by the free play of economic forces," 427 U.S. at 140. A municipality cannot circumvent either the *Garmon* or *Machinists* preemption doctrine under the guise of using its spending power as a pretext for regulating labor relations. *Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282 (1986). Local Law 87 is preempted by the NLRA generally, and preempted specifically under the *Machinists* and *Garmon* doctrines.

### 1. The City's Claimed "Market Participation" Is Irrelevant Due to Local Law 87's Spillover Effects

Plaintiffs' allegations concerning Local Law 87's spillover effects warrant the denial of Defendants' motions. Defendants' defense to Plaintiffs' NLRA preemption claim is based on

their (erroneous) premise that the City enacted Local Law 87 to protect the City's purported participation in the private market for human services from the disruptions that, they contend, could arise from labor strife during union organizing campaigns. As discussed in the next section, the text (and legislative history) of Local Law 87 negates any such intent. The Court, however, can deny Defendants' motions without addressing that issue.

As the Seventh Circuit held in the analogous case of *Metro. Milwaukee Ass'n of Com. v. Milwaukee County*, 431 F.3d 277, 279 (7th Cir. 2005), a plaintiff's showing that "labor peace" agreements required by a county statute would "have a spillover effect on labor disputes arising out of the contractors' non-County contracts," 431 F.3d at 279, necessarily defeats a county's "market participation" defense because, even if it is a market participant, a government certainly cannot regulate labor relations unrelated to its market participation., *id.* at 280. ("Even if [the contractor's employee] does some County work, to the extent that [the contractor's employee] does private work as well the ordinance is regulating labor relations arising from activities to which the County is not a party."). Spillover effects are clearly alleged in Plaintiffs' Complaint.

In this case, the concern about spillover effects is not theoretical. Defendants do not (and cannot) claim that Local Law 87 only reaches employees whose salaries are wholly paid for with City dollars. Human service nonprofits like Plaintiffs routinely have employees who work on multiple different projects, only some of which are even partially funded by the City. Compl. ¶¶ 147-48, 52, 67, 74, 77, 81, 85, 88, 93, 97, 101. Plaintiffs allege that they face exactly this circumstance – *i.e.*, they have many employees who devote a portion of their time to projects that are partially funded by the City, while devoting the rest of their time to projects that are not funded by the City at all. (*Id.*) Moreover, it is rare for a City human services contract to be funded exclusively with the City's own funds (as opposed to a mix of federal, state, and/or City

funds) and common for the City to serve as a "paying agent" in such situations (*see* Compl. ¶¶ 31, 147), facts that render any purported "market participant" defense inapplicable. *See Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87, 109 (2d Cir. 2006) (market participant defense is inapplicable when the State is "burdening the employer's use of monies belonging to federal and local governments, but merely passing through the State as paying agent"); *see also White v. Massachusetts Council of Const. Emps., Inc.*, 460 U.S. 204, 214–15 (1983) ("[i]nsofar as the city expended ***only its own funds*** in entering into construction contracts for public projects, it was a market participant") (emphasis added).

In fact, it is so common for providers to have employees who only spend a fraction of their time on City-funded work that City fiscal manuals repeatedly stress that a provider can only charge the City for the percentage of work that the provider's employees devote to the City-funded project, Compl. ¶ 31. *See, e.g.*, NYC DHS Fiscal Manual for 2019 at 29  available at DHS website at https://www1.nyc.gov/assets/dhs/downloads/pdf/dhs-dss-fiscal-manual-2019.pdf (stating that if a provider has employees "dividing a full work-week between several programs, a Provider must determine how much to charge the DHS program on the annual contract budget" by "allocat[ing]" the employee's time).  Thus, for example, if a provider's employee only works 10% on the City-funded project, the fiscal manuals say that the provider may not charge the City for more than 10% of that employee's salary.

This is precisely the kind of spillover effect that the Seventh Circuit deemed fatal in *Metro. Milwaukee Ass'n of Com.*, 431 F.3d at 279.  Even though the City, here, refuses to provide to the nonprofits funds for the applicable percentage of an employee's salary, Local Law 87 mandates that such employees are fully subject to the Law, even in instances where they spend the majority of their time working on projects that receive no City funds whatsoever.

The Seventh Circuit explained the significance of such spillover effects in rejecting the County's "market defense" to the NLRA preemption of a similar "labor peace" law in *Metro Milwaukee*. There, Judge Posner found it significant that the County ordinance that mandated "labor peace" agreements, covering employees who only spent a portion of their time working on county projects, was necessarily causing spillover regulation of labor relations to work that was not funded by the County:

> Any doubt that the agreements have a spillover effect on labor disputes arising out of the contractors' non-County contracts is dispelled by the language of the ordinance. . . . An employee who spends only 10 percent of his time on County business is clearly covered by the . . . [County ordinance] . . . . Even if he does some County work, to the extent that he does private work as well the ordinance is regulating labor relations arising from activities to which the County is not a party.

*Metro. Milwaukee Ass'n*, 431 F.3d at 279.

Defendants try to distinguish *Metro. Milwaukee*, claiming that the ordinance at issue there involved more than just "continuity-of-service agreements," with DC37 asserting that the ordinance in *Metro Milwaukee* also "require[d] that employers disclose employee contact information." (Defendant-Intervenor's Memorandum of Law in Support of its Motion to Dismiss the First Amended Complaint ("DC37 Br.") at 10.) First, that is beside the point since, like the *Metro. Milwaukee* ordinance, Local Law 87, at a minimum, requires labor-related "continuity-of-service" agreements that will apply to labor relations **unrelated to City projects**, and *Metro. Milwaukee* holds that such spillover is unlawful regulation preempted by the NLRA. Second, in its FAQs, the City has suggested that a union leader may insist that a nonprofit, through the "labor peace agreement," disclose "employee contact information" to the union, provide the union with "access" to the employer's "workplace," and agree to "alternate procedures related to recognizing the labor organization for bargaining purposes" (Mar. 25 FAQs

3.B.) – concessions that are even more onerous than those at issue in *Metro Milwaukee*. Third, Local Law 87's other burdens on the nonprofits' non-City-related labor relations (*e.g.,* the union leader attestation requirement and the NLRA violations database, LL87 § 6-145(d)(3)) make the case for NLRA preemption even clearer here.

Defendants' assertion that the Court should look to *Airline Services Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074 (9th Cir. 2017), rather than *Metro. Milwaukee,* is misplaced because, in *Airline Services*, the Ninth Circuit relied on the absence of any "allegation that . . . the licensing provision will have spillover effects" (*Airline Services*, 873 F.3d at 1083), while the Complaint here contains such allegations. *Airline Services* relied on the fact that the provision at issue there was narrowly tailored (in that it was limited to LAX airport) and that the "labor peace agreements" could not have spillover effects outside the airport:

> Here, by contrast, there is no allegation that . . . the licensing provision will have spillover effects on the service providers' operations beyond their work for LAX. Rather, the nature of the businesses at issue—services performed at LAX—by definition allows for natural divisions between work for the City and work for private parties: A job is either performed at LAX or it is not, and a strike or other disruption either occurs at LAX or it does not.

*Airline Services*, 873 F.3d at 1083.

Although the City claims that Plaintiffs' allegations about the spillover effect should be rejected because (i) Local Law 87 only requires "labor peace agreements" covering City-contracted human services, and (ii) the City could issue rules narrowing the definition of "labor peace agreement" (Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("City Br.") at 27-29) that attack on the allegations of the Complaint is inappropriate for a motion to dismiss. Moreover, it is meritless. First, it ignores the Complaint's allegations that Plaintiffs cannot segregate their workforces between workers who only provide City-funded services, and workers who provide services funded by others, such as the State, the

federal government, and private donors. Compl. ¶ 148; *see also id.* ¶¶ 52, 67, 74, 77, 81, 85, 88, 93, 97, 101.  Second, it ignores the Complaint's allegation that Local Law 87's stated purpose is to promote unionization. Compl. ¶¶ 6, 30. Third, rather than promulgate a rule narrowly defining "labor peace agreement," the City has issued FAQs providing that a union leader may demand a "labor peace agreement" in which the nonprofit accepts concessions to promote unionization by giving the union access to the nonprofit's workplace and employees contact information.  (*See* Mar. 25 FAQs B.3.)  Since many of the nonprofits' employees provide services that are partially funded by the City as well as services that are funded by other governments or private donors, the City's requirement that nonprofits grant unions "workplace access" and "employee contact information" will necessarily spill over to labor relations that do not arise from City "contracts."

