UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUMAN SERVICES COUNCIL OF NEW
YORK, BRONXWORKS, INC., CATHOLIC
CHARITIES, DIOCESE OF BROOKLYN,
THE CHILDREN'S AID SOCIETY, THE
CHILDREN'S VILLAGE, THE FEDCAP
GROUP INC., FORESTDALE INC.,
GREENWICH HOUSE, INC., MOSHOLU
MONTEFIORE COMMUNITY CENTER,
INC., PUBLIC HEALTH SOLUTIONS, and
RISEBORO COMMUNITY PARTNERSHIP
INC.,

                 Plaintiffs,

      - against -

THE CITY OF NEW YORK, ERIC ADAMS,
in his official capacity as the Mayor of the
City of New York, and BRAD LANDER, in
his official capacity as the Comptroller of the
City of New York,

              Defendants,

      - and -

DISTRICT COUNCIL 37, AMERICAN
FEDERATION OF STATE, COUNTY, AND
MUNICIPAL EMPLOYEES, AFL-CIO,

           Intervenor-Defendant.

**MEMORANDUM
OPINION & ORDER**

21 Civ. 11149 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      In this action, Plaintiff Human Services Council of New York and a number of its

member organizations challenge the legality of New York City Local Law 87, N.Y.C. Admin.

Code § 6-145 ("Local Law 87"), which requires New York City social services contractors to

negotiate towards a labor peace agreement with any union that seeks to represent the contractors'

employees.  (Am. Cmplt. (Dkt. No. 76-1) ¶ 1)  Plaintiffs contend that the law is preempted by the National Labor Relations Act ("NLRA") and the Labor Management Relations Act ("LMRA"), and that it violates several provisions of the U.S. Constitution.  (Id. ¶¶ 154-56, 159-162, 166, 171, 175)

Defendants City of New York (the "City"), Mayor Eric Adams, and City Comptroller Brad Lander (collectively "Defendants") have moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 94) Intervenor-Defendant District Council 37, American Federation of State, County and Municipal Employees, AFL-CIO ("DC 37") has likewise moved to dismiss the Amended Complaint.  (Dkt. No. 96)

For the reasons stated below, Defendants' and Intervenor-Defendant's motions to dismiss will be granted.

## BACKGROUND

### I.     FACTS[1]

#### A.     The Parties

Plaintiff Human Services Council of New York (the "Council") is a non-profit business association that serves as "an umbrella organization of approximately 170 non-profit organizations that employ over 200,000 individuals who provide social services to the needy in the New York City area."  (Am. Cmplt. (Dkt. No. 76) ¶ 16)  Pursuant to contracts with the City, the Council's member organizations "provide early childhood education and after-school

---

[1]  The Court's factual statement is drawn from the Amended Complaint and documents it incorporates by reference.  The Amended Complaint's well-pled facts are presumed true for purposes of resolving the motions to dismiss.  See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

programs, run food pantries, respond to emergencies and natural disasters, provide mental health counseling, shelter homeless people, and care for the elderly, among many other community services." (Id. ¶ 17)  The Council's "core activities" include "advising its members on how to navigate the City procurement contracting process"; "pressing for higher wages for human services workers"; and "supporting member organizations by addressing their concerns regarding public policy and the regulatory environment, and keeping them informed about economic trends and new technology." (Id. ¶ 20)

The Council's member organizations include Plaintiffs BronxWorks, Inc., Catholic Charities Brooklyn & Queens, The Children's Aid Society, The Children's Village, The Fedcap Group Inc., Forestdale Inc., Greenwich House, Inc., Mosholu Montefiore Community Center, Inc., Public Health Solutions, and RiseBoro Community Partnership Inc. (Id. ¶ 1)  Each Plaintiff currently provides social services to City residents pursuant to contracts with the City. (Id. ¶¶ 65, 72, 75, 79, 83, 87, 91, 95, 99)

Defendant Eric Adams is the mayor of New York City, and Defendant Brad Lander is the Comptroller of New York City. (Id. ¶¶ 103-04)  Intervenor-Defendant DC 37 is New York City's "largest public employee union." (Id. ¶ 124)

**B.    Local Law 87**

**1.    Legislative Background**

On April 22, 2021, New York City Council Speaker Corey Johnson introduced a bill that ultimately became Local Law 87. (Id. ¶¶ 124-25)  DC 37 was "deeply involved" in drafting the bill. (Id. ¶ 126)

The bill was enacted on August 18, 2021. (Id. ¶ 127)  In a press release issued that day, Johnson – the "main sponsor" of Local Law 87 – "did not identify any historic work stoppages that the Law was required to avoid in the future, and did not suggest that the law

would somehow promote continuity of services for New York City's communities." (Id. ¶ 128) Instead, Johnson said that the law would "give over 200,000 of our City's essential human service workers the right to organize for the pay and benefits they deserve." (Id.) (citation and quotation marks omitted)

Bill de Blasio, the then-mayor of New York City, said that the law "would ensure that New York City is 'a union town.'" (Id.)

### 2. **Local Law 87's Requirements**

Local Law 87 – which became effective on November 16, 2021 – requires human services contractors and subcontractors – as a prerequisite for maintaining a contract with a City agency – to either (1) enter into a "labor peace agreement" ("LPA") with a labor organization; or (2) attest that no union has sought to represent their employees. (Id. ¶¶ 1, 4)

The law defines "human services" as

> social services contracted for by [a City] agency on behalf of third party clients including but not limited to day care, foster care, home care, health or medical services, housing and shelter assistance, preventive services, youth services, the operation of senior centers, employment training and assistance, vocational and educational programs, legal services and recreation programs.

N.Y.C. Admin. Code § 6-145(a).

The law's labor peace agreement requirement provides as follows:

(1) No later than 90 days after the award or renewal of a city service contract or approval of a city service subcontractor, such covered employer, shall either:

> (a) submit an attestation to the applicable contracting agency, signed by one or more labor organizations, as applicable, stating that the covered employer has entered into one or more labor peace agreements with such labor organizations, and identify: (i) the classes of covered employees covered by the labor peace agreements, (ii) the classes of covered employees not currently represented by a labor organization and that no labor organization has sought to represent, and (iii) the classes of covered employees for which labor peace agreement negotiations have not yet concluded; or

(b) submit an attestation to the applicable contracting agency stating that the covered employer's covered employees are not currently represented by a labor organization and that no labor organization has sought to represent such covered employees.

(2) Where a labor organization seeks to represent the covered employees of a covered employer after the expiration of the 90-day period following the award date of the city service contract or the approval of a city service subcontractor, and the labor organization has provided notice to the contracting agency and the covered employer regarding such interest, the covered employer shall then submit an attestation signed by the labor organization to the applicable contracting agency no later than 90 days after the date of notice stating that it has entered into a labor peace agreement with such labor organization or that labor peace agreement negotiations have not yet concluded.

Id. § 6-145(b).

The "labor peace agreement" must provide "that the covered employer and the labor organization . . . agree to the uninterrupted delivery of services to be rendered pursuant to the city service contract and to refrain from actions intended to or having the effect of interrupting such services." Id. § 6-145(a).

Any party seeking "the award or renewal of a city service contract" must "provide the awarding contracting agency a certification containing," inter alia,

[a] record of any instances during the preceding five years in which the bidder or proposer seeking award, or the city service contractor seeking renewal, as applicable, has been found by a court or government agency to have violated federal, state or local laws regulating labor relations, in which any government body initiated a judicial action, administrative proceeding or investigation of the bidder, proposer, or city service contractor in regard to such laws.

Id. § 6-145(c). The certifications must be "integrated into and contained in [a City] database" that includes other information about contractors, including contract sanction history, whether the contractor has been the subject of criminal investigation, and administrative findings regarding the contractor. City agencies are required to "examine" this database before awarding a contract. Id. § 6-145(c); see id. §§ 6-116.2(b)(i)(1)-(23), 6-116.2(e).

A failure to comply with Local Law 87 "may constitute a material breach" of a human services contract with the City. Such a breach authorizes the City – upon written notice to the contractor – to "pursue any rights or remedies available under the terms of the city service contract or under applicable law, including termination of the contract." Id. § 6-145(e)(2)(c).

The City's Comptroller "shall conduct an investigation" whenever the Comptroller "has reason to believe that a covered employer or other person has not complied with the requirements of [Local Law 87]." Id. § 6-145(f)(1). "[I]nterested part[ies]" may also submit "verified complaint[s]" of potential violations of Local Law 87 to the Comptroller for investigation. Id. After the Comptroller reports his or her findings to the contracting agency, the agency

> may, where appropriate, issue an order, determination or other disposition. Such disposition may:
>
> (a) Direct the filing or disclosure of any records that were not filed or made available to the public as required by this section;
>
> (b) Direct payment of the sums withheld at the commencement of the investigation and the interest that has accrued thereon to the covered employer;
>
> (c) Find the city service contractor to be in default or otherwise terminate the applicable city service contract;
>
> (d) Withdraw approval of a city service subcontractor;
>
> (e) Assess actual and consequential damages; or
>
> (f) Enter an agreement with the city service contractor allowing the contractor to cure the violation.

Id. "In assessing an appropriate remedy, due consideration shall be given to the size of the covered employer's business, the covered employer's good faith, the gravity of the violation, the history of previous violations and the failure to comply with recordkeeping, reporting or other requirements." Id.

Local Law 87 does "not apply to awards or renewals of city service contracts prior to [its] effective date" of November 16, 2021. N.Y.C. Local Law 87/2021 § 2(a).

Although Local Law 87 provides that the Mayor or his designee "shall promulgate implementing rules and regulations, as appropriate and consistent with this section," N.Y.C. Admin. Code § 6-145(d)(2), "[n]o rules or regulations have been promulgated." (Am. Cmplt. (Dkt. No. 76) ¶ 8)

### 3.    City Guidance Regarding the Effective <u>Date and Implementation of Local Law 87</u>

On February 4, 2022, the City issued a guidance document – styled as answers to frequently asked questions ("FAQs") – regarding the effective date of Local Law 87. (Kane Decl., Ex. 2 (Feb. 4, 2022 Effective Date FAQs) (Dkt. No. 99-2)) In these FAQs, the City advises that, as a general matter, Local Law 87 applies to "non-emergency human services contracts . . . or renewals over $100,000 that are signed by both parties on or after November 16, 2021" where (1) "the contractor was not notified in writing of their selection for the award of such contract or renewal prior to November 16, 2021," and (2) "services did not begin (under either the award or renewal . . .) prior to November 16, 2021." (<u>Id.</u> at 2)[2]

On March 25, 2022, the City issued a second set of FAQs regarding the implementation of Local Law 87. (Kane Decl., Ex. 3 (Mar. 25, 2022 Implementation FAQs) (Dkt. No. 99-2)) The March 25, 2002 FAQs acknowledge that labor peace agreements may include terms unrelated to the delivery of services:

> LPAs may also include other terms agreed upon by the parties, such as terms relating to: (i) alternate procedures related to recognizing the labor organization for bargaining purposes, (ii) public statements, (iii) workplace access, (iv) the provision of employee contact information; and (v) a process for the productive

---

[2] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

Case 1:21-cv-11149-PGG    Document 109    Filed 11/14/24    Page 8 of 57

resolution of disputes. These topics are illustrative and are not intended to specify or limit the terms that may be included in an LPA in order to achieve the goals of ensuring the uninterrupted delivery of services and avoidance of actions intended to or having the effect of interrupting such services.

(Id. at 4)[3]

### C.    Impact of Local Law 87 on Human Services Council Members

The Council estimates that "about half of its members have some unionized workers." (Am. Cmplt. (Dkt. No. 76) ¶ 123)  The Amended Complaint notes that "[u]nions have found it difficult to organize the employees of [human services] charities because the unions have little to offer," given that the City typically sets wages:

> The City's human services contracts are typically "budget based," "cost reimbursement" contracts. The budget set by the City is typically too low for the services solicited by the City. So, in effect, the City is only partially funding the contracted services. When the City issues "budget based" contracts, it generally identifies the staffing pattern that the contractor must provide (e.g., 10 social workers) and an associated maximum reimbursable sum for that staffing pattern. As a result, the City, in effect, sets the wage that it is willing to fund. In short, human services charities generally want to pay their workers more, but they cannot do so due to the limited funds the City's staffing pattern demands. . . .