The City claims that Local Law 87's spillover effects are not substantial enough to warrant preemption.  The case it cites, *Building Industry Elec. Contractors Ass'n v. City of New York*, 678 F.3d 284 (2d Cir. 2012) ("*BIECA*"), contains no such exception.  Even if it did, a motion to dismiss would be an inappropriate vehicle through which to calculate the extent of the Law's spillover effects.  Moreover, *BIECA* is inapplicable, since it involved a construction industry Project Labor Agreement ("PLA"), which is expressly protected by the NLRA.  As the Second Circuit said in *BIECA*, NLRA preemption does not typically apply to construction industry PLAs because NLRA Sections 8(e) and 8(f) authorize their use.  *See BIECA*, 678 F.3d at 188.  As the Supreme Court noted in *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60 (2008), since a PLA is "specifically tailored to one particular job," PLAs will often be viewed as narrowly-tailored market participation.  *Id.*  By contrast, Local Law 87 involves the regulation of labor relations, arising out of both City-funds and non-City funds, with citywide application to hundreds of nonprofits providing services for many different funders, in many different

situations. *BICEA* is completely distinguishable.

Finally, although the City claims that Local Law 87 "does not require unionization of any employees" (City Br. at 27), that claim flies in the face of the Complaint's allegations and is irrelevant. Again, since the Complaint contains allegations describing how Local Law 87 will, in the context of Plaintiffs' activities, tip the balance of power towards union leaders and promote organizing, *see, e.g.*, Compl. ¶¶ 3, 6, 38, 55, 140-45, this Court must accept those allegations on this motion to dismiss. Moreover, a statute may be preempted by the NLRA even if it does not require unionization. Preemption arises when a local government regulates labor relations. Finally, the City's description of the Statute is belied by its words and official legislative history, which expressly and repeatedly states that the purpose of the Law is to promote unionization and muzzle employers who wish to speak about the problems of unionization. *See* discussion of legislative history at Point A.2.b.ii., below.

## 2. In Any Event, the City Is Not Acting as a "Market Participant"

Even if Defendants could establish, as a matter of law on a motion to dismiss, that Local Law 87 will have no spillover effects on the nonprofits' labor relations that do not arise from the City's activities, their motions to dismiss would still fail because their defense to the Complaint's claim of NLRA preemption – the City's "market participation" defense – cannot be established on their motions to dismiss. Their assertions, that the City is acting as a "market participant" in adopting and implementing Local Law 87, are fact-based contentions that cannot be accepted given the contrary allegations in the Complaint.

To invoke the "market participant" doctrine, Defendants must establish, accepting the Complaint's allegations as true, that Local Law 87 reflects the City's "own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior

of private parties in similar circumstances"; and that Local 87 is sufficiently "narrow" in "scope" so as to "defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem." *See Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87, 109 (2d Cir. 2006) (quoting *Cardinal Towing & Auto Repair, Inc. v. City of Bedford,* 180 F.3d 686, 693 (5th Cir.1999) (quote marks omitted). Defendants cannot make such a showing given the allegations of the Complaint.

### a. The City's Conduct Is Not Typical of Similarly-Situated Private Parties

Defendants' motions improperly require the Court to make assumptions, not found in the Complaint, about what would constitute "typical behavior of private parties in similar circumstances," *Healthcare Ass'n*, 471 F.3d at 109 (questions of fact precluded analysis of "market participation" defense). This Court should not make such assumptions, and it may not do so given the Complaint's allegations that the City is not acting in the manner that private parties "typically" do, City humans services contracts are "quite different" from ordinary commercial arrangements, and that there are no similar circumstances in private marketplaces. Compl. ¶¶ 116-118.

To begin with, the types of services covered by Local Law 87 – such as the provision of foster care, and operation of homeless shelters and senior centers – are not "similar" to private market participation. *See Camps Newfound*, 520 U.S. at 605 (Scalia, J., dissenting) ("orphanages, homeless shelters, and refuges for battered women . . . . are traditional governmental functions, far removed from commercial activity and utterly unconnected to any genuine private market"); *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 277 (1988) ("market-participant doctrine has no application . . . . [to the] assessment and computation of taxes – a primeval governmental activity").

Indeed, the Complaint alleges that the City's relationship with Plaintiffs is not "similar" to one in any private market. In part because Plaintiffs exist to support the needy through the uninterrupted delivery of human services, the City "contracts" at issue are completely different from ordinary commercial contracts and other government contracts. Compl. ¶ 117. Nonprofits such as Plaintiffs were providing such services long before governments began partially funding them. *Id.* The City knows this, and also that organizations like Plaintiffs will "provide the services for children and their families, whether they get paid or not," and "take[s] advantage of nonprofits, *id.* ¶ 116, by offering them only "retroactive" "contracts," *id.* ¶ 117, expecting them to start work long before the City is prepared to provide any funding, *id.*, and at risk of never receiving funds, *id.* ¶ 118. The City's "contract" documents for nonprofits, far from "typical" commercial agreements, do not cover the full costs of the human services, *id.* ¶ 114, and the City says it can terminate the "arrangements "at will," suspend them "indefinitely," and decide disputes under them without an arbitral or plenary judicial process (*id.*).

It is telling that the City's demand for "labor peace agreements" was established through legislation, rather than through contract negotiations. A City law that is the product of public hearings and rulemaking is indicative that the City has acted as a government regulator, not as a market participant. *See, e.g., New York Bankers Ass'n, Inc. v. City of New York*, 119 F. Supp. 3d 158, 187 (S.D.N.Y. 2015) (in preemption analysis regarding regulation of banks, court recognized that "the City here does not remotely resemble a 'typical market consumer,'" because a "typical consumer does not hold public hearings, collect and compile an enormous amount of information directly from banks, and then publish its own comprehensive rating system," and noted that statute at issue "seeks to harness the City's power in the marketplace to leverage its own policy goals. This it may not do"); *Metro. Taxicab Bd. of Trade v. City of New York*, 2008

WL 4866021, at *11 (S.D.N.Y. Oct. 31, 2008) ("[T]he process the City followed in promulgating the [challenged] Rules belies any claim that the City is acting as a proprietor rather than a regulator. The City published notice of its intent to adopt new rules in the City Record, took public comments, and then adopted the new rules. It even held additional public hearings. This is not the kind of conduct the City engages in when it purchases vehicles for its own use.").

### b. Local Law 87 is Not Narrowly Tailored to Address a Proprietary Problem

Even if the allegations about Plaintiffs' relationship with the City could be ignored, the motions to dismiss would fail because Local 87 is not sufficiently "narrow" in "scope" so as to "defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem." *See Healthcare Ass'n*, 471 F.3d at 109. The Law's text and legislative history establish that the Law's purpose was to promote unionization, which is a regulatory, not proprietary, goal.

### i. The Statutory Language is Regulatory, Not Proprietary

Local Law 87's text defeats any claim that it has a proprietary rather than a regulatory purpose. Local Law 87 does not merely require City human service contractors to enter into "service continuity" agreements with union organizers. It imposes additional requirements that have nothing to do with ensuring uninterrupted services to the City, and everything to do with empowering union leaders – such as those with whom City politicians bargain, and from whom they solicit political support. The Law thus evinces a regulatory rather than proprietary intent. *See Gould, supra,* 475 U.S. at 282 (state acted as regulator not market participant when it passed law requiring state agencies to compile and use information regarding NLRA violations); *see also Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 232 (1993) ("*Boston Harbor*") (for "market

participant" defense to apply, government requirements must be narrowly "tailored" to alleged proprietary need).

Key requirements of the Law – that nonprofits collect attestations signed by union leaders, that the Comptroller investigate all claims of statutory violations, and that the City collect and store information about NLRA violations, Compl. ¶¶ 12, 131[5] – would never be adopted by a private "market participant." These requirements have nothing to do with the City's purported proprietary interest of ensuring uninterrupted services.

Unable to defend the statutory text, the City relies on its March 25, 2022 FAQs that the City issued on the very date that its opposing papers to Plaintiff's motion for preliminary relief were due. (City Br. at 4-6, 4 n.2, 14-16.) The FAQs cannot save Local Law 87, as they do not change the fact that the Law imposed these additional requirements in the first place. If anything, the FAQs are a recognition by the City that Local Law 87 went too far and is not narrowly tailored to solely ensuring the uninterrupted delivery of services.

In any event, the FAQs do not have the force of law (as they were not promulgated as City "rules," and are not included in the City's contracts) and the City never suggests that it is bound by them. Many of the FAQs make matters worse, as they further the City's effort to promote unionization of private contractors. While the Law does not say that nonprofit human service providers must provide union leaders with "access" to the employer's workplace and confidential "employee contact information," or to support union leaders' "alternate procedures related to recognizing the labor organization for bargaining purposes, the FAQs indicate that any

---

[5] It is irrelevant to the preemption analysis whether the City already requires (without any statutory basis) that contractors report violations of labor relations laws in the City's "PASSPort" system (City Br. at 5 n.2). Local Law 87 expressly requires the City to create a database of NLRA violations for consideration in connection with human service procurement decisions. Since that is unlawful, the Law should be struck down as preempted.

nonprofit that fails to accede to a union leader's demands for such benefits will be found in breach of their contracts and subjected to investigation. (Mar. 25 FAQs B.3.) These provisions have nothing to do with ensuring uninterrupted City services; they are union leader tools for promoting unionization. The FAQs give such union-leader demands the City's stamp of approval, and if a nonprofit provider resists those demands and so cannot obtain an attestation signed by the union leader (who may not even represent any of the provider's employees), the provider can expect to be found in default, placed under investigation, and debarred from City procurement.