> Unlike a construction company, which may have greater control over staffing patterns and access to capital, a human services charity cannot increase wages at will. A unionized worker at such a charity may actually take home less, when union dues are taken into account, than a non-unionized worker. As a result,

---

[3]  The February 2022 and March 2022 FAQs are public records that are available online via the City's Passport website.  (See Passport (last visited November 12, 2024), available at https://passport.cityofnewyork.us/page.aspx/en/rfp/request_browse_public; see also Def. Br. (Dkt. No. 95) at 16 n.2)  This Court may therefore take judicial notice of the FAQs for purposes of resolving Defendants' motions to dismiss.  See Fair Hous. Just. Ctr. Inc. v. Lighthouse Living LLC, No. 20 CV 4066 (NSR), 2021 WL 4267695, at *4 (S.D.N.Y. Sept. 20, 2021) ("The Court may take judicial notice of public documents, including those from administrative agencies."); Porrazzo v. Bumble Bee Foods, LLC, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) ("[I]t is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss.").  Moreover, given that Plaintiffs quote at length from the March 2022 FAQs in the Amended Complaint (Am. Cmplt. (Dkt. No. 76) ¶¶ 30-33), the March 2022 FAQs are incorporated by reference into the Amended Complaint.

8

some workforces have rejected union organizing efforts as contrary to their own financial interests.

(Id. ¶¶ 121-23)

The Amended Complaint alleges, however, that Local Law 87 has "spill-over effects" on employees who are not working on City contracts or working only part-time on City contracts, because "[s]ome human service providers who contract with the City employ . . . workers funded from other sources."  (Id. ¶¶ 10, 147)  Human Services Council

> members include employers that provide human services through City contracts, as well as services funded by the federal government, the state government, and/or private organizations.  These not-for-profit organizations employ workers who work on both City projects and on non-City projects.  In some cases, individual workers provide human services that are only partially funded by the City, i.e., services that are funded, in part, by the federal government, the state government, and/or private donors.

(Id. ¶ 147)

For example, Plaintiff BronxWorks

> also receives funds from New York State, the federal government, and private donations.  Its workforce is not segregated by workers who only perform work on City funded projects, versus workers who perform work on projects funded by the state or federal governments or private parties.  Some BronxWorks employees who work on City contracts also work on state, federal and/or private contracts.  Some BronxWorks employees spend a minority of their time working on projects funded by the City, while spending the majority of their time working on projects that are not funded by the City.

(Id. ¶ 67)  Indeed, all of the Plaintiff Council members allege that they receive funding from sources other than the City; that their employees work on projects funded by those other parties; that they do not segregate their employees by whether they perform work on City-funded projects; and that some of their employees only spend a fraction of their time on projects funded by the City.  (Id. ¶¶ 74, 77, 81, 85, 88, 93, 97, 101)

The Amended Complaint further alleges that, "[a]s a practical matter, if Local Law 87 is applied to . . . [Plaintiffs'] workers [who] work on City contracts, it will also apply to

[Plaintiffs'] workers who perform work funded by the state and federal governments, and private parties." (Id. ¶ 67; see id ¶¶ 74, 77, 81, 85, 88, 93, 97, 101)

## II.    PROCEDURAL HISTORY

The Complaint was filed by the Council on December 29, 2021.  (Cmplt. (Dkt. No. 1))

On April 8, 2022, the Council moved for a preliminary injunction enjoining the City from enforcing Local Law 87.  (Dkt. No. 39)  On June 27, 2022, this Court conducted a hearing concerning the Council's motion.  On July 14, 2022, this Court denied the Council's application.  (Dkt. No. 72)

The Amended Complaint was filed on August 16, 2022; adds a number of Council member organizations as Plaintiffs; and adds Mayor Adams and Comptroller Landers as Defendants.  (Dkt. No. 76)  The Amended Complaint alleges that Local Law 87 (1) is preempted by the NLRA and the LMRA; (2) violates numerous provisions of the U.S. Constitution, including the First Amendment (freedom of speech and freedom of association), the Contracts Clause, the Due Process Clause, the Equal Protection Clause, and the Takings Clause; and (3) violates unspecified New York State and New York City laws.  (Id. ¶¶ 154-56, 161-62, 166, 170, 175)

On September 20, 2022, Defendants moved to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 94)

On September 29, 2022, this Court granted DC 37's motion to intervene pursuant to Fed. R. Civ. P. 24(b)(1)(B).  (Dkt. No. 87)

DC 37 moved to dismiss the Amended Complaint on October 14, 2022.  (Dkt. No. 96)  Plaintiffs filed their opposition on November 15, 2022 (Dkt. No. 100), and Defendants and DC 37 filed reply briefs on December 6, 2022.  (Dkt. Nos. 101-102).

## DISCUSSION

In moving to dismiss, Defendants and Intervenor-Defendant argue that the Amended Complaint fails to state a claim. (Def. Br. (Dkt. No. 95) at 12-14; DC 37 Br. (Dkt. No. 97) at 6-7)

## I.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss[,] . . . the court is to accept as true all facts alleged in the complaint[,]" Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests," Port Dock & Stone Corp. v. Oldcastle Northeast Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish an entitlement to relief]." Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) and Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir.

1999)).  "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).  In resolving a motion to dismiss, "a district court . . . may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201."  Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, . . . matters of which a court may take judicial notice.").

## II.    **PREEMPTION CLAIMS**

In asserting that the Amended Complaint fails to state a claim, Defendants argue that Local Law 87 is not preempted by either the NLRA or the LMRA.  (Def. Br. (Dkt. No. 95) at 34; DC 37 Br. (Dkt. No. 97) at 9)

### A.    **Preemption Under the NLRA**

#### 1.    **Applicable Law**

##### a.    ***Garmon* and *Machinists* Preemption**

The Supreme Court "has articulated two distinct NLRA pre-emption principles." Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 748 (1985).  The first – "Garmon preemption" – forbids state and local regulation of activities that are "protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8."  San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244 (1959); see also id. at 245 ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . .").  In Wisconsin Department of Industry, Labor and Human Relations v. Gould Inc., 475 U.S. 282 (1986), for example, the Court

held that the NLRA preempted a Wisconsin statute that prohibited the state from purchasing

goods or services from any "person or firm found by judicially enforced orders of the National

Labor Relations Board to have violated the NLRA in three separate cases within a 5-year

period." Id. at 283. The Court held that "the Garmon rule prevents States not only from setting

forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also

from providing their own regulatory or judicial remedies for conduct prohibited or arguably

prohibited by the Act." Id. at 286.

      The second NLRA preemption principle – "Machinists preemption" – prohibits

state and municipal regulation in areas that have been left "'to be controlled by the free play of

economic forces.'" Machinists v. Wisconsin Emp. Rels. Comm'n, 427 U.S. 132, 140 (1976)

(quoting NLRB v. Nash-Finch Co., 404 U.S. 138, 144 (1971)). Machinists preemption reflects

"Congress' decision to prohibit certain forms of economic pressure while leaving others

unregulated" – "an intentional balance 'between the uncontrolled power of management and

labor to further their respective interests.'" Golden State Transit Corp. v. City of Los Angeles,

475 U.S. 608, 614 (1986) (quoting Machinists, 427 U.S. at 146). Under Machinists preemption,

"local government . . . lacks the authority to 'introduce some standard of properly "balanced"

bargaining power . . . or to define what economic sanctions might be permitted negotiating

parties in an "ideal" or "balanced" state of collective bargaining.'" Id. at 619 (quoting

Machinists, 427 U.S. at 149-50).

### b.  The Market Participant Exemption

      In Building and Construction Trades Council of Metropolitan District v.

Associated Builders and Contractors of Massachusetts/Rhode Island Inc., 507 U.S. 218 (1993)

("Boston Harbor"), the Supreme Court held that "[NLRA] pre-emption doctrines apply only to

state regulation." Id. at 227 (emphasis in original). In Boston Harbor, the project manager for a

13

Massachusetts agency tasked with cleaning up Boston harbor – a project expected to cost $6.1 billion over ten years – negotiated a project labor agreement with the Building and Construction Trades Council to "assure labor stability over the life of the project." Boston Harbor, 507 U.S. at 221. The project labor agreement required, inter alia,

> recognition of [the Building and Construction Trades Council] as the exclusive bargaining agent for all craft employees; use of specified methods for resolving all labor-related disputes; a requirement that all employees be subject to union-security provisions compelling them to become union members within seven days of their employment; the primary use of [Building and Construction Trades Council] hiring halls to supply the project's craft labor force; a 10–year no-strike commitment; and a requirement that all contractors and subcontractors agree to be bound by the [project labor agreement].

Id. at 221-22.

Contractors employing non-union labor sued, arguing that the project labor agreement was preempted by the NLRA. Id. at 223. In assessing this argument, the Court noted that

> [i]n 1959, Congress amended the NLRA to add § 8(f) and modify § 8(e). Section 8(f) explicitly permits employers in the construction industry – but no other employers – to enter into prehire agreements. Prehire agreements are collective-bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees. . . .
>
> It is undisputed that the [project labor agreement] between [the project manager] and [the Building and Construction Trades Council] is a valid labor contract under §§ 8(e) and (f). As noted above, those sections explicitly authorize this type of contract between a union and an employer like Kaiser, which is engaged primarily in the construction industry, covering employees engaged in that industry. . . .
>
> It is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a long-standing custom of prehire bargaining in the industry. See S.Rep. No. 187, 86th Cong., 1st Sess., 28, 55-56 (1959); H.R.Rep. No. 741, 86th Cong., 1st Sess., 19-20 (1959) U.S.Code Cong. & Admin.News p. 2318.

Id. at 230-31.  The Court concluded that, "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same."  Id. at 231 (emphasis in original).  Thus, "[i]n the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction."  Id. at 231-32.  The Court therefore held that the project labor agreement was not preempted by the NLRA.  Id. at 233.

In Building Industrial Electrical Contractors Association v. City of New York, 678 F.3d 184 (2d Cir. 2012) ("Electrical Contractors Association"), the Second Circuit applied Boston Harbor to project labor agreements negotiated by the City of New York.  These agreements were

> estimated to cover about half of the City's construction projects over the five years between 2009 and 2014, and provide that the covered projects will be serviced by contractors recognizing the Building and Construction Trades Council of Greater New York and Vicinity ("BCTC") and its affiliates as the sole bargaining representatives for all construction workers on [project labor agreement]-covered projects.  The BCTC is affiliated with Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO ("Local 3"), and the [project labor agreements] incorporate favorable terms for members of Local 3, which will provide the lion's share of the electrical labor on projects covered by the City [project labor agreements].  In addition to the requirement that contractors on [project labor agreement]-covered projects recognize BCTC affiliates as the collective bargaining representatives for project employees, relevant common terms of the City [project labor agreements] include:  union security clauses, which require employees on the [project labor agreements] to pay dues, or their equivalent, whether or not they join the relevant BCTC-affiliated union; a requirement for any signatory contractor to secure at least 88% of its labor through BCTC affiliates' hiring halls; prohibitions on unions' discriminating in referrals based on union affiliation; requirements that contractors contribute to affiliated union fringe benefit funds; standard work rules and hours; and no-strike clauses and dispute resolution systems.

Id. at 186.

In considering Boston Harbor's market participant exemption, the Second Circuit observed that

> Congress did not intend states' decisions about how to spend their own money as participants in the labor market to be subject to the same scrutiny as state regulation of the private labor market. "When a State owns and manages property," i.e., when it is a proprietor, "it must interact with private participants in the marketplace." Such marketplace interactions are not regulation and so are not normally subject to preemption analysis at all.

Id. at 187-88 (citation omitted) (quoting Boston Harbor 507 U.S. at 227)); see also Healthcare Ass'n of New York State, Inc. v. Pataki, 471 F.3d 87, 108 (2d Cir. 2006) ("A major limitation on the labor law preemption doctrines is the principle that state conduct will not be preempted if the state's actions are proprietary, rather than regulatory."). Applying Boston Harbor, the Second Circuit concluded that "[t]he [project labor agreements] challenged here represent the City's permissible proprietary choice," in that "the City has behaved just as any other major landowner or developer might to secure labor for many of its construction projects." Id. at 192. "Because the [project labor agreements] are market activity and not regulation, the preemption claim must fail." Id.