Several other features of Local Law 87 also establish that the City enacted the Law to further a "regulatory" rather than "proprietary" purpose.

***First***, Local Law 87 announces a blanket labor relations policy preventing a broad category of human service providers from exercising their rights under the NLRA. The Law is not limited to any particular location since it applies citywide, is not limited to any specific project, is not limited temporally, and is not predicated on any need to redress a history of service disruptions. The use of broad laws or categorical rules like Local Law 87 is characteristic of "regulatory," not "proprietary" conduct. *Brown*, 554 U.S. at 70–71 (state was acting as regulator rather than a market participant when it enacted law that was neither "specifically tailored to one particular job" nor a "legitimate response to state procurement constraints or to local economic needs"); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1337 (D.C. Cir. 1996) (government acts as regulator not market participant when it passes a "general law" requiring entire category of contractors doing business with state to enter into agreements with unions).

***Second***, Local Law 87's use of severe penalties – including contact termination, debarment, and investigations, Compl. ¶¶ 55, 118, 151– is characteristic of regulatory, not

proprietary conduct, as such penalties do more than simply protect the City's interest in contract performance (and, indeed, undermine service continuity). Indeed, New York courts view "debarment from future bidding" as a "severe administrative penalty." *Hull Corp. v. Hartnett*, 77 N.Y.2d 475, 480, 571 N.E.2d 54, 56, 568 N.Y.S.2d 884, 886 (1991). Private market participants do not have the ability to debar contractors, and the use of debarment precludes any claim that a local government is acting as a market participant. *See Gould*, 475 U.S. at 289 (rejecting market participant defense because "debarment scheme is tantamount to regulation," and is not conduct engaged in by "private purchaser of services"); *see also CF & I Steel v. Bay Area Rapid Transit District*, 2000 WL 1375277, *7-*8 (N.D. Cal. 2000) (rejecting market participant defense to NLRA preemption; where "remedies are punitive rather than remedial" government is not exercising its "spending power" but is instead exercising "regulatory power"); *cf. Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 692 (5th Cir. 1999) ("attempts by government entities to punish labor . . . practices they disfavor by withholding contract work have been found preempted by the NLRA").

*Third*, the City's comments that, if a nonprofit wishes to resist unionization, it can simply refrain from contracting with the City (City Br. at 24, 27-28, 31) confirms that the City is using the Law to put "pressure on an employer" to "forgo his 'free speech right to communicate his views to his employees'" in violation of the NLRA. *Brown*, 554 U.S. at 63, 73 (state or local law or policy designed to promote unionization preempted by NLRA); *Metro. Milwaukee*, 431 F.3d 277 (same); *Van–Go Transp. Co., Inc., v. New York City Bd. of Educ.*, 53 F. Supp. 2d 278, 289 (E.D.N.Y. 1998) (same).

*Fourth*, because the City is imposing a restriction on human service contractors' normal interactions with third parties (labor unions), and because the City is at most an indirect

beneficiary of that restriction, a substantial commercial justification is required to invoke the market-participant exception. Here, there is no evidence establishing that Local Law 87 is necessary or tailored to serve the City's own proprietary and financial interests in ensuring uninterrupted services in the human service sector.

*Fifth*, laws mandating "labor peace agreements" between contractors and unions "are not actually tailored to preventing work stoppages" given that the "usual way of dealing with the problem is to include contract terms that by adding sticks or carrots or both give the provider of the service a compelling incentive to take effective measures to avoid stoppages." *Metro. Milwaukee*, 431 F.3d at 280. As the Seventh Circuit concluded, the "existence of effective contractual remedies for service interruptions eliminates the need for states or their subdivisions to create a special regime for the labor relations of their contractors. The inference is inescapable that the County is trying to substitute its own labor-management philosophy for that of the National Labor Relations Act." *Id.* at 280-88.

### ii.    The Legislative History Defeats the "Market Participation" Defense

As alleged in the Complaint, Local Law 87 was not enacted in response to a history of labor-connected work stoppages. Compl. ¶ 128. It was the brainchild of DC37, *id*., the union that bargains with the City over the rights of municipal workers. DC37 was heavily involved in drafting the Law. *Id*. The politicians that introduced Local Law 87 for DC37, voted for it, and signed it into law admitted that the Law was enacted to promote unionization. Compl. ¶ 151.

The officially compiled legislative history for Local Law 87 – including City Council hearing transcripts, committee reports, and City Council minutes – indicates that the purpose of the Law is to promote unionization and require human service providers to give up NLRA rights to voice opposition to union organizing. (The legislative history compiled by the City is

available at https://legistar.council.nyc.gov/Legislation Detail.aspx?ID=4920283&GUID=DD5FF113-9B0E-4479-A483-531D9BA94BDA.) *See* Item 15. July 29, 2021 Hearing Transcript of the City Council of the City of New York (the bill's sponsor, Speaker Johnson, said that it would force employers to "maintain a neutral posture at union efforts to organize employees") ("Legis. History Item 15"); *see also* Item 16. Minutes of the Proceedings for the Stated Meeting of Thursday, July 29, 2021 of the City Council of the City of New York ("Legis. History Item 16") (stating that "unions have increasingly turned to legislation in order to protect their ability to organize and empower workers," specifically "mandatory labor peace" laws, and that passage of the bill would promote that goal).

The legislative history does not cite historical work stoppages as the impetus for Local Law 87. Instead, it cites as the animating concern, declining unionization rates and purported efforts by private employers, such as Amazon, to resist unionization:

> BACKGROUND – The Need for Labor Peace Agreements.
>
> The COVID-19 pandemic and subsequent economic downturn has reinforced the importance of job and income security for workers. While unions and collective bargaining play essential roles in ensuring these rights for workers, union membership has been in steady decline since the 1970s, and has been exacerbated by the July 29, 2021 pandemic. 2020 marked the third year in a row that union membership fell in New York City to a rate of 22%. Recent reports of union-busting and interfering with workers' attempts to organize present further obstacles to labor rights in the coming years.

(Legis. History Item 16.)

The City contends that the Court should simply accept its assertion that Local Law 87 has a "proprietary" purpose of ensuring uninterrupted services. (City Br. at 3, 23; *see also* 24-27.) Yet, in evaluating NLRA preemption, courts do not turn a blind eye to facts concerning a statute's purpose. *See Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 287 (1986) (rejecting "market participant" defense where state admitted that "the point of the

29

statute is to deter labor law violations"); *see also Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 63 (2008) ("*Brown*") (rejecting "market participant" defense where court discerned that actual purpose of statute was to "promote unionization"); *Van–Go Transp. Co., Inc. v. New York City Bd. of Educ.*, 53 F. Supp. 2d 278, 289 (E.D.N.Y. 1999) (rejecting "market participant" defense, finding that there was "powerful evidence" that the City was acting with a regulatory motive to favor unionization).

Moreover, the Second Circuit recognizes that, in conducting a federal preemption analysis, a court must look beyond the stated purpose of the local statute, and instead look to the statute's legislative history and effect. *See Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 418–19 (2d Cir. 2013) ("We do not blindly accept the articulated purpose of [a state statute] for preemption purposes . . . . We must also look to the statute's legislative history to determine if it was passed with an impermissible motive. . . . We [] believe that legislative history is an important source for determining whether a particular statute was motivated by an impermissible motive in the preemption context.") (emphasis added); *see also New York Bankers Ass'n, Inc. v. City of New York*, 119 F. Supp. 3d 158, 190 (S.D.N.Y. 2015) ("To determine whether a local law is preempted by federal law, the Court must look to legislative history and intent").

3. **The Cases Relied on by the City in Support of Its "Market Participant" Defense Are Distinguishable**

To support its market participation theory against NLRA preemption, the City relies heavily on *Building and Const. Trades Council of Metropolitan Dist. v. Associated Builders and Contractors of Massachusetts, Rhode Island, Inc.*, 507 U.S. 218, 224 (1993) (the "*Boston Harbor*" case), and *Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 188 (2d Cir. 2012) ("*BIECA*"), but these cases fundamentally have nothing to do with this matter.

Both cases held that the NLRA did not preempt construction project labor agreements ("PLAs"), which a contractor will sometimes enter into with a union for a single **specific construction project** before hiring workers. Those cases do not apply here because NLRA Sections 8(e) and 8(f) expressly carve out the construction industry from NLRA requirements, allowing a local government to require a PLA for a specific government construction project. *Boston Harbor*, 507 U.S. at 230–31; *BIECA*, 678 F.3d at 188.