Courts considering application of the market participant exemption often utilize the two-part test set forth in Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686 (5th Cir. 1999):

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

Id. at 693; see Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC, 390 F.3d 206, 215-16 (3d Cir. 2004) (adopting a variation of the Cardinal Towing test); Johnson v. Rancho Santiago Cmty. Coll. Dist., 623 F.3d 1011, 1023 (9th Cir. 2010) (same); see also Sprint

Spectrum L.P. v. Mills, 283 F.3d 404, 420 (2d Cir. 2002) (citing Cardinal Towing); Healthcare

Ass'n, 471 F.3d at 109 (same).  The Cardinal Towing test "seek[s] to isolate a class of

government interactions with the market that are so narrowly focused, and so in keeping with the

ordinary behavior of private parties, that a regulatory impulse can be safely ruled out."  Cardinal

Towing, 180 F.3d at 693.

      In Airline Service Providers Association v. Los Angeles World Airports, 873 F.3d

1074 (9th Cir. 2017), the Ninth Circuit applied the Cardinal Towing test to the City of Los

Angeles' requirement that certain contractors at Los Angeles International Airport ("LAX")

"enter a 'labor peace agreement' with any employee organization that requests one."  Id. at 1077.

The Ninth Circuit held that the City of Los Angeles was "acting as a market participant,"

because

> the City is attempting to avoid disruption of its business:  If a private entity
> operated LAX, that entity would have a pressing interest in avoiding strikes,
> picket lines, boycotts, and work stoppages.  Those interests are not any less
> pressing simply because the City rather than a private business operates the
> airport, and labor peace agreements are one way to protect those interests.

Id. at 1080, 1082.

      The court further found that the labor peace agreement requirement was

> narrowly tied to a specific proprietary problem:  service disruptions at LAX,
> which the City manages as proprietor.  Nothing in the text of section 25 or in the
> Complaint's allegations suggests that section 25 will be enforced throughout the
> rest of the City's jurisdiction or that section 25 will hamper service providers'
> operations elsewhere.

Id. at 1082 (quotation marks and citations omitted).  The court therefore "affirm[ed] the [Rule

12(b)(6)] dismissal of Plaintiffs' preemption claims."  Id. at 1086.

      In Metropolitan Milwaukee Association of Commerce v. Milwaukee County, 431

F.3d 277 (7th Cir. 2005), however, the Seventh Circuit reached the opposite result with respect

to a Milwaukee County ordinance that required "firms that have contracts with the County for

the provision of transportation and other services for elderly and disabled County residents to negotiate 'labor peace agreements' with any union that wants to organize employees who work on County contracts." Id. at 277-78. The Seventh Circuit found that the ordinance would have a "spillover effect" on employees working on non-Milwaukee County contracts:

> Although the obligation to negotiate a labor-peace agreement kicks in only when a union seeks to represent employees who do work on the employer's contracts with the County, § 31.03, most of the agreement itself applies to the employer's other employees – employees who may never work on a County contract – as well as to the work that is not County-related of the employees who do work part of the time on the County contracts. In fact, all but one of the terms that the agreement must contain apply to "employees," §§ 31.02(f)(1), (2), (4), (7), rather than just to "employees of the employer [who are] working within the appropriate bargaining unit," which is to say a unit limited to "those employees whose work results from or has some tangible relationship to the provision of contractual services purchased by Milwaukee County." § 31.02(f)(3).

Id. at 279.

The Seventh Circuit further concluded that the Milwaukee ordinance was "not actually tailored to preventing work stoppages," because "the existence of effective contractual remedies for service interruptions eliminates the need for states or their subdivisions to create a special regime for the labor relations of their contractors." Id. at 280-81. Given these circumstances, the Seventh Circuit concluded that the Milwaukee ordinance's labor peace agreement requirement was "a pretext to regulate the labor relations of companies that happen, perhaps quite incidentally, to do some County work," and was therefore preempted by the NLRA. Id. at 282.

### 2.    Analysis

Local Law 87 requires that – within 90 days of the award or renewal of a City human services contract – a contractor must certify to the contracting agency that (1) "the covered employer has entered into one or more labor peace agreements" with a labor organization; or (2) "the covered employer's covered employees are not currently represented by

a labor organization and that no labor organization has sought to represent such covered employees." N.Y.C. Admin. Code § 6-145(b)(1). After the expiration of the 90-day period, whenever a "labor organization has provided notice to the contracting agency and the covered employer" that it "seeks to represent" the contractor's employees, the contractor must submit an attestation within 90 days of the notice stating that "it has entered into a labor peace agreement with such labor organization or that labor peace agreement negotiations have not yet concluded." Id. § 6-145(b)(2). Under Local Law 87, the only required term in a labor peace agreement is that the parties "agree to the uninterrupted delivery of services to be rendered pursuant to the city service contract and to refrain from actions intended to or having the effect of interrupting such services." Id. § 6-145(a).[4]

       This sole required term relates directly to the City's interest in "avoid[ing] disruption of its business" with its contractors and the human services they provide. Airline Serv. Providers, 873 F.3d at 1080. The City clearly has a compelling proprietary interest in avoiding work stoppages, strikes, and other disruptions in the delivery of the critical services provided by Council members. See id. ("If a private entity operated LAX, that entity would have a pressing interest in avoiding strikes, picket lines, boycotts, and work stoppages. Those interests are not any less pressing simply because the City rather than a private business operates the airport, and labor peace agreements are one way to protect those interests."); Metro. Milwaukee, 431 F.3d at 282 ("The County has a legitimate interest in avoiding interruptions in the services it furnishes its residents. . . ."); see also Healthcare Ass'n, 471 F.3d at 108 ("The State's articulated concern, getting what it paid for, is a quintessentially proprietary concern and one that any

---

[4]  Although Local Law 87 states that labor peace agreements must also include "any other terms required by rules promulgated" by the Mayor or the Mayor's designee, id. §§ 6-145(a), 6-145(d)(2), no such rules have been promulgated.  (Am. Cmplt. (Dkt. No. 76) ¶ 8)

private party would care about as well."); Hotel Emps. & Rest. Emps. Union, 390 F.3d at 217
("The City's decision to insist that contractors and employers of staff hospitality employees sign
no-strike agreements is specifically tailored to protect its proprietary interest in the value of the
tax-revenue-generating property."). In requiring that all labor peace agreements provide for the
parties' "agree[ment] to the uninterrupted delivery of services" pursuant to City contracts, Local
Law 87 furthers the City's "legitimate interest in avoiding interruptions in the services it
furnishes its residents. . . ." Metro. Milwaukee, 431 F.3d at 282.

      Moreover, Local Law 87's labor peace agreement requirement is expressly
limited to the "delivery of services to be rendered pursuant to [a] city service contract" and to
"actions intended to or having the effect of interrupting such services." N.Y.C. Admin Code § 6-
145(a) (emphasis added). Accordingly, Local Law 87 does not, on its face, reach beyond City
contracts, and thus differs materially from the Milwaukee ordinance in Metropolitan Milwaukee,
which expressly applied to "the employer's other employees – employees who may never work
on a County contract – as well as to the work that is not County-related of the employees who do
work part of the time on the County contracts." Metro. Milwaukee, 431 F.3d at 289. Because
Local Law 87's labor peace agreement requirement applies solely to the "delivery of services to
be rendered pursuant to [a] city service contract" (N.Y.C. Admin. Code § 6-145(a)), Local Law
87 is tailored to addressing the City's proprietary interest in avoiding service disruptions among
its human services contractors. See Cardinal Towing, 180 F.3d at 693; see also Bldg. & Const.
Trades Dep't, AFL-CIO v. Allbaugh, 295 F.3d 28, 36 (D.C. Cir. 2002) ("Because the Executive
Order does not address the use of [project labor agreements] on projects unrelated to those in
which the Government has a proprietary interest, the Executive Order establishes no condition
that can be characterized as 'regulatory.'"); Hotel Emps. & Rest. Emps. Union, 390 F.3d at 217-

18 (declining to find preemption under the NLRA where "the requirement that an employer sign a labor agreement is limited to hotels and hospitality projects receiving [city] funds"); cf. Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1338 (D.C. Cir. 1996) (executive order "barring the federal government from contracting with employers who hire permanent replacements during a lawful strike" was preempted by the NLRA because it would "have the effect of forcing corporations wishing to do business with the federal government not to hire permanent replacements even if the strikers are not the employees who provide the goods or services to the government"). In sum, Local Law 87 appears to fall within Boston Harbor's market participant exemption.

Plaintiffs argue, however, that Local Law 87 is a mere smokescreen for the regulation of labor relations in the non-profit sector, asserting that (1) the law will have "spillover effects" with respect to non-City-funded work performed by Plaintiffs' employees; (2) the law is poorly tailored to address service disruptions among the City's human services contractors; (3) the legislative history of Local Law 87 reveals an intent to promote unionization in the non-profit sector; (4) the law's enforcement tools are aimed at enforcing the NLRA; and (5) human services contractors do not operate in a private market, such that the City cannot be said to be acting in a "proprietary" capacity in contracting with them.

For the reasons explained below, none of these arguments persuades this Court that Local Law 87 is preempted by the NLRA.

a.    **Spillover Effects**

Plaintiff Council members assert that (1) their employees work on projects funded by parties other than the City; (2) they do not segregate or organize their workforce on the basis of which employees work on City-funded projects; and (3) some of their workers spend only a fraction of their time on City-funded projects. (Id. ¶¶ 67, 74, 77, 81, 85, 88, 93, 97, 101) The

21

Amended Complaint further alleges that, "[a]s a practical matter, if Local Law 87 is applied to

. . . [employees of Council members who] work on City contracts, it will also apply to . . .

workers who perform work funded by the state and federal governments, and private parties."

(Id. ¶ 67)  Because Plaintiffs cannot "segregate their workforces between workers who only

provide City-funded services, and workers who provide services funded by others," Local Law

87's labor peace agreement requirement will inevitably promote unionization among Plaintiffs'

employees with respect to non-City-funded contracts.  (Pltf. Opp. (Dkt. No. 100) at 26)

     In support of this argument, Plaintiffs quote at length from Metropolitan

Milwaukee (see id. at 23-26), including the Seventh Circuit's observation that

> [t]here is nothing distinctive about the work that the contractors do for the
> County; doubtless all or most of their employees who work on County contracts
> also work on private ones.  This means that disputes arising out of the private
> contracts, though unrelated to any spending or procurement activity of the
> County, are in fact regulated by the labor-peace agreements and therefore made
> subject to the County's philosophy of labor relations.

Metro. Milwaukee, 431 F.3d at 279.

     As discussed above, however, Local Law 87 – unlike the Milwaukee ordinance –

explicitly does not extend beyond the City's own contracts.  Accordingly, Plaintiffs' argument is

premised on the incidental effects of the labor peace agreement requirement on non-City-funded

work, rather than any effect contemplated by the text of Local Law 87 itself.

     The plaintiff in Electrical Contractors Association made a similar argument,

premised on the "extracontractual effects" of the City's "project labor agreements" at issue in

that case.  Plaintiff argued that as "an association of union contractors, as opposed to the

nonunion contractor plaintiffs in Boston Harbor, the City's [project labor agreements] interfere

with [the contractors'] right to collectively bargain with union workers," because the contractors

"must alter the [collective bargaining agreement] that governs all of [their] projects in order to do

work under the [project labor agreements]." <u>Electrical Contractors Association</u>, 678 F.3d at 188-

89.