*Boston Harbor* and *BIECA* do not apply here. Local Law 87 has nothing whatever to do with PLAs or the construction industry. Since its purpose is "not the efficient procurement of goods and services, but the furtherance of a labor policy," Local Law 87 is preempted by the NLRA. *Boston Harbor*, 507 U.S. at 232.

As noted previously, the City also erroneously relies on *Airline Services Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074 (9th Cir. 2017), which involved a single airport managed as a "commercial establishment." *Id*. at 1081. The court based its conclusion that there was no NLRA preemption on the view that preemption only applies to state or local regulation. *Id*. at 1079. Yet, here Plaintiffs **are** challenging a local regulation, *i.e.*, a City statute, and Local Law 87 does not concern a "commercial establishment."

The City also mistakenly relies on *Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87 (2d Cir. 2006). *Healthcare Ass'n* mentioned two indicators of government market participation, both of which support Plaintiffs' claim.

The first indicator, *i.e.,* the extent to which the governmental action is like "the typical behavior of private parties in similar circumstances," *id*. at 109, supports Plaintiffs' claim because private parties do not typically – and likely never – willingly invite unions to exercise power over who they contract with and whether those contracts will continue. Yet, the City did

just that in enacting Local Law 87.

The Second Circuit's other indicator (whether a law has a "narrow scope," *id*.) also favors Plaintiffs' position, since Local Law 87 regulates hundreds of nonprofits, thousands of contracts, and billions of dollars, with immense "spillover" effects on federal, state, and private contracts. *See Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999) (also cited by the City) (considering "whether [the challenged governmental action] governs the parties' behavior on [a] specific project or projects in a contract, rather than unrelated matters to which the state might not even be a party"). Local Law 87 does not have a "narrow scope" because the Law is not limited to a single City contract for a specific project, and, were the City a "market participant," it would never be party to the labor agreements that the Law mandates.

Together, the two indicators of *Healthcare Ass'n* "seek to isolate a class of government interactions with the market that are so narrowly focused and so in keeping with the ordinary behavior of private parties that a regulatory impulse can be safely ruled out." *Id*. Local Law 87 fails both prongs of *Healthcare Ass'n*'s test for "market participation."

The City also repeatedly relies on *Legal Aid Society v. City of New York*, 114 F. Supp. 2d. 204 (S.D.N.Y. 2000), which did not involve any statute, let alone one like Local Law 87. *Legal Aid* addressed a single City contract with a single entity, and found it "troubling" that the City's actions "may have had the effect of altering the terms of the [single] collective bargaining agreement in a fashion unrelated to the asserted proprietary purposes of cost containment or strengthening the City's bargaining position," *id*. at 236, but ultimately decided the matter on other grounds.

Local Law 87 is far more pernicious than the procurement at issue in *Legal Aid,* allowing

union leaders to unilaterally dictate – through their power over whether to sign attestations and insist upon Comptroller investigations – the nonprofits' labor relations and contractual relations with the City. The Law was not enacted to address "cost containment," the concern that motivated the City in *Legal Aid*. *Id*. at 236. Moreover, while *Legal Aid* held that addressing "the imminent threat of disruption" of services to the City was indicative of a "proprietary" motive, *id*. at 237, here, the City does not dispute the complete absence of any such threat or history thereof. *Legal Aid* found "no evidence that the City" had sought to impose a "general policy" with respect to "all entities with whom the City contracts for the provision of legal services," which *Legal Aid* said would "indicate the City's 'regulatory purpose.'" *Id*. at 238. By contrast, Local Law 87 imposes requirements on **all** human services providers with whom the City contracts, demonstrating the Law's "regulatory purpose."

The City's reliance on *George v. Richter*, 2014 WL 1666448 (S.D.N.Y. April 25, 2014) is also of no help to its market participant claim. In that case, the court held that, in issuing a new Request for Proposals for child care, the Bloomberg Administration was not regulating labor relations, but was "simply restructuring its relationship with day care providers" consistent with a proprietary interest in "cost savings." *Id.*, at *13, The Court noted that the plaintiff (a labor union) did not "allege that the City is attempting to exclude unionized day care centers from participating in the new program," *id.*, and even cited to "a number of public statements made by City officials indicating that the City wishes to implement a new program for Head Start and day care in order to reduce health care costs" that would be borne by the City, *id.*, at *3. This case is completely distinguishable because, while the Bloomberg Administration simply sought to save money, then-Mayor de Blasio, in his last days in office, signed Local Law 87 to bestow a benefit on union leaders, and ensure that the City would be a "union town."

### 4. Defendants' Other Assertions About NLRA Preemption Are Meritless

#### a. Local Law 87 Strips Plaintiffs of Rights Protected by the NLRA

Defendants deny that Local Law 87 strips Plaintiffs of their rights under the NLRA (City Br. at 30-31; DC37 Br. at 16-18), contending that Plaintiffs "need not agree to maintain neutrality towards unionization, or accept any other limitations on speech or other activities . . . in order to comply with the Local Law" (City Br. at 30).

This assertion is contradicted by the legislative history and FAQs. Local Law 87's legislative history confirms that the City passed the law to block nonprofits from opposing unionization. (*See* Legis. History Item 16). The City's FAQs, in turn, recognize that the City expects "labor peace agreements" under Local Law 87 to include pro-unionization provisions including "(i) alternate procedures related to recognizing the labor organization for bargaining purposes, (ii) public statements, (iii) workplace access," and "(iv) the provision of employee contact information" to the union. (Mar. 25 FAQs B.3.)

The City also incorrectly denies that Local Law 87 strips employees of NLRA rights. (City Br. at 30.) As previously noted, Local Law 87 requires employers to remain neutral during union organizing drives, *i.e.,* to refrain from voicing opposition to unionization. The Supreme Court recognized in *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60 (2008), that employees have the right under the NLRA to receive information opposing unionization. *Id.* at 68 (under NLRA "the amendment to § 7 calls attention to the right of employees to refuse to join unions, which implies an underlying right to receive information opposing unionization," and local laws that impair this right, by requiring an employer to avoid anti-union speech, are preempted).

The City next asserts that any employer that wishes to retain its NLRA rights may simply forego City funds. (City Br. at 31.) However, the Supreme Court has held that a local

government cannot use its spending power to put contractors to a Hobson's choice of either receiving government funds or retaining their rights under the NLRA, and local government laws that create such a Hobson's choice are preempted by the NLRA. *See Chamber of Com. of U.S. v. Brown*, 554 U.S. 60 (2008) ("[a local law's] enforcement mechanisms put considerable pressure on an employer either to forgo his 'free speech right to communicate his views to his employees,' or else to refuse the receipt of any state funds. In so doing, the statute impermissibly 'predicat[es] benefits on refraining from conduct protected by federal labor law,' and chills one side of 'the robust debate which has been protected under the NLRA'") (internal citations omitted).

### b. Local Law 87 Affords Unions Additional Powers

Defendants improperly dispute the Complaint's allegations that a union leader might use Local Law 87 as leverage – refusing to sign a required attestation if the nonprofit does not capitulate to its demands – and allege that the Law contains a "safe harbor" for nonprofits that act in "good faith." (City Br. at 3, 23-24, 31-32, 32 n.22; DC37 Br. at 12-14.)

Defendants' position is belied by the City's FAQs and the legislative history. The FAQs indicate that nonprofits are expected to capitulate to union leader demands for "alternate procedures related to recognizing the labor organization for bargaining purposes"; union "workplace access"; and "employee contact information." (*See* Mar. 25 FAQs B.3.) The legislative history indicates that nonprofits should give unions concessions to promote unionization. (*See* Legis. History Item 16).

Finally, the City's reference to a "good faith" safe harbor is not in the statute itself, is not clearly defined, and is dependent on the City's subjective view of a nonprofit's negotiation positions. The Supreme Court recognizes that, if a local statute violates the NLRA and punishes

conduct protected by the NLRA, then a "safe harbor" cannot rescue the local statute from NLRA preemption. *See Chamber of Com. v. Brown*, 554 U.S. 60, 72 (2008) (finding state statute preempted by NLRA and rejecting defense that penalties were ameliorated by "safe harbor").

### c. Local Law 87 Interferes with the NLRB's Jurisdiction

The City's contention – that Local Law 87 does not deprive the NLRB of its exclusive jurisdiction to determine how union organizing will take place – is also incorrect. As previously discussed, the City's FAQs for Local Law 87 reflect the City's expectation that nonprofits will accept a union's "alternate procedures related to recognizing the labor organization for bargaining purposes." (Mar. 25 FAQs B.3.) That requirement interferes with an employer's right to insist on NLRB-supervised elections. *See Linden Lumber Div., Summer & Co. v. N.L.R.B.*, 419 U.S. 301, 302 (1974) (recognizing that an employer generally may insist upon a NLRB-conducted election to determine whether a majority of its workers supports an organizing union, and an "employer is not obligated to accept" alternative methods of recognizing a union, such as a "card check as proof of majority status").