      In responding to this argument, the Second Circuit acknowledged that it

> may . . . be correct that a state law or contract with profound effects outside of the
> state's market interest in the transaction would be preempted. <u>See</u> <u>Healthcare</u>
> <u>Ass'n</u>, 471 F.3d at 102 ("[A] State cannot leverage its money to affect the
> contractor's protected activity beyond the contractor's dealings with the State.");
> <u>Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.</u>, 180 F.3d 686, 693
> (5th Cir. 1999) (holding that a state's action is more likely to be proprietary than
> regulatory when the "narrow scope of the challenged action defeat[s] an inference
> that its primary goal was to encourage a general policy rather than address a
> specific proprietary problem"). But the supposed extracontractual effect of the
> City [project labor agreements] that Appellants point to in this case – the
> "requirement" that they renegotiate their CBAs – is entirely self-inflicted. [The
> Building Industrial Electrical Contractors Association] is free to renegotiate its
> CBA with Local 363 and its other signatory unions. [The Association] is equally
> free to decline work on City [project labor agreement] projects and continue to
> work under its existing CBAs on other private projects, or on City projects not
> covered by the [project labor agreements].

<u>Id.</u> at 189. (footnote omitted); <u>see also</u> <u>Sprint Spectrum</u>, 283 F.3d at 421 (school district's

requirement that Sprint limit emissions from a cellular tower installed on a school roof was not

preempted by the Telecommunications Act where, <u>inter alia</u>, Sprint "may seek a lease elsewhere

from a property owner who does not insist on such a condition").

      Here, any spillover effect of Local Law 87 on Council members is equally "self-

inflicted." Local Law 87 imposes no obligations on private organizations that choose not to

contract with the City. The decision whether to contract with the City – or not to do so – is

entirely voluntary. While contracting with the City may carry risks for human services

organizations – including a risk that employees may use Local Law 87 as leverage to push for

labor concessions that cover non-City-funded work – that is a risk that employers voluntarily

assume by doing business with the City. Plaintiffs complain that these circumstances present

human services contractors with a "Hobson's choice." (Pltf. Opp. (Dkt. No. 100) at 42) In

<u>Building Industrial</u>, however, the Second Circuit treats that type of risk as a product of market forces, and not as a basis for inferring that the City is acting in a "regulatory" capacity when it enters into contracts with private organizations. <u>See Electrical Contractors Association</u>, 678 F.3d at 189 ("[The Electrical Contractors Association] is free to renegotiate its CBA with Local 363 and its other signatory unions. [The Association] is equally free to decline work on City [project labor agreement] projects and continue to work under its existing CBAs on other private projects, or on City projects not covered by the [project labor agreements].")

Moreover, in <u>Boston Harbor</u>, the Supreme Court notes that it "ha[s] held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor." <u>Boston Harbor</u>, 507 U.S. at 227. And in <u>Electrical Contractors Association</u>, the Second Circuit observed that while "[t]he <u>Boston Harbor</u> [project labor agreement] surely put pressure on the plaintiff contractors' extracontractual decision to employ nonunion workers, . . . the Court found it implausible that Congress intended to foreclose that type of so-called extracontractual effect in public sector construction." <u>Electrical Contractors Association</u>, 678 F.3d at 190. The Second Circuit concluded that there was

> no reason to distinguish <u>Boston Harbor</u> simply because it dealt with nonunion contractors. We recognize that, as compared to nonunion contractors, it may be more difficult for [Electrical Contractors Association] members to comply with the [project labor agreements'] terms where those terms differ from their usual practice. But this difference does not alter the market participant analysis. The effects that [plaintiff] complains of are entirely ordinary consequences of [project labor agreements], in private as well as public contracts. Project labor agreements create winners and losers among contractors and labor unions. Congress foresaw and weighed these consequences when it expressly legalized construction industry [project labor agreements].

<u>Id.</u> (citation omitted).

While <u>Boston Harbor</u> and <u>Electrical Contractors Association</u> both address NLRA preemption in the context of project labor agreements in the construction industry, Plaintiffs have

not explained why the reasoning of these cases should not govern here. See Legal Aid Soc'y v. City of New York, 114 F. Supp. 2d 204, 239 (S.D.N.Y. 2000) (rejecting NLRA preemption argument even though "the City's proprietary actions" in selecting indigent legal defense providers "may have incidental effects on labor in the legal services market"); George v. Richter, No. 11 CIV. 8648 PGG, 2014 WL 1666448, at *13 (S.D.N.Y. Apr. 25, 2014) ("[T]he City's actions – whether in issuing the [request for proposals for child care services] or allegedly influencing the collective bargaining process by not agreeing to the unions' proposal for the delivery of health benefits – may affect labor, but the City has deemed these measures necessary to achieve necessary cost savings. The law permits municipalities to take such steps as market participants."); Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n, 824 F.2d 672, 674-76 (8th Cir. 1987) (state utility commission's "disallowance of what it deemed to be unreasonably high wage expenses" by a telephone company, "while perhaps indirectly affecting future bargaining strategy, does not control the terms of any particular collective bargaining agreement and does not interfere in any impermissible way with the exercise of collective bargaining rights protected by the NLRA"); see also Chamber of Comm. v. Reich, 83 F.3d 439, 440 (D.C. Cir. 1996) ("Virtually any governmental action directed to the . . . economy affects collective bargaining."); Massachusetts Nurses Ass'n v. Dukakis, 726 F.2d 41, 45 (1st Cir. 1984) ("Clean air and water laws, selective cutting requirements in forest operations, industrial safety standards, tax increases – all pro tanto hobble collective bargaining in that they constitute part of the universe in which collective bargaining takes place, just as do general prosperity or depression. But they do not add to or detract from the rights, practices, and procedures that together constitute our collective bargaining system.").

In sum, although the Amended Complaint alleges that Local Law 87 will promote unionization of Plaintiffs' employees who do not work on City-funded projects (Am. Cmplt. (Dkt. No. 67) ¶¶ 67, 74, 77, 81, 85, 88, 93, 97, 101), Plaintiffs have not alleged facts sufficient to demonstrate that those effects are so "profound" that this Court may infer that the City acted in a "regulatory" capacity when it enacted Local Law 87. Electrical Contractors Association, 678 F.3d at 189. By its terms, Local Law 87 addresses only services provided to the City. Plaintiffs may avoid any incidental effects on non-City-funded work by electing not to contract with the City.

Finally, the Amended Complaint alleges that Local Law 87 has "spillover effects" on Plaintiffs' use of non-City funds, because "[i]n most instances, the City does not pay all of a human service provider's costs associated with City work." (Am. Cmplt. (Dkt. No. 76) ¶ 31) In other words, Plaintiffs' employees "provide human services that are only partially funded by the City," and the shortfall is made up by funds from "the federal government, the state government, and/or private donors." (Id. ¶ 147)

In connection with this argument, Plaintiffs cite to Heathcare Association of New York State, Inc. v. Pataki, in which the Second Circuit held that New York State's "proprietary interest in saving money" was not applicable where the State was "burdening the employer's use of monies belonging to federal and local governments" – monies that "merely pass[ed] through the State as paying agent." Healthcare Ass'n., 471 F.3d at 109.

In Healthcare Association, the Second Circuit addressed a New York law that "restrict[ed] employers from spending monies derived from the State to hire employees or contractors to attempt to influence union organizing campaigns." Id. at 90. The court concluded that the law was not preempted by the NLRA to the extent it affected New York State's own

26

funds, because the state had a "proprietary interest[]" in "getting what it paid for." Id. at 109

(citing Allbaugh, 295 F.3d at 35 ("[T]hat the Government is a lender to or a benefactor of, rather

than the owner of, a project is not inconsistent with its acting just as would a private entity; a

private lender or benefactor also would be concerned that its financial backing be used

efficiently.")). But the court concluded that the law was preempted by the NLRA to the extent

that it burdened "the . . . use of proceeds earned from state contracts" or "burden[ed] the . . . use

of federal and local monies that only pass through the State." Id. at 105-106. As an example of

the latter, the court cited the Medicaid funding system, "in which every service is paid for by a

percentage of federally appropriated money and a percentage of State-appropriated money." Id.

at 105.

       Here, City agencies have a proprietary interest in "avoid[ing] disruption of [their]

business" with human services contractors, Airline Serv. Providers, 873 F.3d at 1080, and that

interest far exceeds that of a "paying agent." Healthcare Ass'n., 471 F.3d at 109. In other

words, even accepting Plaintiffs' argument that City contracts are funded in part from non-City

sources, the City has a separate and compelling interest in the timely receipt of the services for

which it has contracted, and for which it has paid, at least in part. Moreover, the Amended

Complaint does not sufficiently allege that the City appropriates and spends funds derived from

other sources in connection with the human services contracts that it awards, as was the case in

Healthcare Association. The Amended Complaint instead merely alleges that the City's human

services providers receive funds from non-City sources, and then choose to use those funds to

cover – in part – the cost of the services provided pursuant to City contracts. (See Am. Cmplt.

(Dkt. No. 76) ¶ 147) These allegations do not suggest that the City has burdened or sought to

regulate the use of non-City funds.

In sum, the "spillover effects" described in the Amended Complaint are not sufficient to plausibly allege that Local Law 87 is preempted by the NLRA.

> ### b.    Whether Local Law 87 Furthers the City's Interest in Avoiding Service Disruptions

Plaintiffs argue that this Court may infer that Local Law 87 is "regulatory" in nature, because it is poorly designed to achieve the City's stated goal of avoiding disruptions in the delivery of human services by its contractors.  (Pltf. Opp (Dkt. No. 100) at 35)

As an initial matter, the Amended Complaint alleges that Local Law 87 could not have been enacted "to prevent any identified or identifiable historic work stoppages" among City human services contractors, because "there are none."  (Am. Cmplt. (Dkt. No. 76) ¶ 128)  In short, Plaintiffs contend that Local Law 87 purports to solve a problem that does not exist.  (Pltf. Opp. (Dkt. No. 100) at 15)

Plaintiffs also quote Metropolitan Milwaukee (see id. at 35) for the proposition that the use of contractual remedies is more efficacious in deterring service disruptions than labor peace agreements:

> [W]hile it is true that union organizing campaigns can result in work stoppages that interrupt service, service interruptions are a risk that any recipient of a continuing service faces.  The usual way of dealing with the problem is to include contract terms that by adding sticks or carrots or both give the provider of the service a compelling incentive to take effective measures to avoid stoppages.  The buyer can offer a premium for timely performance and insist on the inclusion of a stiff liquidated-damages provision as a sanction for untimely performance; there is also, as a further incentive to good performance, the implicit threat of refusing to renew the contract if performance is unsatisfactory.

> The County need only write a strong sanction for work stoppages into its contracts to protect its interest as a buyer of services, and then, if labor-peace agreements really are efficacious methods of preventing work stoppages, employers will voluntarily offer such agreements to unions that want to organize their employees in order to reduce the likelihood of having to pay damages to the County.  Employers know better how to keep their workers from striking than purchasers of the employers' services, such as Milwaukee County, do.

> Generalizing, we see that the existence of effective contractual remedies for
> service interruptions eliminates the need for states or their subdivisions to create a
> special regime for the labor relations of their contractors.  The inference is
> inescapable that the County is trying to substitute its own labor-management
> philosophy for that of the National Labor Relations Act.

Metro. Milwaukee, 431 F.3d at 280-81.

   Plaintiffs also argue that because human services contractors must negotiate a

labor peace agreement with any labor organization that requests one, Local Law 87 provides

labor organizations with leverage to demand concessions wholly unrelated to "the uninterrupted

delivery of services" under City contracts, resulting in increased costs to the City.  (See, e.g.,

Pltf. Opp. (Dkt. No. 100) at 20)  Indeed, the City's March 25, 2022 FAQs regarding the

implementation of Local Law 87 anticipate that labor peace agreements may include terms that

do not directly address the delivery of services, although disputes about these matters may result

in the interruption of services:

> [Labor peace agreements] may also include other terms agreed upon by the
> parties, such as terms relating to:  (i) alternate procedures related to recognizing
> the labor organization for bargaining purposes, (ii) public statements, (iii)
> workplace access, (iv) the provision of employee contact information; and (v) a
> process for the productive resolution of disputes.  These topics are illustrative and
> are not intended to specify or limit the terms that may be included in [a labor
> peace agreement] in order to achieve the goals of ensuring the uninterrupted
> delivery of services and avoidance of actions intended to or having the effect of
> interrupting such services.