The City's FAQs also reflect an expectation that the employer will grant a union other concessions to promote unionization, such as "workplace access" and "employee contact information." (Mar. 25 FAQs B.3.) In addition, as previously discussed, Local Law 87's legislative history indicates that the City requires that nonprofits remain "neutral" during union organizing drives. This is precisely the sort of local interference with collective bargaining that is preempted by the NLRA. *See Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 619 (1986) ("[f]ree collective bargaining is the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA," and "local government . . . lacks the authority to 'introduce some standard of properly balanced bargaining power'" that is

different than that provided for in the NLRA).

**B.  The Complaint States a Claim for Labor Management Relations Act Preemption**

The Court should also reject the City's attempt to dismiss Plaintiffs' LMRA claim.  The City's motion to dismiss that claim ignores the Complaints allegations, which must be accepted as true at this point in the litigation.

The basis of Plaintiffs' LMRA preemption claim is that, in order to comply with Local Law 87, human service providers may have to engage in conduct that some federal courts have deemed violative of the LMRA.  The City cannot lawfully regulate conduct in a manner that places Plaintiffs at risk of violating federal law, as such regulation is preempted by federal law.

There are serious questions about whether a so-called "labor peace agreement," as described by the City through its FAQs, is unlawful under the LMRA (or "Taft Hartley Act").  LMRA Section 302, codified at 29 U.S.C. § 186(a)(2), makes it a crime for an employer to "pay, lend, or deliver, any money or other thing of value" to a union that seeks to organize the employer's workforce.  Under the LMRA, a "thing of value" is not limited to something with a monetary value.  *Mulhall v. Unite Here Loc. 355*, 667 F.3d 1211, 1215 (11th Cir. 2012).

In *Mulhall*, the Eleventh Circuit held that a "neutrality" agreement between an employer and a union – under which the employer would remain neutral regarding unionization – could be deemed a violation of Section 302 when it required the employer to provide assistance to the union's organizing efforts.  This organizing assistance might be a "thing of value" that, if demanded by the union, could constitute an "illegal payment" in a scheme to "extort a benefit from an employer."  *Id.* at 1215 ("innocuous ground rules [under a neutrality agreement] can become illegal payments if used as valuable consideration in a scheme to . . . extort a benefit from an employer").

*Mulhall* remains the law of the Eleventh Circuit.  The Supreme Court initially granted certiorari to review the *Mulhall* decision, but reversed its grant of certiorari, thereby leaving the *Mulhall* decision in place and valid.  *See Unite Here Loc. 355 v. Mulhall*, 571 U.S. 83 (2013).

While some courts have held that neutrality agreements do not necessarily violate Section 302 of the Taft Hartley Act, *see Adcock v. Freightliner LLC*, 550 F.3d 369, 376 (4th Cir. 2008); *Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206 (3d Cir. 2004), the Second Circuit has not ruled on this question, and the current Supreme Court will almost surely adopt the position enunciated in *Mulhall*.

The City's defense to Plaintiffs' LMRA preemption claim is based on cases presenting precisely the opposite situation to this one.  (City Br. at 34-37.)  The City's cases merely address whether there is a private right of action to ***affirmatively enforce*** the LMRA.  Plaintiffs, by contrast, are not seeking to enforce the LMRA.  Instead, Plaintiffs contend that Local Law 87 places them at risk of ***violating*** the LMRA (a problem compounded by the City's FAQs), such that Local Law 87 is preempted.

*Ziglar v. Abassi*, 137 S. Ct. 1843 (2017) (City Br. at 35), is not only unhelpful to the City (it does not address LMRA preemption and focuses, instead, on when courts may imply a *Bivens* remedy), but actually supports Plaintiffs' claim.  The *Ziglar* Court confirmed that injunctive relief is appropriate when a government policy (here a law, not merely policy) applies to numerous individuals.  *Id*. at 1862, 1865.  Local Law 87 will undoubtedly affect numerous human service providers and their employees.

Although the City also cites to *Hosp. Emps. Div. of Local 79 v. Mercy-Memorial Hosp. Corp.*, 862 F.2d 606, 608 (6th Cir. 1988), to claim that LMRA Section 302 cannot preempt Local Law 87, that case has no bearing here.  There, the court simply held that LMRA Section 302 did

not preempt a ***federal*** RICO civil suit by a union against an employer where the NLRB was considering similar issues.

The basis of Plaintiffs' LMRA preemption claim here is that Local Law 87 may affirmatively require Plaintiffs to violate Section 302 of the LMRA, which carries criminal penalties. *See* Compl. ¶ 162. Courts have repeatedly held that when a state or local law requires parties to affirmatively violate federal laws, especially federal criminal laws, that state or local law is preempted. *See, e.g., Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (state law preempted when it "stands as an obstacle to the accomplishment and execution" of federal law); *Medford v. Eon Labs, Inc.*, 2021 WL 5204035, at *3 (D.N.J. Nov. 9, 2021) (state law "impliedly preempted insofar as it would obligate" party to violate its duty under federal law).

Finally, although the City asserts that Local Law 87 does not create any risk of violating the LMRA because it does not require employers to agree to anything more than non-interruption of services, that assertion is once again contradicted by the City's FAQs and Local Law 87's legislative history. As previously discussed, that legislative history states that nonprofits are expected to enter into agreements with unions in which the nonprofits promise to remain "neutral" during union organizing drives. (*See* Point A.2.b.ii., *supra*.) Similarly, the City's FAQs indicate that the City expects "labor peace agreements" to include employer concessions such as granting unions "workplace access," "employee contact information," and "alternate procedures related to recognizing the labor organization for bargaining purposes." (Mar. 25 FAQs B.3.) These are precisely the sorts of "things of value" at issue in the *Mulhall* case.

## C. The Complaint States a Claim for a Violation of Plaintiffs' First Amendment Rights

The City's motion to dismiss Plaintiffs' First Amendment claim should be denied. Local Law 87 violates Plaintiffs' rights to freedom of speech and freedom of association, bestowed by

the First Amendment, as applied to the states (and their subdivisions) through the Fourteenth Amendment, in interrelated ways that include, but are not limited to: (1) imposing content-based restrictions on speech by requiring City contractors to relinquish their free speech rights as a condition of entering into City service contracts; (2) chilling and restricting otherwise protected speech regarding unions and unionization; and (3) compelling speech, association with speech, or promotion of pro-union speech.

The City's argument that Local Law 87 "imposes no restrictions on a contractor's ability to express its views on unionization in general, the merits of a particular union, or on any other aspect of labor relations," and "requires only a good faith effort to obtain an agreement for uninterrupted delivery of services and for avoidance of actions interrupting such services" (City Br. at 9), is way off the mark. The Law blocks nonprofits' lawful advocacy against unionization by a) requiring them to enter into union contracts, so-called "labor peace agreements," in which they must agree with unions, and union members, not to engage in any action that may interfere with the delivery of human services, and b) requiring them to obtain a union official's signature on attestations, confirming that they have entered into "labor peace agreements," attestations that the nonprofits must then provide to the City.

The City begins its attack on the Complaint's First Amendment allegations by citing *Americans For Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021), which does not help the City at all. The Court there recognized that there is a "type of facial challenge [under the First Amendment], whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" in obtaining information. *Id*. at 2378 (holding facially unconstitutional a state law collecting IRS forms that listed donors to the State's over 100,000 charities). The City has neither argued nor

shown that Local Law 87's promotion of unions specifically constitutes a "plainly legitimate sweep" to gather information from human services providers.

In fact, *Bonta*'s analysis requires this Court to hold that the Complaint sufficiently alleges a First Amendment violation, since Local Law 87's overall "substantial application" to human services providers – requiring that they enter into union contracts ("labor peace agreements"), or attest that no labor union has sought to unionize their workers, as a condition to obtaining and keeping a City service contract – is an unconstitutional content-based regulation designed to suppress anti-union speech.[6]

Local Law 87's legislative history a) expressly provides that it is intended to require human service providers to remain neutral during union organizing efforts, *i.e.*, the nonprofits may not engage in speech opposing union organizing, and b) confirms that this restriction of free speech is the very aim of the Law. The official legislative history states as follows regarding the Law: "During [labor peace] agreements, ***employers agree to maintain a neutral posture at union efforts to organize employees***, meaning they agree to not hinder or disrupt the organizing

---

[6] Local Law 87 achieves this forced deprivation of free speech by requiring nonprofits to enter into union contracts (the "labor peace agreements") as a condition of obtaining or keeping City funding, and providing that:

> The term "labor peace agreement" means an agreement between a covered employer and a labor organization that seeks to represent employees who perform one or more classes of work to be performed pursuant to the city service contract, where such agreement:
>
> 1. requires that the covered employer and the labor organization and its members agree to the uninterrupted delivery of services and to refrain from actions that may have the effect of interrupting such services; and
>
> 2. includes any other terms required by rules promulgated pursuant to paragraph 2 of subdivision d of this section.