(Kane Decl., Ex. 3 (Mar. 25, 2022 Implementation FAQs) (Dkt. No. 99-3) at 4)

   In Electrical Contractors Association, the Second Circuit considered a similar

argument that the project labor agreements at issue in that case were not economically rational,

because they did "not achieve the lowest possible costs for the City."  Electrical Contractors

Association, 678 F.3d at 192.  Those project labor agreements "recogniz[ed] the Building and

Construction Trades Council of Greater New York and Vicinity ('BCTC') . . . and its affiliates as

the sole bargaining representatives for all construction workers on [project labor agreement]-

covered projects." Id. at 186.  The Electrical Contractors Association, however, "ha[d] a collective bargaining agreement with a different union," which "[made] it difficult for [the Association] to seek work under the City [project labor agreements]." Id.  The Association argued that this arrangement was not economically rational for the City, because if the City had contracted with Association members – rather than with providers who had a collective bargaining agreement with BCTC-affiliated entities – the City "would in some instances [have] achieve[d] even greater savings than the [project labor agreements'] terms provide." Id. at 191.

In rejecting this argument, the Second Circuit makes clear that application of the market participant exception does not turn on whether a municipality's contracts result in the lowest possible cost:

> Appellants misunderstand the purpose that satisfies the market participant exception. It cannot be correct that to qualify for the exception, the City must show that its contracts are maximally efficient.  "Acting like a proprietor" does not mean acting exclusively with the narrow goal of minimizing costs regardless of consequences.  Private proprietors are entitled to, and sometimes do, prefer working with familiar faces or contracting with larger entities that can consistently and simply provide all their requirements.  These practices may reflect long-run economic rationality.  But even if they do not, accepting [plaintiff's] restrictive theory of economic rationality would expose every public [project labor agreement] to challenge based on speculative ex post evaluations of whether the [project labor agreements] in fact proved economically prudent.  Cf. Rancho Santiago, 623 F.3d at 1025 (noting that a state interest in "efficient procurement" satisfying market participant exception "does not necessarily mean 'cheap' procurement, but rather 'procurement that serves the state's purposes'"), quoting Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 498 F.3d 1031, 1046 (9th Cir. 2007).

Id. at 191-92.

The Second Circuit also stated that even if the City "relied on poor or even biased expert data to justify the [project labor agreements]," that "does not demonstrate that the City was regulating." Id. at 192 (emphasis in original).  In so concluding, the court found persuasive the Ninth Circuit's reasoning in Rancho Santiago:

"The plaintiffs further contend that the [project labor agreement] does not advance an interest in efficient procurement because it presents several downside risks while offering no benefits in terms of costs, labor availability, or timeliness for the construction.  Whether the [project labor agreement's] benefits outweighed its costs, however, bears only on whether the District made a good business decision, not on whether it was pursuing regulatory, as opposed to proprietary, goals.  We must keep in mind that congressional intent is the touchstone of our preemption analysis, Engine Mfrs., 498 F.3d at 1040, and we have no reason to think that Congress intended to allow beneficial state contracts while preempting similar contracts in which the state got a bad deal."

Id. (quoting Rancho Santiago, 623 F.3d at 1025); see also Legal Aid Soc'y, 114 F. Supp. at 241 (preemption analysis not "altered by the possibility that the City might have pursued its proprietary goals by more effective means").

Under Electrical Contractors Association – in order to determine whether Local Law 87 is a "smokescreen" for the City to regulate labor relations – this Court need not engage in a "speculative ex post evaluation[]" of whether the City's decision to require labor peace agreements was "economically prudent."  Electrical Contractors Association, 678 F.3d at 192.  It is enough that the City has identified a goal in which it has a legitimate and compelling proprietary interest – i.e., "the uninterrupted delivery of services" under its human services contracts, see N.Y.C. Admin Code § 6-145(a) – and that it has attempted to advance that interest through a labor peace agreement requirement that applies solely to City contracts.  Even if the labor peace agreement requirement results in the City not getting the best possible financial outcome – or indeed, results in the City getting a "bad deal" – under those contracts, Rancho Santiago, 623 F.3d at 1025, the labor peace agreement requirement would not "thereby [be] transformed from [a] contract[] [provision] into regulation[]."  Electrical Contractors Association, 678 F.3d at 192 (emphasis in original).

Finally, Plaintiffs argue that Local Law 87 is "regulatory" given its broad scope; the law is "not limited to any particular location since it applies citywide, is not limited to any specific project, [and] is not limited temporally." (Pltf. Opp. (Dkt. No. 100) at 33)

The Second Circuit rejected a virtually identical argument in Electrical Contractors Association:

> [Plaintiff's] argument that the City [project labor agreements] are not "narrow" because they cover many projects spanning several years misunderstands the relevant meaning of "narrow" or "tailored" in this context. A contract is "specifically tailored to one particular job" within the meaning of Boston Harbor, 507 U.S. at 232, 113 S.Ct. 1190, if it governs the parties' behavior on the specific project or projects in the contract rather than on unrelated matters to which the state might not even be a party. Extracontractual effect is an indicator of regulatory rather than proprietary intent, so a provision that is not "narrow" may be preempted because of such regulatory intent. For example, the preempted law in [Wisconsin Department of Industry, Labor and Human Relations v. Gould Inc., 475 U.S. 282 (1986)] reached conduct – past violations of the NLRA – entirely outside any contract with the state. Thus, "narrow" refers to the range and type of covered conduct, not to the number of covered projects. A contract does not become preempted simply because it covers a number of projects rather than a single one. See Cardinal Towing, 180 F.3d at 694 (finding a regulation narrow in scope because "the specification [at issue] looked only to the bidder's dealing with the City" and not to its behavior on non-City projects).

Electrical Contractors Association, 678 F.3d at 189 n.2; see also Michigan Bldg. & Const. Trades Council v. Snyder, 729 F.3d 572, 578 (6th Cir. 2013) ("The councils argue that the act is too broad to be proprietary because it does not consider projects on a case-by-case basis. But private proprietors can and do act on an across-the-board basis without somehow becoming regulators."); Allbaugh, 295 F.3d at 35 ("[N]either the district court nor the plaintiffs offer any good explanation why a 'blanket rule' – applicable to all government contracts, but not to the non-government contracts of those who do business with the Government – is somehow inconsistent with the action of a proprietor." (quotation marks and citations omitted)).

In sum, the fact that Local Law 87 applies to all human services contracts citywide does not demonstrate that the City is acting as a regulator.

c.    **Legislative Intent**

Plaintiffs next argue that the legislative history of Local Law 87 and the pre-enactment statements of various proponents of the law demonstrate that the City intended to regulate labor relations.  (Pltf. Opp. (Dkt. No. 100) at 35-37)

The Amended Complaint alleges that DC 37 was "deeply involved" in drafting the bill that became Local Law 87.  (Am. Cmplt. (Dkt. No. 176) ¶ 6)  Moreover, the law's legislative history includes discussion of "'job and income security for workers'" and the role that "'unions and collective bargaining play . . . in ensuring these rights for workers.'"  (Pltf. Opp. (Dkt. No. 100) at 36 (quoting July 29, 2021 City Council Meeting Minutes, at 12-13))  And in a press release issued the day that Local Law 87 was enacted, New York City Council Speaker Corey Johnson – the "main sponsor" of Local Law 87 – "did not identify any historic work stoppages" that rendered Local Law 87 necessary, "and did not suggest that the law would somehow promote continuity of services for New York City's communities."  (Am. Cmplt. (Dkt. No. 76) ¶ 128)  Instead, Johnson said that Local Law 87 would "give over 200,000 of our City's essential human service workers the right to organize for the pay and benefits they deserve." (Id.) (citation and quotation marks omitted)  Bill de Blasio, the then Mayor of New York City, said that the law "would ensure that New York City is 'a union town.'"  (Id.)

Plaintiffs' legislative intent arguments are foreclosed by the Second Circuit's analysis in Electrical Contractors Association.  In that case, plaintiff argued that the project labor agreements at issue "cannot fall within the market participant exception, since the City's purpose in agreeing to them was not to achieve cost reductions, but to further the interests of the [Building and Construction Trades Council of Greater New York and Vicinity] and its affiliates, which were politically aligned with City officials' interests."  Electrical Contractors Association, 678 F.3d at 190-91.

In rejecting this argument, the Second Circuit stated that it

> misapprehends both the means for determining governmental purpose and the
> bounds of the market exception itself. . . . [W]hen a court assesses whether a
> governmental policy has a regulatory purpose, it looks primarily to the objective
> purpose clear on the face of the enactment, not to allegations about individual
> officials' motivations in adopting the policy. We will not search for an
> impermissible motive where a permissible purpose is apparent, because "[f]ederal
> preemption doctrine evaluates what legislation does, not why legislators voted for
> it or what political coalition led to its enactment." N. Ill. Chapter of Associated
> Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004, 1007 (7th Cir. 2005). This
> principle is true across many fields of substantive law. See, e.g., Mueller v. Allen,
> 463 U.S. 388, 394-95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (noting that for
> Establishment Clause analysis, the Court is "reluctan[t] to attribute
> unconstitutional motives to the States, particularly when a plausible secular
> purpose for the state's program may be discerned from the face of the statute").
> Our reluctance is motivated in no small part by separation of powers concerns:
> "Judicial inquiries into legislative or executive motivation represent a substantial
> intrusion into the workings of other branches of government. Placing a
> decisionmaker on the stand is therefore usually to be avoided." Vill. of Arlington
> Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d
> 450 (1977) (internal quotation marks and citations omitted). Other circuits have
> expressed reluctance to examine official motives in the [project labor agreement]
> context. See Colfax Corp. v. Ill. State Toll Highway Auth., 79 F.3d 631, 635 (7th
> Cir. 1996) (declining to "go behind the contract to determine whether the . . . real,
> but secret motive was to regulate labor"); Johnson v. Rancho Santiago Cmty.
> Coll. Dist., 623 F.3d 1011, 1026-27 (9th Cir. 2010). Moreover, it is difficult to
> discern officials' motives given the complex workings of government. See Bush
> v. Vera, 517 U.S. 952, 1012-14 & n. 9, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996)
> (Stevens, J., dissenting) (discussing difficulty of determining legislature's
> "predominant" motive for passing a law, and collecting cases).

Id. at 191; see also Cardinal Towing, 180 F.3d at 692 ("While the leverage a state can exert

through its spending power and the absence of a true profit motive to restrain government action

may create a temptation to take advantage of these interactions to pursue policy goals, the

presence of the state in the market cannot automatically be assumed to be motivated by a

regulatory impulse. Given the volume of, and obvious need for, interaction between the

government and the private sector, the application of preemption in a manner that hobbles state

and local governments' purchasing efforts threatens severe disruption."); N. Illinois Chapter of

Associated Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004, 1007 (7th Cir. 2005) ("If (as

seems likely) Illinois has taken the approach in this law because state officials want to assist

organized labor . . . , that is neither a surprise nor a reason for invalidity.  Most legislation is the

product of coalitions among interest groups."); Engine Mfrs. Ass'n v. S. Coast Air Quality

Mgmt. Dist., 498 F.3d 1031, 1046 (9th Cir. 2007) ("That a state or local governmental entity

may have policy goals that it seeks to further through its participation in the market does not

preclude the doctrine's application, so long as the action in question is the state's own market

participation.").

       Here, the role of Local Law 87 in promoting "the uninterrupted delivery of

services" provided pursuant to City human services contracts, see N.Y.C. Admin. Code § 6-

145(a), is "clear on the face of the enactment."  Electrical Contractors Association, 678 F.3d at

192.  Accordingly, it is not appropriate for this Court to consider "individual officials'

motivations" in determining whether the City was acting in a regulatory capacity.  Id.