LL87 § 6-145(a) ("Definitions"). Paragraph 2(d) says that "the mayor or the mayor's designee shall promulgate implementing rules and regulations, as appropriate and consistent with this section, and may delegate such authority to the comptroller." While no rules or regulations have yet been promulgated, the City may do so at any time.

process." (Legis. History Item 16.)

A nonprofit that, under Local Law 87, must a) maintain a neutral position about union efforts to unionize its employees, and b) agree with a union and the union's members to refrain from any action that may have the effect of interrupting services, is effectively muzzled from speaking against unionization. Although there is no history of human services being interrupted, under the Law, a nonprofit must agree ahead of time to refrain from speech to its employees against unionization, ***no matter what union leaders may say to its employees***.

Further, requiring a nonprofit to request a union leader to attest that the nonprofit has either entered into a "labor peace agreement" with the union or that negotiations for an agreement are ongoing, LL87 § 6-145(b), compels a nonprofit to engage in both speech and association with union leaders, and, by submitting the resulting attestation to the City, associate itself with that speech. A union leader may refuse to sign an attestation for any reason, including if the union is dissatisfied with the nonprofit's communications with its employees about unionization, causing the nonprofit to lose an existing or future City "contract," *id*. §§ 6-145(c)(1)(b); (e); (f)(1)(c)-(d), thereby forcing nonprofits to appease unions by promoting unionization. Even a nonprofit's duty, alternatively, to submit an attestation that its employees "are not currently represented by a labor organization and that no labor organization has sought to represent [its] employees," *id*. § 6-145(b)(1)(b), forces the nonprofit to engage in speech about unionization with its employees that it would not otherwise undertake. It may be impossible for a nonprofit to comply with Local Law 87's "labor peace agreement" and attestation requirements and still be free to advocate against unionization or refuse to associate with unions. As a result, the Law also interferes with the rights of nonprofits' employees to hear free discussion of the pros and cons of unionization.

### 1. The City's Freedom of Speech Cases Are Inapposite

The City does not cite to any precedent that would warrant the dismissal of Plaintiffs' First Amendment claim. Indeed, its effort to dispute this claim devolves into at best careless or at worst disingenuous out-of-context citations and quotations to irrelevant cases.

The cited portion of *IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 434, 456 (D. Vt. 2009), *rev'd* 630 F.3d 263 (2d Cir. 2010), addressed a Fifth Amendment vagueness challenge. Where *IMS Health* does address the First Amendment, its analysis is confined to commercial speech, not at issue here. Finally, the Second Circuit reversed *IMS Health*, holding that for a regulation to survive First Amendment challenge, the state must show that it "is narrowly tailored to serve the substantial state interests that it contends justify the speech restriction." *Id.* at 281.

The City makes no attempt to validate Local Law 87's speech restrictions as serving any comparable City interest. The Law is certainly not narrowly tailored to prevent an interruption in human services, which could be prevented solely by a contract between the City and a nonprofit in which the nonprofit agrees to provide continued services, without union involvement (particularly when the City cannot point to any such historical interruptions).[7]

---

[7] The City's citations to cases involving public employees (City Br. at 10 n.5), also completely miss the mark. While *Engquist v Oregon Dep't of Agric.*, 553 U.S. 591 (2008), did not involve a First Amendment claim, the Court stated, in *dicta*, that the state as employer may only regulate speech that "cannot be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* at 600. Speech about unionization inarguably relates to political and social concerns.

*Planned Parenthood Assn. of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016), recognized the validity of a claim that the state improperly imposed a penalty for the plaintiff contractor's exercise of First Amendment rights, and held that "the government may not . . . . compel the endorsement of ideas that it approves." *Id.* at 1258, 1259. Local Law 87 compels nonprofits to endorse the City's approval of unionization.

*Dejana Indus. v. Vil. Of Manorhaven*, 2015 WL 1275474, at *9 (E.D.N.Y. Mar. 18, 2015), did not address legislative effects on the First Amendment, but instead merely refused to grant summary judgment because there were triable issues of fact about the defendant's motivation for terminating the individual plaintiff.

The City cites another irrelevant case, *Carey v. Wolnitzek*, 2012 WL 4597236 (E.D. Ky. Sep. 29, 2012), which addressed whether a state's Code of Judicial Conduct was void for vagueness, and did ***not*** distinguish between whether protected speech ***might*** be chilled or ***will*** be chilled, as the Defendant's assert (City Br. at 10), instead stating: "The touchstone of a facial vagueness challenge in the First Amendment context [not at issue here] . . . is not whether some amount of legitimate speech ***will*** be chilled; it is whether a substantial amount of legitimate speech ***will*** be chilled" *id*. at *5 (emphases added) (citation omitted).[8]  While Plaintiffs have not asserted any vagueness challenge to Local Law 87, it is certain that the Law will serve to chill a substantial amount of legitimate speech both against and for unionization.

Similarly, *Brooks v. Raemisch*, 717 Fed. Appx. 766 (10th Cir. 2017), by no stretch of the imagination supports that "the ready availability of legal steps or a legal remedy to avert adverse consequence weighs strongly against" a finding that legislation chills protected speech (City Br. at 10).  *Brooks* did not involve a challenge to any legislation.[9]

---

[8] Finally, *Hotel & Rest. Empls. Union Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 566 (2d Cir. 1993), is equally removed from Plaintiffs' First Amendment claims, addressing whether the district court had jurisdiction under section 301(a) of the LMRA over a specific contract dispute between a union and a private employer.  No such contract is involved in this case.

[8] The part of *Sullivan-Knoff v. City of Chicago*, 348 F. Supp. 3d 787, 795 (N.D. Ill. 2018), on which the City relies yet again involved a void for vagueness challenge, this time to an ordinance regulating nude dancing, a challenge which the court refused to dismiss.  With respect to the plaintiff's straightforward First Amendment challenge, the court held that to validate an ordinance that has secondary effects on First Amendment rights, "a regulating body [must] produce some specific, tangible evidence establishing a link between the regulated activity and harmful secondary effects."  But, at the motion to dismiss stage, a complaint cannot be dismissed based on such alleged evidence; instead a plaintiff must be afforded the opportunity to challenge that evidence at trial. *Id*. at 794-95.  The case provides the City no support.

[9] In *Brooks*, a *pro se* prisoner alleged that correction officials expunged his disciplinary record in retaliation for his constitutionally-protected legal filings, which had unlawful effects. *Id*. at 767.  It is impossible to analogize *Brooks* to the Complaint here, but Local Law 87 certainly has the potential to chill nonprofits from exercising their First Amendment rights.

## 2. The City's Freedom of Association Cases Are Inapposite

The City cites no authority supporting its conclusion that Local Law 87 does not interfere with Plaintiffs' right to free association under the First Amendment. Its argument is based on a slough of irrelevant cases. Indeed, some of the City's cases concern "intimate associations" (City Br. at 11), which are not at issue here.

The City's only relevant statement is that "[e]xpressive association involves association for the purpose of engaging in some form of expression or some activity protected by the First Amendment, such as *speech* [or] assembly." (City Br. at 12 (emphasis added).) The City's cases all agree with this statement, which supports that Local Law 87's effects on protected speech violate the First Amendment, but then apply this precept in situations quite unlike this case.[10]

For example, in *Scahill v. District of Columbia*, 909 F.3d 1177 (D.C. Cir. 2018), which the City cites for the alleged proposition that business or commercial relationships are not generally expressive associations, the court held only that there is no general "associational right" that prevented the D.C. Alcoholic Beverage Control Board from barring the plaintiff restaurant from employing an individual who had been fined for allowing underage drinking, or allowing him on restaurant premises, and that there was no viable "compelled speech claim"

---

[10] *Salmon v. Blesser*, 802 F.3d 249 (2d Cir. 2015), involved a tort claim alleging police brutality; *Amato v. Elicker*, 534 F. Supp. 3d 196, 201 (D. Conn. 2021), held that restaurateurs subject to COVID regulations had not "assembled or associated with friends and/or customers at the restaurant (or elsewhere) for [First Amendment expressive] purposes or that they sought to do so." *United States v. Thompson*, 896 F.3d 155 (2d Cir. 2018), upheld a prosecution for sex-trafficking against a statutory challenge because, "[t]o the extent that the minor victim trafficking provision restricts the activities of charitable or religious groups, it places limits on the non-expressive *conduct* in which they may engage, rather than on their right to associate for the purpose of expressing their views." *Id*. at 165 (emphasis in original).

based on license conditions requiring the restaurant to report any violation of this barring order. *Id*. at 1185. This kind of regulation of a commercial relationship has nothing to do with Local Law 87's attempts to suppress "expressive association" involving protected speech.