       In sum, Local Law 87's legislative history does not demonstrate that the law

constitutes regulation.[5]

---

[5]  In arguing that this Court should consider Local Law 87's legislative history, Plaintiffs cite
Entergy Nuclear Vermont Yankee, LLC v. Shumlin, 733 F.3d 393 (2d Cir. 2013) ("Vermont
Yankee"), in which the Second Circuit states that "legislative history is an important source for
determining whether a particular statute was motivated by an impermissible motive."  Id. at 419.
The Second Circuit made this comment in connection with determining whether Vermont's
legislation regarding the Vermont Yankee nuclear power plant was preempted by the Atomic
Energy Act.  Id. at 418-19.  Under the Atomic Energy Act, states are broadly prohibited from
attempting to regulate the safety of nuclear power plants; that responsibility has been exclusively
assigned to the Federal Government.  Id. at 409-10.  Moreover, in the context of the Atomic
Energy Act, the Supreme Court has "defined the pre-empted field, in part, by reference to the
motivation behind the state law."  English v. Gen. Elec. Co., 496 U.S. 72, 84 (1990).  Given this
precedent, courts "have endorsed the use of legislative history to determine whether the Atomic
Energy Act preempts a particular state statute or local ordinance."  Vermont Yankee, 733 F.3d at
419.  And it was in this context that the Second Circuit considered the expressed views of
Vermont legislators in passing legislation requiring that Vermont Yankee be shutdown.  Id. at
418-20.

d.      **Local Law 87's Enforcement Mechanisms**

Plaintiffs argue that Local Law 87's enforcement mechanisms reflect an intent to enforce the NLRA rather than promote the City's interest in the uninterrupted delivery of human services.  (Pltf. Opp. (Dkt. No. 100) at 33-34)

Plaintiffs analogize Local Law 87's enforcement mechanisms to those that the Supreme Court found preempted by the NLRA in <u>Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.</u>, 475 U.S. 282 (1986).  In <u>Gould</u>, Wisconsin procurement agents were "statutorily forbidden to purchase any product known to be manufactured or sold by any person or firm" found to have "violated the NLRA in three separate cases within a 5-year period." <u>Id.</u> at 283-84 (citation and quotation marks omitted).  The Court concluded that because of the "rigid and undiscriminating manner in which the statute operates," the law "serves plainly as a means of enforcing the NLRA" and "deter[ing] labor law violations." <u>Id.</u> at 287-88.  And because "[t]he manifest purpose and inevitable effect of the debarment rule is to enforce the requirements of the NLRA," the law "assumes for the State of Wisconsin a role Congress reserved exclusively for the [National Labor Relations Board]." <u>Id.</u> at 291.

Local Law 87 does not contain the "rigid and undiscriminating" features that the Supreme Court found problematic in <u>Gould</u>.  As an initial matter, the law is not directed at enforcement of the NLRA.  Instead, human services organizations seeking a contract with the City are required to submit a certification disclosing all violations of "federal, state or local laws regulating labor relations." N.Y.C. Admin. Code § 6-145(c).  This information is then uploaded

---

<u>Vermont Yankee</u> thus addresses an entirely unrelated regulatory environment, in which the Congress has broadly preempted action by the States, and in which the Supreme Court has recognized that "the motivation behind the state law" at issue is relevant to the preemption analysis. <u>English</u>, 496 U.S. at 84. <u>Vermont Yankee</u> does not address the preemptive effect of the NLRA and the market participant exemption.

to a pre-existing City database that contains varied information about potential contractors, including their business history, contract sanction history, and whether they have been the subject of criminal investigation or administrative rulings.  See id. § 6-116.2(b)(i)(1)-(23).  City agencies are required to "examine" this information prior to awarding contracts, but Local Law 87 does not mandate that City agencies take any particular action depending on the nature of the information that a contractor discloses.  Id. § 6-116.2(e).

More broadly, when a City agency discovers that a contractor has failed to comply with Local Law 87, the agency has discretion in determining the appropriate remedy. The agency may, for example, "[e]nter an agreement with the city service contractor allowing the contractor to cure the violation," id. § 6-145(f)(1)(f), or "[d]irect the filing or disclosure of any records that were not filed or made available to the public as required by this section."  Id. § 6-145(f)(1)(a).  The agency may also "[w]ithdraw approval of a city service subcontractor," id. § 6-145(f)(1)(d), or "[f]ind the city service contractor to be in default or otherwise terminate the applicable city service contract."  Id. § 6-145(f)(1)(c).  In determining the appropriate remedy, agencies are obligated to consider "the size of the covered employer's business, the covered employer's good faith, the gravity of the violation, the history of previous violations and the failure to comply with recordkeeping, reporting or other requirements."  Id. § 6-145(f)(1).

In sum, Local Law 87 does not contain the "rigid and undiscriminating" enforcement mechanism that the Supreme Court struck down in Gould.  The law directs City agencies to consider NLRA violations along with a wide variety of other information relevant to assessing the fitness of a prospective contractor, including the history of the contractor's business, contract sanction history, and whether they have been the subject of criminal investigation or administrative rulings.  Local Law 87 assigns no particular weight to this

information, mandates no particular outcome, and affords City agencies ample discretion in

determining how to address a contractor's non-compliance with Local Law 87. Accordingly,

Local Law 87's enforcement mechanisms do not demonstrate an intent to enforce the NLRA as

opposed to promoting the City's interest in the uninterrupted delivery of human services.

### e.    The Market for Humans Services

Finally, Plaintiffs argue that the services covered by Local Law 87 are so unlike

those offered in the private marketplace that the City cannot be considered a genuine "market"

participant. (Pltf. Opp. (Dkt. No. 100) at 29-31)

According to Plaintiffs, such functions as providing foster care and operating

homeless shelters lack equivalents in the private market. (Id. at 29) (citing Camps

Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 605 (1997) (Scalia, J., dissenting)

("[L]ibraries, orphanages, homeless shelters, and refuges for battered women . . . are traditional

governmental functions, far removed from commercial activity and utterly unconnected to any

genuine private market."). And because human services non-profit organizations are "mission-

driven, [and] not revenue-driven," they often begin performing services under City contracts

even before they have been approved for payment (Am. Cmplt. (Dkt. No. 76) ¶ 116):

> [Council] members – non-profits that literally exist to support the needy – are
> passionate about the uninterrupted delivery of human services. They don't care
> for the needy because the City contracts for social services or pays for the
> delivery of such services. They serve the needy to fulfill charitable missions – in
> many cases faith-based charitable missions. This is readily apparent from the fact
> that, in the City of New York, most human services contractors start "working"
> for the City (serving City social services clients) long before a contract is in place
> (i.e., before contract "registration"), and long before the City is prepared to fund
> the non-profit's activities. If the City asks a construction contractor to build a
> bridge, it will typically hold-off on construction until the government contract is
> "registered." By contrast, the human services providers referenced in Local Law
> 87 routinely "work" without legal assurance that the City will pay, and without
> the contract funds in hand.

(<u>Id.</u> ¶ 117)[6]

Acknowledging that some services covered by Local Law 87 lack clear equivalents in the private market, many services referenced in the law – including "day care, . . . home care, health or medical services . . . , preventive services, youth services, . . . employment training and assistance, vocational and educational programs, legal services and recreation programs," <u>see</u> N.Y.C. Admin Code § 6-145(a) – have obvious analogues in the private sector.

In any event, Plaintiffs have not explained why the market for human services differs so markedly from other markets that the City cannot act in a "proprietary" capacity when it enters into contracts with human services providers.  <u>See Legal Aid Soc'y</u>, 114 F. Supp. at 237-39 (applying the market participant exception to the City's contracts with indigent legal services providers); <u>George</u>, 2014 WL 1666448, at *12-14 (same for child day care centers). The City's delays in paying human services providers – and those organizations' apparent willingness to begin performance of City contracts even before they have been approved for payment – may reflect both the City's bargaining power and the fact that the non-profits who provide human services are mission-driven.  These circumstances do not demonstrate, however, that the City is acting in a "regulatory" capacity when it enters into contracts with private human services organizations.

---

[6]  The Amended Complaint also quotes Deputy Mayor Sheena Wright acknowledging that the City has "taken advantage of nonprofits, because we know that [they are] going to do the work, that they're going to provide the services for children and their families, whether they get paid or not.  And it's a different system for for-profit companies.  They're not going to do the work until they get the check."  (<u>Id.</u> ¶ 116) (quoting Transcript:  Mayor Eric Adams Announces City has Unlocked More Than $4.2 Billion in Contractual Dollars for Nonprofits Through "Clear the Backlog Initiative", NYC.gov (July 29, 2022), <u>available at</u> https://www.nyc.gov/office-of-the-mayor/news/553-22/transcript-mayor-eric-adams-city-has-unlocked-more-4-2-billion-contractual).

In sum, the unique features of the market for human services do not demonstrate that Local Law 87 constitutes "regulation" rather than participation in that market.

*     *     *     *

For all the reasons set forth above, the Amended Complaint does not plausibly allege that Local Law 87 is preempted by the NLRA.

**B.    Preemption Under the LMRA**

The Amended Complaint alleges that Local Law 87 is preempted by Section 302 of the LMRA (Am. Cmplt. (Dkt. No. 76) ¶ 162), which provides that "[i]t shall be unlawful for any employer" to "pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value" to "any labor organization." 29 U.S.C. § 186(a).

Defendants contend that (1) Plaintiffs "cannot invoke a preemption doctrine with respect to this theory"; (2) there is no private right of action to enforce Section 302 of the LMRA; and (3) even assuming Plaintiffs may bring a challenge to Local Law 87 under LMRA § 302, nothing in Local Law 87 conflicts with Section 302. (Def. Br. (Dkt. No. 95) at 45-48)

With respect to preemption under LMRA § 302, the Supreme Court has recognized "three typical settings" in which "courts will find that Congress intended to preempt" state law:

> First, when Congress expressly provides that a federal statute overrides state law, courts will find state law preempted if, applying standard tools of statutory construction, the challenged state law falls within the scope of Congress's intent to preempt. See, e.g., Medtronic, Inc. v. Lohr, 518 U.S. 470, 484, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Second, when Congress legislates so comprehensively in one area as to "occupy the field," we may infer from the federal legislation that Congress intended to preempt state law in that entire subject area. Crosby v. Natl. Foreign Trade Council, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal quotation marks omitted). Third, when neither of the first two categories applies but state law directly conflicts with the structure and purpose of a federal statute, we may conclude that Congress intended to preempt the state law. In the latter case, we will find a conflict with preemptive effect only in two circumstances: first, when "compliance with both federal and state regulations is

40

a physical impossibility," and second, when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona [v. United States, 567 U.S. 387, 399 (2012)](internal quotation marks omitted).

In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 725 F.3d 65, 96-97 (2d Cir. 2013).

Plaintiffs do not argue that the LMRA contains an express preemption provision, nor do they contend that the "field" preemption applicable under the NLRA via Garmon and Machinists applies here. Instead, Plaintiffs appear to argue that Local Law 87 "conflicts with the structure and purpose" of LMRA Section 302. According to Plaintiffs,

> in order to comply with Local Law 87, human service providers may have to engage in conduct that some federal courts have deemed violative of the LMRA. The City cannot lawfully regulate conduct in a manner that places Plaintiffs at risk of violating federal law, as such regulation is preempted by federal law.

(Pltf. Opp. (Dkt. No. 100) at 44)

As explained below, Plaintiffs have not demonstrated that compliance with both Local Law 87 and LMRA § 302 is an "impossibility," nor have they shown that Local Law 87 otherwise conflicts with the "purposes and objectives of Congress" in enacting LMRA § 302. In re MTBE, 725 F.3d at 97 (quotation marks at citations omitted).[7]

As the Fourth Circuit explained in Adcock v. Freightliner LLC, 550 F.3d 369 (4th Cir. 2008), LMRA § 302

> was enacted to curb abuses that Congress felt were "inimical to the integrity of the collective bargaining process." Arroyo v. United States, 359 U.S. 419, 425, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959). In particular, Congress was "concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible

---

[7] Citing Hosp. Employees' Div. of Loc. 79, Serv. Emps. Int'l Union, AFL-CIO v. Mercy-Mem'l Hosp. Corp., 862 F.2d 606 (6th Cir. 1988), Defendants contend that "preemption theories cannot be invoked as to Section 302" of the LMRA. (Def. Br. (Dkt. No. 95) at 45) In that case, the Sixth Circuit concluded that an action alleging a violation of LMRA § 302 was not "preempted" by the NLRA. Id. at 607-08. That case does not address whether LMRA § 302 can ever preempt a state law.