As the Supreme Court has declared generally: "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citations omitted). An example is "picketing about a wide variety of causes." *Id*. Local Law's requirements that Plaintiffs engage in union negotiations, convey information about these negotiations to the City, and, by necessary implication, refrain from speaking against unionization to their employees, all convey a particularized message in favor of unionization that will be understood by nonprofits, their employees, unions, and union members. This both brings the First Amendment into play and violates its protections of free speech as well as its protections against compelled speech and association.[11]

_____

[11] The City cites cases allegedly supporting the notion that Local Law 87's requirement that nonprofits interact with unions does not violate their rights to free association, but these cases are once again irrelevant. (City Br. at 12-13.) *See, e.g., Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018), holding that "[t]he First Amendment is violated when money [in the form of agency fees, a kind of union dues] is taken from nonconsenting employees for a public-sector union," *id*. at 2459, when it is "undeniable that 'labor peace' can readily be achieved 'through means significantly less restrictive of associational freedoms' than the assessment of agency fees," *id*. at 2457. This case does not involve non-consenting employees of Plaintiffs, nor union dues, but *Janus* does indicate that Local Law 87's purported aim to foster "labor peace" must, if it is a legitimate aim when there is no history of labor discord, be attained through means that do not impinge on Plaintiff's First Amendment rights to the extent that Local Law 87 does.

A case that the City cites for the proposition that "restriction of participation in government contract work to those affiliated with a particular union has been upheld against free association challenges," held only that a contractor who was not awarded a government contract could not state a plausible First Amendment claim that this resulted in a violation of its right to associate with a labor union representing its workers or with the workers themselves. *Higgins Elec. Inc. v. O'Fallon Fire Protection Dist*., 813 F.3d 1124, 1130 (8th Cir. 2016). *Higgins* has

The City's allegation that "courts have commonly invoked the principle that government is not required to provide funds to maximize exercise of free association even if the result is economic hardship" (City Br. at 13), rests primarily on the Supreme Court's reasoning that "[e]xercising the right to strike inevitably risks economic hardship, but we are not inclined to hold that the right of association requires the Government to minimize that result by qualifying the striker for food stamps." *Lyng v. Int'l Union*, 485 U.S. 360, 368 (1988). That case has no relevance here where employees have never gone on strike, and any interference with the nonprofits' missions would involve far more than "economic hardship" for a few people.

Finally, the City cannot support Local Law 87's requirement that "labor peace agreements" include a provision that the parties will "refrain from actions intended to or having the effect of interrupting . . . . Services" on the ground that "[t]he right to free speech does not encompass the right to cause disruption" (City Br. at 13), by citing *Startzell v. City of Philadelphia*, 553 F.3d 183, 198 (3d Cir. 2008), which held that the state is free to uphold public order by banning demonstrations in public places. The allegations in the Complaint belie any suggestion by the City that public order may be jeopardized by public demonstrations.

## D.  The Complaint States a Claim Under the Contracts Clause of the U.S. Constitution

The City's attack on Plaintiffs' Contracts Clause claim is also misplaced. Among other things, the Complaint alleges complex facts about the nature of the agreements affected by Local Law 87 and, ultimately, factual development will be needed.

The Second Circuit very recently noted the Supreme Court's current recognition that the Contracts Clause, U.S. Const. art. 1, § 10, cl.1, undoubtedly has "continued validity" both in the context of public contracts and private contracts. *Melendez v. City of New York*, 16 F.4th 992,

<hr>

nothing to do with this case.

1027-28 (2d Cir. 2021) (citations omitted). The Complaint alleges sufficient facts to demonstrate

that 1) Local Law 87 creates a substantial impairment of contract, and 2) that it does not serve "a

legitimate public purpose such as remedying a general social or economic problem," and

therefore violates the Contracts Clause. *Connecticut State Police Union v. Rovella*, 36 F.4th 54,

63 (2d Cir. 2022). Plaintiffs are required only to "establish that the allegations in the Complaint

are sufficient to render [their] claim[s] plausible," *Roberts v. New York*, 911 F. Supp. 2d 149, 177

(N.D.N.Y. 2012) (citations omitted), and the Complaint here more than meets this standard..

### 1. Local Law 87 Creates a Substantial Impairment of Contract

In the unusual circumstances of Plaintiffs' unusual relationship with the City, the

Contracts Clause issues implicated by Local Law 87 cannot adequately be analyzed on a motion

to dismiss.  Moreover, this Court should not deploy an overly exacting standard regarding when

a City "contract" "was made" for purposes of deciding whether the Law violates pre-existing

contracts.

The City cites *Community Housing Improvement Prog. v. City of New York*, 492 F. Supp.

3d 33, 53 (E.D.N.Y. 2020) (appeal pending) (and other similar cases), for the proposition that a

contract cannot be impaired "by a law in effect at the time the contract was made" (City Br. at

21), but that case involved amendments to the state's rent-stabilization laws, *id*. at 38, whose

application to future leases was plain and straightforward.  The City also cites two other

inapplicable cases: *Harmon v. Markus*, 412 Fed. App'x 420, 423 (2d Cir. 2011), where there was

"no dispute that the [challenged statute] was enacted and became applicable to the Harmons'

property ***many years*** before they took ownership of it" (emphasis added), and *2 Tudor City Place

Assocs. v. 2 Tudor City Tenants Corp*., 924 F.2d 1247, 1254 (2d Cir. 1991), where nullification

of a lease did not violate the Contracts Clause since the lease was executed a year ***after*** passage

of a law permitting nullification of such a lease.

These cases have very little relevance here, where it would ignore reality to base the Constitutional analysis on a strict line between a human services agreement registered before or after Local Law 87 became effective on November 16, 2021. As discussed above, since the City rarely processes its human services contracts before the contract "start date," virtually all of the human services contracts, when finalized, are "retroactive," meaning that they are registered by the City Comptroller for "implementation" (and payment) well after the contract "start date." Human services "contracts" are typically "registered" months, or even years, after their "start dates."[12] Human services providers work without City funding during the interim. As a result, a purportedly-prospective Local Law 87 will, in effect, be retroactive.

This also raises the serious question about whether a City human services "contract" is "made" when signed or when registered. Local Law 87 defines a "city service contractor" as "any person that enters into a city service contract with a contracting agency." LL87 § 6-145(a). The Law variously describes a "city service contract" as a "written agreement, *id*., or an "award or renewal" *id*. § (b) & (c). Local Law 87 does not mention signing, execution, or registration.[13]

---

[12] *See* Compl. ¶ 51 (plaintiff FedCap Group's "affiliates often perform services for City clients before a City contract is in place and City funding is available."); *id.* ¶¶ 66, 73, 76, 80, 84, 87, 91, 100, 114 (same with plaintiffs BronxWorks, Catholic Charities Neighborhood Services, Inc.; Children's Aid; Children's Village; Forestdale, Inc.; Greenwich House; Mosholu Montefiore Community Center; RiseBoro Community Partnership; HSC's general membership.) The City has admitted that it has "taken advantage" of non-profit human services providers in this way because they will provide services without funding since providing human services is their mission and their passion; for-profit entities would not work under this kind of delayed-funding system. Compl. ¶¶ 116, 117.

[13] The City has tried to rectify this through provisions in its litigation-driven "Rider" to a "city services contract" that provides that the date of an "award" will be deemed to be the date on which a contract is signed (Kane Dec. Exh. 1 at § 6), and through its likewise litigation-driven FAQs, which provide:

The requirements of Local Law 87 apply to "City Service Contracts," . . . . that

The signature/registration delay, however, is significant in making Local Law 87's provisions retroactive, as described above. As a specific example, a contract between plaintiff Catholic Charities Neighborhood Services, Inc. and a City agency was not registered until April 15, 2022, despite a formal start date of December 1, 2021. Compl. ¶ 73.

In this situation, the Complaint's description of the complexity surrounding the City's system for funding nonprofit human service providers is sufficient to survive a motion to dismiss. Factual development will ultimately be needed before the Court can complete the Contracts Clause analysis.

---

are signed by both parties on or after November 16, 2021; for which the contractor was not notified in writing of their selection for the award of such contract or renewal prior to November 16, 2021; and for which services did not begin (under either the award or renewal, as described in question three) prior to November 16, 2021.

(Feb. 4 FAQs 1.) Neither of these documents has the force of law and neither is binding on the City. The fact that the City felt the need to make such statements after this case was brought is only an admission that there are questions of fact that need to be explored through discovery regarding when a human services contract enters into force for the purposes of the Contracts Clause and Local Law 87.

The City's allegation that the "Court **must reject** Plaintiff's allegations to the extent they are specifically contradicted by the Local Law, ***and/or the FAQs referred to and incorporated into the Complaint*** (City Br. at 14 n.7) (emphases added), is plain nonsense. The FAQs have not been promulgated as rules under the City Administrative Procedure Act (because the City does not want to be bound by them), they are not binding on the City, Compl. ¶ 33, and certainly not on this Court, which is now only addressing the sufficiency of the Complaint's Contracts Clause claim. The FAQs have no more legal significance than unsupported assertions in the City's legal brief.