41

> abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." Id. at 425-26, 79 S.Ct. 864 (footnotes omitted); see also Turner v. Local Union No. 302, Int'l Bhd. of Teamsters, 604 F.2d 1219, 1227 (9th Cir.1979) ("The dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers."). Thus, § 302 is aimed at preventing "bribery, extortion and other corrupt practices conducted in secret." Caterpillar, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 107 F.3d 1052, 1057 (3d Cir. 1997) (en banc).

Id. at 375; see also Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC, 390 F.3d 206, 219 (3d Cir. 2004) (finding no "legal support for the remarkable assertion that entering into a valid labor agreement governing recognition of a labor union amounts to illegal labor bribery").

As discussed above, the core requirement of Local Law 87 is that a City contractor and a labor organization representing the contractor's employees must "agree to the uninterrupted delivery of services to be rendered pursuant to [a] city service contract and to refrain from actions intended to or having the effect of interrupting such services." N.Y.C. Admin Code § 6-145(a). Negotiating a labor peace agreement with a labor union in order to comply with City law – and then reporting the results of the labor peace agreement negotiation to the City, as the law requires – does not constitute "bribery, extortion and other corrupt practices conducted in secret." Caterpillar, 107 F.3d at 1057. Plaintiffs cite no case suggesting that when a City contractor negotiates an agreement with a union for "the uninterrupted delivery of services" – in order to comply with City law – the contractor is "pay[ing], lend[ing], or deliver[ing]" a "thing of value" to the union under LMRA § 302.

Mulhall v. Unite Here Loc. 355, 667 F.3d 1211, 1213 (11th Cir. 2012), cited by Plaintiffs, is not to the contrary. (Pltf. Opp. (Dkt. No. 100) at 44) In Mulhall, an employer agreed to grant workplace access to a union, to provide employee information, and to remain neutral as to unionization, in exchange for the union agreeing to financially support a casino

ballot initiative that, if passed, would benefit the employer.  Mulhall, 667 F.3d at 1213.  The

court held that under these circumstances "organizing assistance can be a thing of value that, if

demanded or given as payment, could constitute a violation of § 302."  Id.

There is no similarity between the circumstances in Mulhall and the obligations

imposed by Local Law 87.  Local Law 87 requires human services contractors doing business

with the City to negotiate a labor peace agreement with a labor organization.  The Law does not

constitute or facilitate a corrupt private bargain between the contractor and the labor union.

The Court concludes that the Amended Complaint does not plausibly allege that

Local Law 87 is preempted by LMRA § 302.

## III.   **CONSTITUTIONAL CLAIMS**

The Amended Complaint asserts that Local Law 87 violates numerous provisions

of the U.S. Constitution, including the First Amendment's freedom of speech and freedom of

association guarantees, the Contracts Clause, the Due Process Clause, the Equal Protection

Clause, and the Takings Clause.  (Id. ¶¶ 154-56, 166, 170, 175)  Defendants contend that the

Amended Complaint fails to state a claim under any of these provisions.  (Def. Br. (Dkt. No. 95)

at 20-34)

### A.   **Legal Standard**

Defendants argue that the Amended Complaint should be construed as raising

only facial, as opposed to as-applied, challenges.  (Def. Br. (Dkt. No. 95) at 19-20)  Plaintiffs do

not address which legal standard should govern their constitutional claims.  (See Pltf. Opp. (Dkt.

No. 100) at 46-62)

As an initial matter, the Amended Complaint does not allege any instance in

which Local Law 87 has been enforced against Plaintiffs.  While each Council member Plaintiff

alleges that it provided human services pursuant to contracts with the City (Am. Cmplt. (Dkt.

No. 76) ¶¶ 65, 72, 75, 79, 83, 87, 91, 95, 99), the Amended Complaint does not describe any instance in which the City refused to award or renew a contract governed by Local Law 87, or in which the City made any adverse findings against a contractor or imposed any penalty under Local Law 87.

Accordingly, the Amended Complaint constitutes a "pre-enforcement" challenge to Local Law 87. Where a plaintiff's challenge to a statute is brought "before they have been charged with any violation of law, it constitutes a 'facial,' rather than 'as-applied,' challenge." New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015). For such facial challenges, a plaintiff must demonstrate that "'no set of circumstances exists under which [the statute] would be valid.'" Id. (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). "[A] facial challenge to a legislative enactment is 'the most difficult challenge to mount successfully.'" Id. (quoting Salerno, 481 U.S. at 745).

For facial challenges brought under the First Amendment, a plaintiff "must demonstrate that the challenged law either 'could never be applied in a valid manner' or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.'" N.Y. State Club Ass'n, Inc. v. City of N.Y., 487 U.S. 1, 11 (1988) (quoting City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 798 (1984)); see also Hobbs v. Cty. of Westchester, 397 F.3d 133, 154-55 (2d Cir. 2005) (same). Under the latter type of facial challenge, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 615 (2021) (quotations and citation marks omitted). This type of invalidation is "'manifestly, strong medicine' that 'has been employed by the [Supreme] Court sparingly and only as a last resort.'"

Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)).

### B. Freedom of Speech

Plaintiffs contend that Local Law 87 "impos[es] content-based restrictions on speech by requiring City contractors to relinquish their free speech rights as a condition of entering into City service contracts." According to Plaintiffs, Local Law 87 "chill[s] and restrict[s] otherwise protected speech regarding unions and unionization," and "compel[s] speech, association with speech, or promotion of pro-union speech." (Pltf. Opp. (Dkt. No. 100) at 47)

Defendants argue that Local Law 87 "does not bar speech," does not compel speech, and does not chill protected speech. (Def. Br. (Dkt. No. 95) at 20-22)

### 1. Applicable Law

The First Amendment applies to the states through the Fourteenth Amendment, see Thornhill v. Alabama, 310 U.S. 88, 95 (1940), and provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. "Restraints on speech on the basis of its content, except in a few limited categories such as obscenity, defamation, and fighting words, are generally disallowed." Hobbs, 397 F.3d at 148. "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 537 (1980). Regulation of speech based on its content is "presumptively invalid." R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992).

The First Amendment also "prohibits the government from telling people what they must say." Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 61 (2006) ("FAIR"). And compelled speech is not limited "to the situation in which an individual must

personally speak the government's message." Id. at 63; see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 782 (1988) ("[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). Indeed, the Supreme Court has "in a number of instances limited the government's ability to force one speaker to host or accommodate another speaker's message." FAIR, 547 U.S. at 63. In each such case, however, the Court held that speech was compelled because "the complaining speaker's own message was affected by the speech it was forced to accommodate." Id.

   2.    **Analysis**

Plaintiffs contend that Local Law 87 "blocks nonprofits' lawful advocacy against unionization" by (1) requiring them to enter labor peace agreements "in which they must agree with unions, and union members, not to engage in any action that may interfere with the delivery of human services"; and (2) requiring them to "obtain a union official's signature on attestation" confirming that the contractor has entered into a labor peace agreement. (Pltf. Opp. (Dkt. No. 100) at 47)  According to Plaintiffs, Local Law 87 compels "the nonprofit to engage in speech about unionization with its employees that it would not otherwise undertake." (Id. at 49)

As discussed above, however, Local Law 87 requires only that human services contractors (1) negotiate a labor peace agreement with any labor organization that seeks to represent its employees, and (2) submit an attestation regarding the labor peace agreement negotiations – signed by a representative of the labor organization – to the contracting City agency. See N.Y.C. Admin Code § 6-145(b).  The sole required term of the labor peace agreement is that the parties "agree to the uninterrupted delivery of services to be rendered pursuant to the city service contract and to refrain from actions intended to or having the effect of interrupting such services." Id. § 6-145(a).

Local Law 87 does not require a City contractor to maintain "neutrality" with respect to the unionization of its employees.[8]  Indeed, the law imposes no restriction on a contractor's ability to express its views on unionization – or any other topic – in any forum, by any means, to any party.  Plaintiffs, for their part, have cited no authority suggesting that the contractual relationship mandated by Local Law 87 involves speech protected by the First Amendment.  Nor do Plaintiffs explain how the act of submitting an attestation to the City regarding the status of labor peace agreement negotiations could constitute compelled speech.

In sum, the Amended Complaint does not plausibly allege that Local Law 87 restricts or compels speech.

### C.    Freedom of Association

Plaintiffs argue that Local Law 87 violates their associational rights under the First Amendment by compelling them to associate with a labor union.  (Pltf. Opp. (Dkt. No. 100) at 47-48)

### 1.    Applicable Law

"[T]he . . . 'freedom of association' protected by the First Amendment has been generally understood to encompass two quite different types of associational activity:  'choices to enter into and maintain certain intimate human relationships,' and 'associat[ion] for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion.'"  Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Departments, App. Div. of the Supreme Ct.

---

[8]  Plaintiffs contend that the legislative history of Local Law 87 "expressly provides that it is intended to require human service providers to remain neutral during union organizing efforts." (Pltf. Opp. (Dkt. No. 100) at 48)  No such "neutrality" requirement appears in the text of Local Law 87, however.

of New York, 852 F.3d 178, 187-88 (2d Cir. 2017) (quoting Roberts v. U.S. Jaycees, 468 U.S.

609, 617-18 (1984)).  These rights are commonly referred to as "intimate association" and

"expressive association," respectively.  See Sanitation & Recycling Industry, Inc. v. City of

N.Y., 107 F.3d 985, 995-96 (2d Cir. 1997) ("The United States Constitution affords protection to

two distinct types of association, 'intimate association' and 'expressive association.'"); see also

FAIR, 547 U.S. at 68 (the First Amendment protects the right to "associate for the purpose of

speaking, which [the Supreme Court has] termed a 'right of expressive association.'" (quoting

Boy Scouts of Am. v. Dale, 530 U.S. 640, 644 (2000))).

      The "intimate relationships" to which the Supreme Court has accorded

constitutional protection include, inter alia, "marriage, the begetting and bearing of children,

child rearing and education, and cohabitation with relatives."  Bd. of Directors of Rotary Int'l v.

Rotary Club of Duarte, 481 U.S. 537, 545 (1987) (citations omitted).  Intimate relationships "are

distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to

begin and maintain the affiliation, and seclusion from others in critical aspects of the

relationship." Roberts, 468 U.S. at 620.  However, "[t]he Constitution does not recognize a

generalized right of social association.  The right generally will not apply, for example, to

business relationships, chance encounters in dance halls, or paid rendezvous with escorts."

Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 996 (2d Cir. 1997)

(citations omitted); see Roberts, 468 U.S. at 620 ([A] large business enterprise . . . seems remote

from the concerns giving rise to this constitutional protection.").

      As to the right to expressive association, "'implicit in the right to engage in

activities protected by the First Amendment' is 'a corresponding right to associate with others in

pursuit of a wide variety of political, social, economic, educational, religious, and cultural

ends.'" <u>Boy Scouts of Am.</u>, 530 U.S. at 647 (quoting <u>Roberts</u>, 468 U.S. at 622). "The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." <u>Id.</u> at 648. "When . . . an individual engages in conduct that does not manifest an 'intent to convey a particularized message,' the First Amendment does not come 'into play.'" <u>United States v. Thompson</u>, 896 F.3d 155, 164 (2d Cir. 2018) (quoting <u>Texas v. Johnson</u>, 491 U.S. 397, 404 (1989)). "Because '[i]t is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall' – the fact that an activity contains a 'kernel of expression' does not compel the conclusion that the activity qualifies as a form of 'expressive association' and is shielded by the First Amendment." <u>Id.</u> (quoting <u>City of Dallas v. Stanglin</u>, 490 U.S. 19, 25 (1989)).

       The Supreme Court has only found forced association where "actual association threatened to distort the groups' intended messages." <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442, 457 (2008). And in <u>Washington State Grange</u>, the Supreme Court noted that it was not aware of any "case in which the mere <u>impression</u> of association was held to place a severe burden on a group's First Amendment rights." <u>Id.</u> (emphasis in original).