The City cites *Poindexter v. EMI Record Group Inc.*, 2021 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2021), which says only that a court "***may consider*** . . . materials incorporated in the Complaint by reference." (Emphasis added.) And here, the Complaint does ***not*** incorporate the City's FAQs by reference, but instead sets out their grievous shortcomings, noting, among other things, that they lack the force of law. Compl. ¶¶ 30-33. Similarly, *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 314 (S.D.N.Y. 2008), has nothing to do with this case, and just says that a court "is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff[.]"

Indeed, in a case where unions attacked a county wage freeze instituted after the county contracted with the unions, *Sullivan v. Nassau Cty. Interim Finance Authority*, 959 F.3d 54 (2d Cir. 2020), the Second Circuit rejected a "bright line" between pre- and post-contract legislative action when this "potentially simple rule is complicated by two additional and commingled factors: the Supreme Court's holding that the exercise of some powers, no matter who exercises them, is necessarily legislative; and the advent of oversight agencies . . . , with authority to act under broad delegations of state power," which "may be too broad to be viewed as simply applications of a previously established rule." *Id*. at 62.

Here, exercise of the Comptroller's or City agencies' purported powers to apply and interpret Local Law 87 is necessarily legislative. Where a legislature's acts allow a governmental oversight body "not only to breach a previously made . . . contract to which the state is a party," but also "to use the state's power to invalidate portions of those contracts, thereby negating any state law breach of contract remedy," courts have consistently held that "the line between breach and removal of any remedy for a breach" is the "line delineating when a Contracts Clause claim might lie." *Id*. at 63.

Local Law 87 defines a "material breach" of a "city services contract" as occurring any time a nonprofit cannot obtain and submit a union leader's attestation and cannot cure this breach within 30 days, LL87 § 6-145(e)(2)(a) & (c). Under the statute, a City agency may ***by itself*** find a nonprofit to be in default and terminate a contract, *id*. (f)(1)(c); and a nonprofit's only remedy is an administrative proceeding before a "hearing officer" at the City's Office of Administrative Trials and Hearings. *Id*. § (f)(2). Local Law 87 thereby operates to remove the usual legal remedy for a breach of contract. "Hearing Officers" at OATH, are themselves members of a union, the United Federation of Teachers, which, circularly, as a labor union, can instigate an

investigation into a nonprofit under Local Law 87.  *Id*. § (f)(1).[14]  Plaintiffs' claim that Local Law 87 violates the Contracts Clause properly lies between the City agency's determination that there is a "breach of contract" and the removal of any meaningful remedy against this determination available to the nonprofit.

In addition, since Local Law 87, by its terms, reaches "renewals" of pre-existing contracts, it is retroactive and impairs pre-existing contracts.  LL87 § 6-145(b)(1) & (c)(1).  Generally, the renewal of a City contract is one-sided; the City can renew a contract, and a provider must accept the renewal.  Local Law 87 thereby unlawfully inserts new terms into contracts due for renewal.  Compl. ¶ 149.

Local Law 87's retroactive application to existing contracts is further confirmed by its provision for the Mayor or his designee, including the Comptroller, to promulgate rules "as appropriate" through the City Administrative Procedure Act, or CAPA. LL87 § 6-145(d)(2).  Since neither the Mayor nor his designee has (yet) issued such rules, human services providers must enter into City contracts without knowing if or when any rules may be promulgated or by whom, let alone what these rules may provide.  The most significant factor in determining whether there is a substantial impairment of contract is "the extent to which the disadvantaged party . . . ordered its affairs" based upon a contract's terms.  *Donohue v. Paterson*, 715 F. Supp. 2d 306, 218, 319 (N.D.N.Y. 2010) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978) ("Contracts enable individuals to order their personal and business affairs . . . . Once arranged, … the parties are entitled to rely on them.")).  The uncertainty over what rules

---

[14] The City cites to the availability of Article 78 proceedings to review OATH decisions (City Br. at 17-18; *see also id*. at 9 n.4, 10-11), but the standard of review ("arbitrary and capricious") would leave essentially unreviewable an inherently-biased OATH ruling, that is itself based on the Comptroller's or a City agency's unfettered discretion.

may apply to Plaintiffs' human services contracts fulfills the most significant factor required for the Complaint's Contracts Clause claim.

All these allegations together are sufficient to withstand a motion dismiss, since Local Law 87's inevitable retroactive application to human services contracts, as well as City officials' ability to promulgate binding rules at any time after a contract begins, works a substantial impairment of contract. Indeed, a law that, like Local Law 87, "provides for only one side of the bargaining table to modify any term of a contract after it has been negotiated and executed is perhaps the epitome of a substantial impairment." *Donohue v. Mangano*, 886 F. Supp. 2d 126, 156 (E.D.N.Y. 2012) (citation omitted).

A more-specific example of Labor Law 87's interference with existing contracts is that it "has already caused significant complications for [plaintiff Mosholu Montefiore Community Center]'s operations." Compl. ¶ 92. Since its employees are already unionized, MMCC hoped it would be exempt from the Law or that it would only be required to file one attestation for each agency with which it contracts, rather for each contract, but the City has required an attestation per each of MMCC's fifty-one City contracts. (*Id*.) The Law has thereby imposed new repetitive, time-consuming, and unforgiving contractual demands on MMCC. (*Id*.)

## 2. Local Law 87 *Does Not* Serve a Significant and Legitimate Public Purpose But *Does* Provide a Benefit to Special Interests

A case cited by the City, *Energy Reserves Grp. v. Kan. Power & Light Co*., 459 U.S. 411 (1983), explains exactly why Local Law 87 *is* unconstitutional:

> If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, . . . . such as *the remedying of a broad and general social or economic problem*. . . . The requirement of a legitimate public purpose guarantees that the State is exercising its police power, *rather than providing a benefit to special interests*.

*Id*. at 411-12 (emphases added); *see also Menendez v. City of N.Y.*, 16 F.4th 992, 1027 (2d Cir.

2021) (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26 (1977) ("a less deferential standard of review [of a legislative judgment about social legislation] should apply in assessing whether a state's impairment of its own contract is 'reasonable and necessary to serve an important public purpose.'")).

The City's motion never even ***attempts*** to identify a broad and general social or economic problem that Local Law 87 was promulgated to remedy. The City ***could not do so*** as there is ***no history*** of labor-connected work stoppages in the provision of human services by nonprofits. Compl. ¶ 128. The main sponsor of Local Law 87 did not identify any historic work stoppages that the Law was required to prevent going forwards. (*Id.*) The Law's championing of agreements in which "[a] covered employer and [a] labor organization and its members agree to the uninterrupted delivery of services pursuant to [a] city service contract and to refrain from actions intended to or having the effect of interrupting such services," LL87 § 6-145(a) (subpart 1 of definition of "Labor Peace Agreement"), is not aimed to cure any prior interruption of services; there has been none, and the City does not suggest otherwise.

On the other hand, what Local Law 87 ***does do*** is provide "a benefit to special interests," *i.e.,* labor unions. The Law's requirements – that, "[n]o later than 90 days after the award or renewal of a city service contract," a nonprofit must "submit an attestation to the applicable contracting agency, ***signed by one or more labor organizations***"; and then, thereafter, during the entire term of a contract, if a union seeks to represent its employees, submit an attestation, ***again signed by a union***, LL87 § 6-145(b)(1) & (2) – have no effect other than to invite and encourage labor unions to organize nonprofits' workers, and to give union leaders the power to sign or refuse to sign attestations as they please. The law does more than "provide a benefit" to unions, essentially ceding power over City human services contracts to union leaders. Indeed, the Law's

preamble makes this manifest by describing itself as "in relation ***to requiring city human services contractors to enter into labor peace agreements***."

**E. Local Law 87 Violates New York State Law**

Finally, the Law's delegation of procurement powers to labor union leaders does not merely violate the Supremacy Clause and federal labor law; it violates State procurement laws as well.  *See In re New York State Corr. Officers*, 70 A.D.3d at 243-44, 892 N.Y.S.2d at 617 (State's agreement to give a union "veto power" over government contracts "would constitute an impermissible delegation of the state's obligations").  The motions to dismiss should be denied.

**CONCLUSION**

The Court should deny the City's and DC37's motions to dismiss the Complaint.

Dated: New York, New York

     November 15, 2022

                            KOSTELANETZ LLP

By:     *[signature]*

                    Claude M. Millman
                    Caroline Rule
                    Usman Mohammad
                    Seven World Trade Center, 34th Floor
                    New York, NY 10007
                    212-808-8100
                    cmillman@kflaw.com
                    crule@kflaw.com
                    umohammad@kflaw.com
                    *Attorneys for Plaintiffs*