2.     <u>**Analysis**</u>

       As discussed above, Local Law 87 requires that – as a condition of doing business with the City – human services contractors must enter into a contractual relationship with a labor organization that provides for the "uninterrupted delivery of services" under City contracts. The law imposes no further requirements, and in particular does not require contractors to support unionization or espouse any other message. This type of association – an arm's length

commercial relationship between a nonprofit organization and a labor union regarding the delivery of services under City contracts – bears none of the hallmarks of an intimate or expressive association protected by the First Amendment. Instead, this type of association falls squarely within the "business relationships" to which the First Amendment does not apply. Sanitation, 107 F.3d at 996. Plaintiffs cite no authority to the contrary.

The Court concludes that the Amended Complaint does not plausibly allege that Local Law 87 violates Plaintiffs' associational rights under the First Amendment.

**D.    Contracts Clause**

The Amended Complaint alleges that Local Law 87 violates the Contracts Clause. (Am. Cmplt. (Dkt. No. 76) ¶ 166) Defendants contend that the Contracts Clause is not applicable here, because Local Law 87 does not apply to pre-existing contracts. (Def. Br. (Dkt. No. 95) at 32)

**1.    Applicable Law**

The Contracts Clause states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Contracts Clause applies to "any kind of contract," although "not all laws affecting pre-existing contracts violate the Clause." Sveen v. Melin, 584 U.S. 811, 818-19 (2018). "The threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.'" Id. at 819 (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978)). In answering that question, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." Id. (citing Allied Structural Steel, 438 U.S. at 246). "If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular, the Court has asked whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a

significant and legitimate public purpose.'" Id. (quoting Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983)).

"The law has been well settled for almost 200 years[, however,] that the Contract Clause does not 'limit the ability of the government to regulate the terms of future contracts.'" Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York, No. 19-CV-11285 (KMK), 2021 WL 4198332, at *32 (S.D.N.Y. Sept. 14, 2021), aff'd, No. 21-2448, 2024 WL 1061142 (2d Cir. Mar. 12, 2024) (emphasis in original) (quoting Traher v. Republic First Bancorp, Inc., 432 F. Supp. 3d 533, 539 (E.D. Pa. 2020) (citing Ogden v. Saunders, 25 U.S. 213, 6 L. Ed. 606 (1827))).  For this purpose, "[l]aws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein."  2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp., 924 F.2d 1247, 1254 (2d Cir. 1991); see also Hertz Corp. v. City of N.Y., 1 F.3d 121, 132 (2d Cir. 1993) (affirming dismissal of Contracts Clause claim where the law at issue did "not apply to . . . outstanding contracts").

  **2.**  <u>**Analysis**</u>

  Local Law 87 states that it "shall not apply to awards or renewals of city service contracts prior to [the law's] effective date" of November 16, 2021.  N.Y.C. Local Law 87/2021 § 2(a).  Moreover, and as discussed above, the City's February 4, 2022 FAQs advise that Local Law 87 applies to "non-emergency human services contracts . . . or renewals over $100,000 that are signed by both parties on or after November 16, 2021" where (1) "the contractor was not notified in writing of their selection for the award of such contract or renewal prior to November 16, 2021," and (2) "services did not begin (under either the award or renewal . . .) prior to November 16, 2021."  (Kane Decl., Ex. 2 (Feb. 4, 2022 Effective Date FAQs) (Dkt. No. 99-2) at 2)

In sum, Local Law 87 provides on its face that it does not apply to contracts "award[ed] or renew[ed]" prior to its effective date.  And the City's FAQs confirm that the City does not intend to apply the law to pre-existing contracts.  Moreover, the Amended Complaint does not allege any instance in which the City has attempted to enforce Local Law 87 with respect to any particular contract, much less a contract that was entered into prior to November 16, 2021.

Plaintiffs argue, however, that Local Law 87 could be applied retroactively.  In this regard, the Amended Complaint alleges that human services contracts are often "register[ed] with the City Comptroller" well after the contractual start date, and that this step is a "prerequisite for social services providers to be paid."  (Am. Cmplt. (Dkt. No. 76) ¶ 1)  Plaintiffs contend that these circumstances "raise[] [a] serious question about whether a City human services 'contract' is 'made' when signed or when registered."  (Pltf. Opp. (Dkt. No. 100) at 56)

As an initial matter, Plaintiffs' suggestion that a contract's "award" or "renewal" date is the date of registration with the City Comptroller is not consistent with the text of Local Law 87.  The law states that a covered "city service contract" is entered into between a human services organization and a "contracting [City] agency," not the City's Comptroller.  And the Office of the New York City Comptroller is defined separately from "contracting agency" in Local Law 87.  N.Y.C. Admin Code § 6-145(a).  Local Law 87 also refers to an "<u>awarding</u> contracting agency," suggesting that the agency that enters into the contract with the human services contractor is also the party that "awards" the contract.  <u>Id.</u> § 6-145(c)(1) (emphasis added).  In short, nothing in Local Law 87 suggests that the date of a contract's registration with the Comptroller should be treated as the date of the "award" or "renewal."  Nor does the

Amended Complaint allege any instance in which the City has taken such a position with respect to a particular contract.

The Court concludes that the Amended Complaint's allegations regarding the registration of human services contracts with the Comptroller are not sufficient to plausibly allege that Local Law 87 applies to pre-existing contracts.

In arguing that Local Law 87 could be applied retroactively, Plaintiffs also contend that it reaches "'renewals' of pre-existing contracts." (Am. Cmplt. (Dkt. No. 76) ¶ 149) According to Plaintiffs, because "the renewal of a City contract is one-sided," the City "can renew a contract, and a provider must accept the renewal." (Id.) Accordingly, for contracts that were awarded prior to November 16, 2021, but renewed after this date – Local Law 87 applies retroactively. (Pltf. Opp. (Dkt. No. 100) at 59)

The Amended Complaint does not explain, however, how the City would have the authority to automatically renew a contract without the counterparty's consent. Nor does the Amended Complaint allege any instance in which a human services contract awarded prior to November 16, 2021 was renewed by the City without the contractors' consent.

Moreover, the City's February 4, 2022 FAQs indicate that pre-November 16, 2021 contracts will not be automatically renewed:

> [Q:] If my base contract was signed prior to November 16, 2021, the effective date of Local Law 87, and a renewal term scheduled to begin on or after November 16, 2021 is authorized under such contract, will my contract be renewed if I do not agree to include the terms of the [labor peace agreement] Rider in the renewal contract?
>
> [A:] No. Even though the [labor peace agreement] Rider was not included in the base contract, the City may not proceed with the renewal unless the [labor peace agreement] Rider is included in the contract renewal.

(Kane Decl., Ex. 2 (Feb. 4, 2022 Effective Date FAQs) (Dkt. No. 99-2) at 2) Accordingly, for human services contracts awarded prior to November 16, 2021, there will be no renewal unless

the human services contractor consents to a contractual rider addressing the labor peace agreement requirement. A contractor with a pre-November 16, 2021 contract thus faces at renewal the same decision that contractors applying for a post-November 16, 2021 contract face: whether to comply with the labor peace agreement requirement or decline to do business with the City.

Finally, Plaintiffs contend that any action taken by City agencies to enforce Local Law 87 would be "'necessarily legislative'" and therefore capable of independently violating the Contracts Clause. (Pltf. Opp. (Dkt. No. 100) at 58) (quoting Sullivan v. Nassau Cnty. Interim Fin. Auth., 959 F.3d 54, 62 (2d Cir. 2020)) As noted above, however, the Amended Complaint does not allege any instance in which a City agency has taken action to enforce the terms of Local Law 87 with respect to a particular contract. There is therefore no factual basis for this Court to conclude that any such agency enforcement action would be "legislative" under Sullivan.[9]

In sum, Local Law 87 states that it "shall not apply to awards or renewals of city service contracts prior to [the law's effective date]." N.Y.C. Local Law 87/2021 § 2(a). As drafted, the law is clearly capable of being applied in a manner that does not violate the Contracts Clause. Moreover, Plaintiffs have not cited any instance in which Local Law 87 was enforced in a manner that constitutes a violation of the Contracts Clause. Accordingly, the Court concludes that the Amended Complaint does not plausibly allege a violation of the Contracts Clause.

---

[9] Plaintiffs also suggest that Local Law 87 violates the Contracts Clause in that it empowers the Mayor or his designee to promulgate implementing rules and regulations. (Pltf. Opp. (Dkt. No. 100) at 59) No such rules or regulations have been promulgated, however. (Am. Cmplt. (Dkt. No. 76) ¶ 8) Accordingly, it is entirely speculative how rules and regulations not yet promulgated might violate the Contracts Clause.

E.    **Plaintiffs' Remaining Constitutional Claims**

        The Amended Complaint also alleges that Local Law 87 violates the Due Process Clause, the Equal Protection Clause, and the Takings Clause. (Am. Cmplt. (Dkt. No. 76) ¶¶ 155-56, 171)

        In their moving brief, Defendants argue at length that the Amended Complaint fails to state a claim under any of these provisions. (Def. Br. (Dkt. No. 95) at 24-31, 33-34) In their opposition brief, Plaintiffs do not respond to any of Defendants' arguments. (See Pltf. Opp. (Dkt. No. 100))

        Courts may "deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." Lipton v. Cnty. of Orange, NY, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004); see also Romeo & Juliette Laser Hair Removal, Inc. v. Assam I LLC, No. 08-CV-442 (TPG), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage[,] . . . a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

        Here, Plaintiffs have not responded to any of Defendants' arguments related to the Due Process Clause, the Equal Protection Clause, and the Takings Clause, despite filing an opposition brief with more than fifty pages of argument. (See Pltf. Opp. (Dkt. No. 100)) Given these circumstances, Plaintiffs' failure to respond "reflects a decision by [Plaintiffs'] attorn[eys] to pursue some claims . . . and to abandon others." Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014).

        Plaintiffs having abandoned their claims alleging violations of the Due Process Clause, the Equal Protection Clause and the Takings Clause, those claims will be dismissed.

## IV.    PLAINTIFFS' STATE AND LOCAL LAW CLAIMS

The Amended Complaint alleges that Local Law 87 violates "New York State and City law," but does not specify which laws have been violated or the basis for any such violation. (Am. Cmplt. (Dkt. No. 76) ¶ 175)  Given these circumstances, Plaintiffs have failed to provide Defendants with adequate "notice of the state [and local] law claims" they wish to pursue, and have "run[] afoul of federal pleading rules which require that a [p]laintiff's claim for relief contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Cocca-Rau v. Standard Ins. Co., No. 19-CV-06149 (PMH), 2020 WL 4207442, at *9 (S.D.N.Y. July 22, 2020) (quoting Fed. R. Civ. P. 8(a)(2)).  Accordingly, the Amended Complaint fails to plausibly allege a violation of state or local law, and those claims will be dismissed.[10]

---

[10]  In their opposition brief, Plaintiffs suggest that Local Law 87 "violates State procurement laws." (Pltf Opp. (Dkt. No. 100) at 62)  Even if this assertion were sufficient to plead a claim under New York law – which it is not – new allegations set forth in an opposition brief cannot defeat a motion to dismiss.  See Logfret, Inc. v. Gerber Fin., Inc., 559 F. Supp. 3d 348, 361 (S.D.N.Y. 2021) ("[N]ew facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered in deciding a motion to dismiss." (citations and quotation marks omitted)); Ferreira v. N.Y.C. Dep't of Educ., No. 22 Civ. 4993, 2024 WL 308005, at *3 (S.D.N.Y. Jan. 26, 2024) ("'[A]llegations raised for the first time in an opposition brief cannot defeat a motion to dismiss, and such allegations do not automatically amend the complaint.'" (quoting Lee v. Saul, No. 19 Civ. 6553, 2022 WL 873511, at *4 (S.D.N.Y. Mar. 23, 2022))).

## CONCLUSION

For the reasons stated above, Defendants' and Intervenor-Defendant's motions to dismiss the Amended Complaint (Dkt. Nos. 94, 96) are granted. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 94, 96).

Because the Court's rulings turn primarily on matters of statutory interpretation, it appears unlikely that any motion to amend would be productive. Nonetheless, if Plaintiffs wish to move for leave to amend, they will do so by **December 2, 2024**; attach the proposed Second Amended Complaint as an exhibit to their motion; and explain how their new pleading leads to a different result.

Dated: New York, New York
      November 14, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge